## Docket No. 2015-1494

*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

A&J MANUFACTURING, LLC, A&J MANUFACTURING, INC.,

*Appellants*

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION,

*Appellee*

CHAR-BROIL, LLC, OUTDOOR LEISURE PRODUCTS, INC.,

*Intervenors*

OUTDOOR DIRECT CORPORATION,

*Third-Party*

_____

*Appeal from the United States International Trade Commission in Investigation No. 337-TA-895.*

## NON-CONFIDENTIAL BRIEF OF APPELLANTS (CORRECTED)

LANCE D. REICH, ESQ.
HAN SANTOS REICH, PLLC
1411 4th Avenue, Suite 760
Seattle, Washington 98101
(425) 786-9734 Telephone
(425) 374-0921 Facsimile

ROBERT J. CARLSON, ESQ.
LEE & HAYES, PLLC
One Convention Place
701 Pike Street, Suite 1600
Seattle. Washington 98101
(206) 315-4001 Telephone
(206) 315-4004 Facsimile

*Counsel for Appellants A&J Manufacturing, LLC and A&J Manufacturing, Inc.*



PRINTED ON RECYCLED PAPER



## CERTIFICATE OF INTEREST

Counsel for the Appellant certifies the following:

1.　　The full name of every party or amicus represented by me is:

A&J Manufacturing, LLC

A&J Manufacturing, Inc.

2.　　The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.　　All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.　　The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

<u>Han Santos Reich, PLLC</u>

Lance D. Reich, Kevin E. Regan.

<u>Lee & Hayes, PLLC</u>

Robert J. Carlson.

<u>Miller Nash Graham & Dunn, LLP</u>

<u>Adduci Mastriani & Schaumberg, LLP</u>

V. James Adduci, Michael L. Doane, Thomas R. Burns Jr.,

Lauren E. Petersen.


Dated:  January 7, 2016                  Respectfully submitted,

                                         <u>/s/ Lance D. Reich</u>
                                         Lance D. Reich
                                         HAN SANTOS REICH PLLC
                                         Attorney for Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT OF RELATED CASES ................................................. x

STATEMENT OF JURISDICTION.................................................... 1

STATEMENT OF ISSUES ................................................................ 2

STATEMENT OF THE CASE............................................................ 3

STATEMENT OF FACTS .................................................................. 4

    I.    A&J's Multi-Mode Barbecue Grill ........................................ 4

    II.    The '712 Patent ...................................................................... 5

    III.    The 337-TA-895 ITC Investigation...................................... 5

        A.    The Parties Here................................................................ 5

        B.    Initiation of the Investigation......................................... 7

        C.    Rulings on Summary Determination ............................. 7

        D.    The Evidentiary Hearing.................................................. 9

        E.    The ALJ's Final Initial Determination.......................... 9

        F.    The Commission's Determination ................................ 11

SUMMARY OF ARGUMENT ........................................................ 12

INTRODUCTION ............................................................................ 14

STANDARD OF REVIEW .............................................................. 15

ARGUMENT ................................................................................... 17

    I.    The ITC Erred by Construing "Openable Cover" (Claims 1
        and 17) to Exclude Grills that have Exhausts on the Stationary
        Part of a Two-part Grill Cover ........................................... 17

        A.    The Claim Term "Openable [] Cover" Should Be
            Interpreted to Have its Ordinary Meaning................. 19

            1.    The Ordinary Meaning of "Openable [] Cover"
                Includes Two-Piece Structures ..................................... 19

2. A Broad Interpretation of "Cover" to Include Two–Part Covers is Consistent with the Specification ....................................................21

3. Prior art before the USPTO supports the interpretation of "cover" to include two-piece grill covers...................22

  a) Sarten....................................................22

  b) Beller ....................................................23

  c) Hathorn..................................................24

B. The August 25, 2011 Amendments Were Not Narrowing Amendments to Give Rise to Amendment-Based Prosecution Estoppel....................................................26

1. Legal Standard ............................................26

2. The Prosecution History does not Include a Narrowing Amendment Disclaiming Stationary Portions of a Grill Cover ................................27

C. There was Not an Argument-Based Prosecution History Estoppel....................................................29

1. Argument-Based Prosecution History Estoppel Requires an Explicit and Unequivocal Surrender of Subject Matter ........................................30

2. The Single Sentence in Applicant's September 4, 2012 Appeal Brief does Not Give Rise to A Clear and Unmistakable Surrender of Subject Matter .............31

D. This Court should Remand This Case for the ITC to Determine Whether the Non-Infringing Grills Actually Infringe the '712 Patent Under a Proper Claim Construction ....................................................36

II. The Commission Erred by Construing "Openable [] Cover Means" (Claim 10) to Exclude Grills that have Exhausts on the Stationary Part of a Two-Part Grill Cover ................................37

A. The Separate Argument for the Patentability of Claim 1 in the Appeal Brief Cannot Be Used to Find an Estoppel of Claim 10....................................................38

1.      The ITC Erroneously Found that Prosecution
        History Estoppel from Arguments Regarding
        Claim 1 Also Applied to Claim 10 ................................ 39

2.      Federal Regulations Dictate the Structure of
        Appeal Briefs and How the USPTO Analyzes
        Arguments in the Briefs .............................................. 40

3.      In the USPTO Appeal Brief, A&J Unambiguously
        Elected to Argue the Patentability of Claim 1 and
        Claim 10 Separately ...................................................... 42

4.      As a Matter of Law, the USPTO Considered the
        Arguments Supporting Patentability of Claims 1
        and 10 Separately ............................................................ 45

B.   The Construction of "Openable [] Cover Means" should
     be construed to include both the non-moving and moving
     portions of two-part covers ...................................... 48

     1.      The August 25, 2011 Amendment is Not
             Narrowing ......................................................... 49

     2.      There Must be an Explicit Disclaimer of
             Equivalent Structures to the Openable Cover
             Means in the Prosecution History ................... 49

     3.      The Argument in the Appeal Brief is Completely
             Irrelevant to Structural Equivalency, and Is Too
             Ambiguous to Create an Estoppel ................... 52

C.   The ITC Erred in Failing to Consider the Structure of
     the Firebox in the '712 Specification as an "Openable
     Cover Means" .......................................................... 53

     1.      Two Structures are Shown in the '712 Patent that
             are "Selectively Covering the Grill" ............... 53

     2.      The Argument on the Inclusion of the Firebox Lid
             Was Timely ...................................................... 55

     3.      The Firebox Lid is Relevant to Claim 10 to
             Interpret the Terms "Fixed Portions" ............. 57

III.    The Factual Determination of Non-Infringement for the
        Char-Broil 463724512 Grill Was Not Supported By Substantial
        Evidence ................................................................................59

        A.    The Dissenting Commissioner is Correct ................................60

        B.    The Evidence Supports a Finding of Infringement Under
              Any Construction of "Openable Cover" or "Openable []
              Cover Means" ........................................................61

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................63

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

## CONFIDENTIAL MATERIALS OMITTED

The materials omitted from this addendum reflect information designated confidential under the USITC's protective order that principally relate to confidential financial and operational data of the parties.

# TABLE OF AUTHORITIES

## CASES

*Alpex Computer Corp. v. Nintendo Co.,*
    102 F.3d 1214 (Fed. Circ. 1996) .................................................................50

*Amkor Techs., Inc. v. International Trade Comm'n*,
    692 F.3d 1250 (Fed. Cir. 2012) ...................................................................15

*Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.,*
    179 F.3d 1279 (11th Cir. 1999) ...................................................................51

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012) ...................................................................19

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    296 F.3d 1106 (Fed. Cir. 2002) ...................................................................53

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,*
    460 F.3d 1349 (Fed. Cir. 2006) ...................................................................30

*Cybor Corp. v. FAS Techs.*, Inc.,
    138 F.3d 1448 (Fed. Cir. 1998) (*en banc*) ..................................................47

*EcoLab, Inc. v. FMC Corp.*,
    569 F.3d 1335 (Fed. Cir. 2009) ...................................................................30

*Funai Elec. Co. Ltd. v. Daiwoo Electronics Corp.*,
    616 F.3d 1357 (2010) ...................................................................................58

*In re McDaniel,*
    293 F.3d 1379 (Fed. Cir. 2002) ............................................................42, 46

*In re Van Geuns*,
    988 F.2d 1181 (Fed. Cir. 1993) ...................................................................43

*In re Watts*,
    354 F.3d 1362 (Fed. Cir. 2004) ...................................................................43

*J&M Corp. v. Harley Davidson, Inc.,*
    269 F.3d 1360 (Fed. Cir. 2001) ...................................................................50

*Lelo Inc. v. Int'l Trade Comm'n*,
    786 F.3d 879 (Fed. Cir. 2015) .....................................................................15

*Linear Tech. Corp. v. International Trade Comm'n*,
   566 F.3d 1049 (Fed. Cir. 2009) ...................................................26

*Lockwood v. American Airlines, Inc.*,
   107 F.3d 1565 (Fed. Cir. 1997) ...................................................58

*Metro. Edison Co. v. NLRB*,
   460 U.S. 693 (1983)..................................................................51

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
   194 F.3d 1250 (Fed. Cir. 1999) ...................................................53

*Molins PLC v. Textron, Inc.*,
   48 F.3d 1172 (Fed. Cir. 1995) .....................................................46

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ...................................................16

*Norgen Inc. v. International Trade Comm'n*,
   699 F.3d 1317 (Fed. Cir. 2012) ...................................................63

*Northern Telecom Ltd. v. Samsung Electronics Company*,
   215 F.3d 1281 (Fed. Cir. 2000) ...................................................52

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ..................................5, 30, 49, 52

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ...............................19, 20, 22, 29

*Rexnord Corp. v. Laitram Corp.*,
   274 F.3d 1336 (Fed. Cir. 2001) ...................................................52

*Rite–Hite Corp. v. Kelley Co., Inc.*,
   819 F.2d 1120 (Fed. Cir. 1987) ...................................................45

*Schwing GmbH v. Putzmeister Aktiengesellschaft*,
   305 F.3d 1318 (Fed. Cir. 2002) ...................................................47

*Signtech Usa Ltd. v. Vutek Inc.*,
   174 F.3d 1352 (Fed. Cir. 1999) ...................................................50

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ...................................................27

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015) ...................................................47

*Univ. of Minn. v. AGA Medical Corp.*,
    717 F.3d 929 (Fed. Cir. 2013) ......................................................49

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
    392 F.3d 1325 (Fed. Cir. 2004) ....................................................54

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ....................................................16

**REGULATIONS**

37 C.F.R. § 41.37 (2013) ....................................................40, 41, 43, 46

77 Fed. Reg. 48612-01 (Aug. 14, 2012) ...................................................44

78 Fed. Reg. 59373 (Sept. 26, 2013) ......................................................7

**STATUTES**

5 U.S.C. § 706 ...........................................................................15

19 U.S.C. § 1337 .............................................................1, 3, 7, 14, 15

28 U.S.C. § 1295 ..........................................................................1

35 U.S.C. § 112 .............................................................5, 16, 50, 56

**OTHER AUTHORITIES**

Manual of Patent Examining Procedure (MPEP) § 1205.2 ........................41, 42, 46

## STATEMENT OF RELATED CASES

This appeal is related to United States International Trade Commission Investigation No. 337-TA-895.

This appeal is also related to the following cases pending in federal district court: *Char-Broil, LLC, v. A&J Manufacturing, LLC*, S.D. GA, No. 2:13-cv-00140-LGW-JEG; *A&J Manufacturing, LLC v. Academy, LTD et al.*, S.D. GA, No. 2:13-cv-00113-LGW-JEG; *A&J Manufacturing v. The Brinkmann Corporation*, S.D. GA, No. 2:13-cv-00114-LGW-JEG; *A&J Manufacturing v. W.C. Bradley. Co. et al.*, S.D. GA, No. 2:13-cv-00115-LGW-JEG; *A&J Manufacturing v. GHP Group, INC. et al.*, S.D. GA, No. 2:13-cv-00116-LGW-JEG; *A&J Manufacturing v. HEB Grocery, LP. et al.*, S.D. GA, No. 2:13-cv-00117-LGW-JEG; *A&J Manufacturing v. Kamado Joe Company and Wuxi Joyray Int'l, Corp.*, S.D. GA, No. 2:13-cv-00118-LGW-JEG; *A&J Manufacturing v. Outdoor Leisure Products, Inc. et al.*, S.D. GA, No. 2:13-cv-00120- LGW-JEG; *A&J Manufacturing v. Rankam Group*, S.D. GA, No. 2:13-cv-00121-LGW-JEG; *A&J Manufacturing v. Sears Holdings Corp. et al.*, S.D. GA, No. 2:13-cv-00119-LGW-JEG; *A&J Manufacturing v. Tractor Supply Company. et al.*, S.D. GA, No. 2:13-cv-00122-LGWJEG; *Academy, Ltd. v. A&J Manufacturing LLC*, S.D. GA No. 2:14-cv-00172-LGW-RSB; and *A&J Manufacturing v. FerrellGas, L.P. and Blue Rhino Global Sourcing, Inc.*, S.D. GA, No. 2:15-cv-28-LGW-RSB.

## STATEMENT OF JURISDICTION

A&J appeals the ITC's February 3, 2015 Opinion and Limited Exclusion Order ("LEO"), the ALJ's Order No. 33 granting summary determination in part against A&J, and the ITC Order affirming in part and reversing in part that decision, all of which are final determinations of the ITC under 19 U.S.C. § 1337 on February 3, 2015. JA61-64; JA3914-41. This Court has appellate jurisdiction under 19 U.S.C. § 1337(c); *see also* 28 U.S.C. § 1295(a)(6).  A&J timely filed its petition for review on March 24, 2015.  *See* 19 U.S.C. § 1337(c). This Court has jurisdiction under 28 U.S.C. § 1295(a)(6).

## STATEMENT OF ISSUES

I.   Did the ITC commit an error of law by narrowly construing the term "openable [] cover" in claims 1 and 17 to exclude as infringing grills that have exhausts on the stationary part of a two-part grill cover?

II.  Did the ITC commit an error of law by narrowly construing means-plus-function claim 10 to exclude as infringing grills that have exhausts on the stationary part of a two-part grill cover?

III. Did the ITC err by finding that the Char-Broil Model No. 463724512 barbecue grill cover was non-infringing because it did not have an "exhaust" as required by the claims of the '712 patent, even though its cover contains an exhaust that moves with opening and closing of the cover?

## STATEMENT OF THE CASE

The ITC found a violation of 19 U.S.C. § 1337 by respondents (and intervenors here), ODC, OLP, and Academy and their respective foreign grill manufacturers. The ITC issued a Limited Exclusion Order and Cease and Desist Orders directed to the respondents and terminated the investigation. JA6593; JA6589. Based on its claim construction, the ITC held that certain other accused grills did not infringe A&J's patent rights. A&J seeks review of the ITC's claim construction as to the term "openable [] cover" in Claims 1 and 17 and the term "openable [] cover means" in Claim 10.

## STATEMENT OF FACTS

### I.    A&J's Multi-Mode Barbecue Grill

A&J makes dual cooking mode outdoor grills, such as the Char-Griller Duo™.
The Duo features both a gas grill and a charcoal grill on the same support structure.
JA373.  The gas and charcoal grills may be used simultaneously, but independently,
as each has its own openable cover enclosing the cooking space above each
respective grate, and each cooking space is vented by an exhaust.  The Duo and
A&J's other dual cooking mode grills are protected by U.S. Patent No. 8,381,712,
"Simultaneous Multiple Cooking Mode Barbecue Grill." JA370-378.

Since A&J introduced the Duo, numerous competitors have imitated the Duo
and sold grills having a gas grill and a charcoal grill on the same support structure.
A&J commenced an ITC § 1337 Investigation to halt further imports of these
infringing products.

The ALJ found, and the full Commission affirmed, that A&J satisfied the
domestic industry requirement, that the '712 patent was not invalid in view of prior
art relied upon by Respondents there, and that the majority of the accused products
infringed one or more claims of the '712 patent. JA7.

## II.    The '712 Patent

The '712 patent has 20 claims with three being independent, Claims 1, 10, and 17. JA377-378.    Claims 1 and 17, and their dependent claims 2-9 and 18-20, respectively, are not written in a means-plus-function format.    Claim 10 and its dependent claims 11-16 are means-plus-function claims as authorized by 35 U.S.C. § 112(f). JA1715.    The Opinion dated June 27, 2014 confirmed that the "openable []  cover means" limitations in Claim 10 and its dependent claims "are mean-plus-function limitations."   JA3915.    Because means-plus-function claims are construed differently than conventional patent claims, the construction for claims 10-16 is different than that for the other claims. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003).

## III.    The 337-TA-895 ITC Investigation

### A.    The Parties Here

Appellant A&J Manufacturing, LLC is a Georgia corporation whose business involves the design, development, manufacture, distribution and sale of barbecue smokers, grills, and accessories sold under the "Char-Griller®" trademark, and Appellant A&J Manufacturing, Inc. is a Florida corporation that is an affiliated company under common ownership and management with A&J, LLC, and is generally responsible for sales and distribution of Char-Griller® products.

Intervenor ODC (formerly the Brinkmann Corporation) is a Texas-based manufacturer and seller of outdoor cookers, smokers. JA5693. ODC is currently in bankruptcy proceedings.

Intervenor Outdoor Leisure Products (OLP) is a Missouri corporation that supplies grills, smokers, and related products to the North American retail marketplace under the trademark Smoke Hollow™. JA5693; JA5696. Kingsun is a company organized under the laws of the People's Republic of China and is a manufacturer of outdoor cooking grills and parts thereof sold by OLP. JA5694.

Intervenor Char-Broil is a Georgia corporation that sells Char-Broil® branded grills in the United States, and also manages and manufactures a portfolio of outdoor cooking brands including Oklahoma Joe®, New Braunfels Smoker Company®, and Thermos®. JA5694, JA5696. Fudeer is a company organized under the laws of the People's Republic of China and is engaged in the development and manufacture of barbecue grills, outdoor electric grills, outdoor gas grills, charcoal grills, including the accused products sold by Char-Broil. JA5694.

Academy is a Texas corporation that designs, manufactures and sells barbeque grills. JA5693. Huige is a company organized under the laws of the People's Republic of China and is a manufacturer of barbecue grills, smokers, fire pits, and manufactures certain Accused Products sold by Academy. JA5700.

6

## B.    Initiation of the Investigation

The ITC instituted its investigation on September 26, 2013, based on a Complaint filed by A&J.  78 Fed. Reg. 59373 (Sept. 26, 2013).  The complaint, as amended, alleged violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the sale for importation, importation, or sale within the United States after importation of certain multiple mode outdoor grills and parts thereof by reason of infringement of claims 1-20 of the '712 patent.[1]  The ITC's notice of investigation, as amended, named numerous respondents.  Relevant to this Appeal, the respondents that remained in the investigation included Brinkmann, OLP, Kingsun, Academy, Huige, Char-Broil, and Fudeer (collectively "the Remaining Respondents").  The Office of Unfair Import Investigations (OUII) was also a party to this investigation.

## C.    Rulings on Summary Determination

On March 5, 2014, respondents Char-Broil, Fudeer, OLP, Kingsun, TSC, and Chant filed a motion for summary determination of non-infringement.  JA500-555.  On March 24, 2014, A&J opposed the motion, and the OUII filed a response in

---

[1] The Amended Complaint also asserted infringement of two related design patents, U.S. Patent Nos. D660,646 and D662,773, but these allegations which were later voluntarily dismissed from the investigation. JA65.

partial support of the motion.  On April 17, 2014, the ALJ granted the motion in part. Order No. 33.  JA1850.

The ALJ construed the term "openable [] cover" to mean "a cover that excludes any portion of the grill enclosure that is not openable (i.e. fixed)." JA1853. The ALJ found that the applicant had disclaimed any construction of the term "openable [] cover" that included non-openable/fixed portions of the grill as a result of the claim amendments made on August 25, 2011.  JA1856-57.  The ALJ also found that the A&J's argument in its appeal brief to the USPTO's Board of Patent Appeal and Interferences ("BPAI") showed that the applicant did not regard the fixed portion of the grill enclosure as "openable."  JA1855.

On June 27, 2014, after briefing by the parties, the Commission affirmed-in-part and vacated-in-part Order No. 33. JA3914.  The Commission adopted the ALJ's construction of the term "openable [] cover," stating: "The ALJ determined that the plain language of the disputed claim term 'openable [ ] cover' requires that the cover be openable, and that in view of the prosecution history of the '712 patent, the 'openable [ ] cover' limitations cannot be met by grills having exhausts on fixed portions of the grill."  JA3919.  The Commission also determined that the term "openable [] cover means" in claim 10 is a means-plus-function limitation and vacated the ALJ's grant of summary determination as to that claim because the ALJ had not construed it as a means-plus function limitation.  JA3926.  The Commission

8

found that the claimed function was "selectively covering the [] grill," and instructed the ALJ to identify structures in the specification that performed the claimed function.  JA3927-928.

The Commission also affirmed, based on the ALJ's construction of "openable [] cover," that seven accused grills did not infringe the '712 Patent.  JA3934-938.

### D.    The Evidentiary Hearing

An evidentiary hearing was held in the investigation from July 15-18, 2014. JA5698.  Brinkmann, OLP, Kingsun, Char-Broil, Fudeer, Academy, and Huige appeared as Respondents there.

### E.    The ALJ's Final Initial Determination

The ALJ issued a Final Initial Determination (FID) on September 26, 2014. JA5580-689.  Relevant to this appeal, that decision made findings of prosecution history estoppel as to the construction of claim 10 of the '712 patent, JA5622-624, and found that certain grills did not infringe the '712 patent. JA5637-39 (finding non-infringement of the Char-Broil grills) and JA5641 (finding non-infringement of the Outdoor Leisure Product Redesigned Grills).  On October 14, 2014, A&J filed a petition for review by the Commission of the FID. JA5835-892.  A&J's petition sought review of legal and factual conclusions of the ALJ, including issues related to patent prosecution history estoppel for claim 10 of the '712 patent and determinations of whether certain grills infringed claim 10. See JA5850-857

(arguing that the ALJ's finding of patent prosecution history estoppel for claim 1 should not be used to find an estoppel of claim 10) and JA5873-882 (arguing that the ALJ's error construing claim 10 led to erroneous finding of non-infringement as to several grills). On December 2, 2014, the Commission issued a notice of its determination to review in-part the FID. Exhibit 3. JA6269-276.   That notice identified nine issues for which the Commission requested briefing from the parties, including issues related to the construction of "openable [] cover" means. JA6271-272.

The FID also found a violation of section 337 as to Brinkmann, OLP, Kingsun, Academy, and Huige based upon the ALJ's determinations: (1) that certain, but not all, accused products infringe at least one claim of the '712 patent; (2) that the domestic industry requirement has been satisfied; and (3) that the asserted claims of the '712 patent have not been shown by clear and convincing evidence to be invalid. JA5580. The ALJ also found that the following products do not infringe any asserted claim of the '712 patent: (1) Char-Broil/Fudeer Model Nos. 463724512, 12201767, 463724514, and 14201767 (collectively, "the Char-Broil/Fudeer Grills"); (2) the OLP/Kingsun Redesigned Grills; and (3)   GHP's   Dyna-Glo Model Nos. DGJ810CSB-D and DGB730SNB-D (collectively, "the GHP Grills").   JA5637; JA5639; JA5644.  Thus, the FID found no violation as to Respondents Char-Broil, Fudeer, and GHP. JA5580; JA5683.  See JA5637-639; 5643-644.

10

On October 9, 2014, the ALJ issued his recommended determination ("RD") on remedy and bonding. JA5800.  On October 14,  2014, A&J filed a petition for review of: (1) the FID 's interpretation of  the scope of claim 10 of the '712 patent; (2) the FID 's finding that the accused Char-Broil/Fudeer Grills and the OLP/Kingsun Redesigned Grills do not satisfy the "openable [] cover means" limitations of claim 10 of the '712  patent; and (3) the FID 's finding that the Char-Broil 463724512 grill  and  GHP 's DGB730SNB-D grill do not satisfy the claim limitation that the first cover "includes at least one exhaust" in claims 1, 10, and 17 of  the '712  patent. JA5835-892.  Respondents each filed a response to the petitions on October 22, 2014. JA6119-268.

### F.    The Commission's Determination

The full Commission issued a Final Determination on February 3, 2015. JA1-64.   The Commission declined to review the ALJ's construction of claim 10. JA6269-276.   The Commission affirmed the ALJ's finding that accused grills of Brinkmann, OLP, and Academy infringed claims of the '712 patent, JA2, and likewise affirmed that the Char-Broil 463724512 grill did not infringe. JA30-34.

## SUMMARY OF ARGUMENT

I.     The ITC committed an error of law by narrowly construing the term "openable [] cover" in claims 1 and 17 to exclude grills that have exhausts on a stationary part of a two-part grill cover.  Once that term is properly construed, grills that include covers with both stationary and moving parts should be found to infringe at least claims 1 and 17 of the '712 patent.

II.     The ITC committed an error of law by narrowly construing means-plus-function claim 10 to exclude grills that have exhausts on a stationary part of a two-part grill cover. The ALJ conflated the argument made in the appeal brief at the United States Patent and Trademark Office (USPTO) as to the patentability of claim 1 with the separate argument as to the patentability of claim 10.  Further, the ITC ignored the heightened standard to find argument-based prosecution history estoppel in the context of means-plus-function patent claims.  Finally, the ALJ incorrectly failed to consider a second structure expressly shown in the specification of the '712 patent that "selectively covers the grill means"—the firebox—that demonstrates that two-part grill covers are structures for an "openable [] cover means."  Once the term and corresponding structures are properly construed, grills containing two-part covers with stationary and moving components should be found to infringe claim 10 of the '712 patent.

III.    The full ITC erred by finding that the Char-Broil Model No. 463724512 barbecue grill cover did not have an "exhaust" as required by the claims of the '712 patent, even though its cover includes an exhaust that moves with opening and closing of the cover.  A dissenting Commissioner correctly found that the evidence shows that the Char-Broil 463724512 grill cover includes an exhaust that "moves" with the cover of the grill. JA34 n.12.  It was factual error for the majority of the Commission to find that the Char-Broil grill does not infringe any claims of the '712 patent.

# INTRODUCTION

A&J Manufacturing, LLC and A&J Manufacturing, Inc. (collectively "A&J") makes outdoor barbecue grills under the Char-Griller® name and created an entirely new product line in this iconic American industry. A&J's top-selling product, the Duo™, is a highly successful dual cooking mode outdoor grill that features both a gas grill and a charcoal grill on the same support structure. The gas and charcoal grills may be used simultaneously, but independently, as each has its own openable cover enclosing the cooking space above each respective cooking grate. The Duo and A&J's other dual cooking mode grills are protected by U.S. Patent No. 8,381,712, for a "Simultaneous Multiple Cooking Mode Barbecue Grill."

In the years since A&J introduced its Duo, numerous competitors have introduced grills virtually identical to A&J's patented grill, selling a simultaneously operable gas grill and a charcoal grill on the same support structure. A&J commenced a United States International Trade Commission (ITC) Investigation pursuant to 19 U.S.C. § 1337 to halt further imports of these infringing products.

The ITC found that A&J satisfied the domestic industry requirement, that the '712 patent was not invalid in view of prior art, and that the vast majority of Respondents' accused products infringed one or more claims of the '712 patent. However, the ITC allowed some of the accused grills to escape by narrowly construing terms for two separate sets of patent claim elements: (1) "openable []

14

cover" in Claims 1 and 17, and (2) "openable [] cover means" for Claim 10.  A&J seeks reversal of the ITC's claim constructions for claims 1, 10, and 17, and requests that this Court remand this action to the ITC for further findings of infringement under the proper claim construction.

The ITC also incorrectly found that one particular grill, the Char-Broil 463724512, did not infringe the '712 patent solely because its "openable cover" did not include an exhaust.  This finding was not supported by substantial evidence because, even under the current construction of the claims, the Char-Broil grill cover includes an exhaust that moves with the cover, and the grill therefore infringes the '712 patent.

## STANDARD OF REVIEW

Under 19 U.S.C. § 1337(c), this Court reviews ITC Final Determinations in accordance with the Administrative Procedure Act (APA), setting aside conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).  *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 883 (Fed. Cir. 2015).  This Court otherwise "reviews the Commission's legal determinations de novo and factual determinations for substantial evidence." *Amkor Techs., Inc. v. International Trade Comm'n*, 692 F.3d 1250, 1254 (Fed. Cir. 2012).

"Regarding questions of claim construction, including whether claim language invokes 35 U.S.C. § 112, para. 6, the district court's determinations based on evidence intrinsic to the patent as well as its ultimate interpretations of the patent claims are legal questions that [the Court] review[s] de novo." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015). "To the extent the district court, in construing the claims, makes underlying findings of fact based on extrinsic evidence, [the Court will] review such findings of fact for clear error." *Id*. Thus, the Court will review de novo questions of claim construction of the '712 patent, including whether claim 10 invokes 35 U.S.C. § 112 (f), based upon intrinsic evidence to the patent, and will review claim construction made upon underlying findings of fact based on extrinsic evidence to the '712 patent for clear error.

In applying the substantial evidence standard, "[a] reviewing court must consider the record as a whole, including that which fairly detracts from its weight, to determine whether there exists such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citations and internal quotation marks omitted).

# ARGUMENT

I.    **The ITC Erred by Construing "Openable Cover" (Claims 1 and 17) to Exclude Grills that have Exhausts on the Stationary Part of a Two-part Grill Cover**

The ITC erred by narrowly construing the term "openable [] cover" in independent claims 1 and 17 of the '712 patent to exclude grills that have exhausts on the stationary part of a two-part grill cover.  Claims 1 and 17 both require that a grill have an "openable first cover" that "includes at least one exhaust" and an "openable second cover" that "includes at least one exhaust." JA377-378.   The Commission and ALJ both erroneously rejected A&J's arguments that the term "openable [] cover" does not require construction, and if it does, the term should be construed to include parts of the grill cover that are stationary, as well as the parts of the cover that move.  The ALJ found that "the disputed term 'openable [] cover' should be construed to mean a cover that excludes any portion of the grill enclosure that is not openable (*i.e.*, fixed)."  JA1853.  The ALJ further explained: "Here, the claimed 'openable cover' does not include fixed portions of a grill enclosure.  The recited exhausts must be located on the 'openable' portion of the grill." JA1856. The Commission adopted the ALJ's construction of "openable [] cover," (JA3925) and noted: "We agree with the ALJ that the applicant's statements and claim amendments constitute a clear and unmistakable disclaimer of any construction of the term "openable [] cover" that includes portions of the grill enclosure that are not

fixed." JA3924. This construction excluded grills containing exhausts on stationary, non-moving portions of grill covers.

The Commission and the ALJ both cited the legal doctrine of claim amendment prosecution estoppel as one basis for their construction of "openable [] cover." JA3923-924; JA1856. Both pointed to A&J's August 25, 2011 claim amendments during prosecution as the basis for finding a disclaimer of grills containing exhausts on the stationary portions of a grill enclosure. JA3923-924; JA1856. Notwithstanding their purported reliance on the doctrine of amendment-based estoppel, both the full Commission and the ALJ based their legal conclusions on arguments made in an appeal brief filed by the patent applicant during prosecution. JA3924; JA1855. Out of a voluminous, 437-page prosecution history, the ALJ and Commission focused on <u>one single sentence</u> in an appeal brief that explained why the Patent Examiner's proposed combination of two references cited against the patent application was not workable. The explanation in the appeal brief was not addressing A&J's invention, it was referencing the prior art cited by the Examiner. Based on the erroneous reliance on that sentence, the ALJ narrowly construed "openable [] cover" to exclude grills that had exhausts on a stationary portion of the cover. In turn, the full Commission incorrectly granted summary determination of non-infringement and excluded seven accused grills from the investigation.

18

The ITC's construction of "openable [] cover" was erroneous as a matter of law because, firstly, the term should be given its ordinary meaning and needs no construction. The plain language of the claims includes grills with openable two-part covers that have exhausts on movable and stationary parts of the cover. Secondly, the ITC erroneously found that the August 25, 2011 claim amendments gave rise to "amendment-based" estoppel, yet there was no explicit disclaimer of the stationary portions of openable covers. Thirdly, under the correct legal standard for argument-based prosecution history estoppel, the statement in the appeal brief did not constitute a clear and unequivocal waiver of scope, and any ambiguity of disclaimer cuts in favor of A&J.

## A.    The Claim Term "Openable [] Cover" Should Be Interpreted to Have its Ordinary Meaning

All intrinsic evidence shows that the Commission erred in arriving at its narrow construction of the "openable [] cover" and excluding from infringement grills that have exhausts on the stationary part of a two-part grill cover.

### 1.    The Ordinary Meaning of "Openable [] Cover" Includes Two-Piece Structures

Claim construction process begins with the language of the claims. *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)). A bedrock principle of claim construction is that a claim term is given its ordinary and customary meaning, that

is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1312-13.   Where the ordinary meaning of the claim term is readily apparent to lay readers, "claim construction…involves little more than the application of the widely accepted meaning of commonly understood words." *Id*. at 1314.   Here, the terms "openable [] cover" are commonly understood English words with meanings apparent to lay readers, and claim construction requires no more than application of their widely accepted meaning.  *Phillips*, 415 F.3d at 1314.

Claim interpretation should only begin from the understanding of a person of skill in the art if the term is truly ambiguous. It is agreed between the parties that the field of art relevant to the claims of the '712 patent is industrial design and the design of barbeque grills, as all experts testified to at the Evidentiary Hearing.  *See* JA9740-741 (Q/A 12); JA9673- 674 (Q/A 10).  The skilled artisan understands "cover" here to have its common mechanical meaning: a structure that "selectively covers the…grill," means a structure above the plane of the first or second grill that covers or encloses the grill. JA1641.  The skilled artisan would not limit the claim term "cover" or "openable… cover" in the '712 patent to describe only a unitary or one-piece structure.

20

Rather, the skilled artisan would be familiar with two-piece cover designs, and would interpret the term "openable… cover" broadly to include a structure composed of both stationary and moving pieces, and thus include the stationary portions of a grill enclosure in the meaning of "openable [] cover." JA1641. The plain meaning of the "openable" limitation in this context simply means that at least some portion of the cover can be opened to permit access to the grill.

### 2.     A Broad Interpretation of "Cover" to Include Two–Part Covers is Consistent with the Specification

The '712 patent specification repeatedly makes it clear that the disclosed embodiments are exemplary embodiments of multiple cooking mode grills. See JA376 '712 Patent column 2, lines 2, 22, 53 and 66; column 3, lines 17, 23, 24, 41 and 55; column 4, lines 13, 21 and 47. JA376- JA77. The specification teaches that each component of the multiple mode grill can be modified in ways known in the art to obtain cooking performance comparable to the corresponding single-mode grills, col. 3, line 62 – col. 4, line 2. JA376- JA77. The specification instructs that the exemplary embodiments described "can have various shapes, sizes and configurations (e.g., other than those discussed above)" and that the functions of components described in the specification "are not limited to those described above with respect to the exemplary embodiments." Col. 4, lines 16-21. JA377. It is clear that the specification does not require "cover" to be the unitary, semi-cylindrical

structure of the preferred embodiment, and supports a broad interpretation of "openable [] cover" to include grill covers that may include stationary portions.

### 3.    Prior art before the USPTO supports the interpretation of "cover" to include two-piece grill covers

Prior art references before the Examiner during prosecution of the '712 patent show numerous examples of a two-part cover design for barbecue grills, with one part of the cover remaining stationary while a second part moves to allow access to the grill.  These prior art references are part of the prosecution history and show how the Examiner and inventor understood the claim terms. *See Phillips*, 415 F.3d at 1317.  The references show that an exhaust located on a stationary portion of a multi-component "openable [] cover" satisfy the limitations of Claims 1 and 17.

### a)    Sarten

One example of prior art before the USPTO during the prosecution of the '712 patent is U.S. patent No. 5,070,857, issued to Sarten in 1991, JA1788-98. Sarten discloses a portable food preparation apparatus "that may be used as a charcoal or gas grill…" col. 1, line 9; "the cabinet also includes structure for selectively mounting a charcoal pan or a gas burner assembly," JA1793; JA1609. The structure Sarten describes as "hood 108" is a two-piece cover assembly wherein the rear quarter cylinder remains stationary while the front quarter cylinder rotates inside the

rear's diameter to open the cover and provide access to the grill beneath, as shown

in FIG. 2A, below. JA1790.



The Sarten reference uses a single reference numeral 108 to describe both the

stationary (i.e. fixed) and moving parts of "hood 108," and discusses the two-piece

structure as a single part, the hood, JA1790. Sarten teaches that this form of two-part

structure is "known in the art." Col. 8, lines 12-20. JA1796.

> b)    **Beller**

Another prior art reference before the USPTO during prosecution is U.S.

Patent No. 5,195,423, issued in 1993 to Beller, JA1800-808. Beller discloses a

smoker assembly with a side firebox where "[t]he cover is hinged and consists of a

central piano hinge, which divides the cover lid into two openable halves and allows

access to the food racks from the top front or top rear of the assembly." Abstract,

JA1800. Thus, the cover lid 72 is openable at either side to provide two ways to gain access to the smoking chamber 74." JA1806, col. 4, lines 27-31. Figure 1 of Beller (JA1801):



Beller is another example of prior art in the prosecution history describing a "cover" as a unit formed of two discrete halves, wherein one half remains stationary while the other is opened to permit access to the grill space being covered.  Beller teaches that both halves together make up the whole "cover."

### c)    Hathorn

Another prior art reference before the USPTO during prosecution is U.S. Patent No. 2,902,026 issued to Hathorn in 1959, JA1810-20. Hathorn discloses portable barbecue pits with a smoker housing 9 having "a hood section 54 rigid or integral with the bottom section and extending the length of the housing …", as well as a door 52; JA1813, col. 3, lines 6-7.  Hathorn teaches that housing 9 has a "major body portion 50 [that] includes a bottom section 53," col. 3, lines 4-5, JA1813.

24

Figures 1 and 3 from Hathorn shows the overall housing 9, composed of bottom section 53 and hood section 54, plus door 52 (JA1810).



Hood section 54 and door 52 together comprise the grill hood.

Hathorn teaches that a grill hood may be integral with a grill's bottom section, and be furnished with a door to permit access to the covered area within. Thus, prior art shows that the ordinary meaning of "openable [] cover" includes two-part grill covers. One of skill in the art would understand that Claims 1 and 17 do not require that the exhaust be included only on the part of the cover that moves.

**B.    The August 25, 2011 Amendments Were Not Narrowing Amendments to Give Rise to Amendment-Based Prosecution Estoppel**

To the extent that construction of the term "openable [] cover" requires construction, the ITC erred by reaching a narrow and unworkable construction of that term. The ITC found that the applicant's August 25, 2011 claim amendments constituted a clear and unmistakable disclaimer of any construction of the term "openable [] cover" that includes portions of the grill enclosure that are not "fixed." JA3924; JA1854. The ALJ specifically found that "A&J's narrowing amendment made on August 25, 2011 gives rise to 'claim amendment estoppel.'" JA1856 (emphasis added). Yet, a review of the August 25, 2011 amendments shows that the amendments did not make such a surrender of scope.

**1.    Legal Standard**

Prosecution history estoppel arises when an applicant cancels, amends, or adds claims in order to secure issuance of a patent. 5A-18 Chisum on Patents § 18.05. An estoppel does not arise where the applicant amends a claim for purposes of clarity without substantially changing its meaning. *Id*. The 2011 amendments to the claim language here did not narrow or alter the scope of claims 1 and 17.

This Court has repeatedly emphasized that a claim's scope should not be restricted absent a clear disclaimer. *See Linear Tech. Corp. v. International Trade Comm'n*, 566 F.3d 1049, 1057-58 (Fed. Cir. 2009) (adopting a broad construction

because there was no "clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction'"); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (cautioning against a restrictive construction "unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term . . . [using] words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") (emphasis added).

### 2. The Prosecution History does not Include a Narrowing Amendment Disclaiming Stationary Portions of a Grill Cover

During the prosecution of the '712 patent, the Examiner rejected several claims in a May 25, 2011 Office Action, including the predecessor claims that eventually became claims 1 and 17 (JA10145), and objected to certain drawings. JA10146. In relevant part, the Examiner noted that "[t]he drawings must show every feature of the invention specified in the claims" and "[t]herefore the hinged attachment of the cover must be shown on the features canceled from the claims." JA10146. A telephonic interview was later held between the Examiner and Applicant's counsel on August 1, 2011. JA10190. The Patent Office's interview summary form notes:

> We discussed the 112 first paragraph rejection of claims 22, 32, and 42 and the objection to the drawings. We agreed that language like "openable first cover" would overcome the rejections and the objection.

Upon submission of proper amendment, the application would be updated including possible further search. JA10190.

In turn, on August 25, 2011, Applicant submitted amendments to the claim language that became claims 1, 10, and 17. JA10193; JA10194; JA10196. For each of those claims, Applicant deleted the words "hingedly attached" and added the words "openable," and the words "attached to the [] cooking unit," and the requirement that the "openable [] cover" for each cooking unit includes at least one exhaust. JA10193; JA10194; JA10196.

The amendments direct the claim coverage to structures having an "openable" cover, i.e. not a cover that is necessarily hingedly attached to the support structure, and provides that the cover includes an exhaust. The amendments did not contain the words "fixed portion," or say anything about the cover needing to be completely movable and openable. The amendments did not contain any indication that the subject matter of an exhaust attached to a non-moveable portion of a grill cover was being surrendered.

Accordingly, the August 25, 2011 amendments do not: (1) limit the construction of cover to structure that is not "fixed portions"; (2) limit the construction of cover to a single-piece structure (as in the preferred embodiment); or (3) require that exhausts be only on "fixed" parts of a two-piece cover.

*Phillips* cautions against reading statements from the prosecution history in isolation and relying on them to narrow claim scope: "[B]ecause the prosecution history represents an ongoing negotiation between the USPTO and the applicant… it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. The ordinary meaning of "openable [] cover" should not be trumped by an amendment made to clarify an element and not to define the invention over the prior art. Here, the edits to the text of claims 1 and 17 do not show a surrender of subject matter.

### C.    There was Not an Argument-Based Prosecution History Estoppel

Contrary to its stated rationale, the ITC actually completely relies on argument-based estoppel to find a purported disclaimer of the stationary portion of a grill cover. This is clearly indicated by the emphasis of the Commission and ALJ on the phrase "*fixed portion*" in their construction of "openable [] cover." JA3924; JA1856. Those terms do not appear in the '712 patent specification or claims--the only place in the extensive prosecution history of the '712 patent that these terms appears is in <u>one sentence</u> in the applicant's September 4, 2012 appeal brief. JA10321.

That sentence states: "Assuming, for the sake of argument, that this combination [of Cox and McLane] is even possible (which it is not), at best it would result in a barbecue grill with chimneys connected to exit ports on the fixed portions

of the oven/smoker enclosures which are not openable (i.e., not covers)." JA10321. This is the <u>only place</u> in the entire prosecution history the phrase "fixed portion" appears. And even there, the term "fixed portion" is not defined or specifically linked to any structure in the Cox and McLane references, or the embodiments of the '712 patent.   That sentence addresses a hypothetical combination of art raised by the Examiner and does not give rise to a clear and unequivocal waiver.   Nevertheless, both the ALJ and Commission erroneously found it amounted to a disclaimer of the stationary parts of two-part grill covers.

### 1.    Argument-Based Prosecution History Estoppel Requires an Explicit and Unequivocal Surrender of Subject Matter

Argument-based estoppel invokes a wholly different standard than claim amendment-based estoppel.  *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,* 460 F.3d 1349, 1364 (Fed. Cir. 2006): "to invoke argument-based estoppel, however, 'the prosecution history must evince a clear and unmistakable surrender of subject matter.'").  Prosecution history estoppel may apply to arguments made by an applicant "only if the allegedly disclaiming statements constitute 'a clear and unmistakable surrender of subject matter.'" *EcoLab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009).  If there is ambiguity about whether there was a clear surrender of subject matter, argument-based prosecution history estoppel cannot be found.  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003)

(The Federal Circuit has "declined to apply the doctrine of prosecution disclaimer where the alleged disavowal of claim scope is ambiguous.").

> ### 2. The Single Sentence in Applicant's September 4, 2012 Appeal Brief does Not Give Rise to A Clear and Unmistakable Surrender of Subject Matter

A competitor looking at the '712 prosecution history as a whole would not reasonably believe that Applicant's single remark in the Appeal Brief surrendered the openable, multi-piece cover structures such as those in the Sarten, Beller, and Hathorn references. The remarks in the appeal brief were not even addressed to features of the invention, rather, those remarks were directed to the hypothetical combination of the prior art McLane and Cox references suggested by the Examiner. The Applicant pointed this out as an impossible combination because of the features of Cox, emphasizing that the skilled artisan would not be motivated to modify McLane with the teachings of Cox. JA10321. There was absolutely no discussion about how the terms "fixed portion" would apply to the grill of the '712 patent or pending claims.

Given that the ITC's entire argument for disclaimer here rests on two words in a single sentence, that sentence deserves intense scrutiny. The first part of the sentence says: "Assuming, <u>for the sake of argument</u>, that this combination [of Cox and McLane] is even possible (which it is not). . . " JA10321 (emphasis added). This statement indicates the applicant is describing the hypothetical combination of

Cox and McLane.   The preceding sentence stated: "The Office suggests that combining the barbecue grill of McLane with the oven/smoker enclosures and chimneys described in Cox would render obvious wherein the first cover includes at least one exhaust and wherein the second cover includes at least one exhaust as recited claim 22."  JA10321. There is no statement of what claim 22 (present Claim 1) requires there—this statement solely and explicitly concerns the proposed combination of Cox and McLane.

Secondly, the hypothetical continues: ". . . at best it would result in a barbecue grill with chimneys connected to exit ports on the fixed portions of the oven/smoker enclosures which are not openable (i.e., not covers)."  JA10321.  The Patentee used the terminology of chimneys (i.e. exhausts) connected to "fixed portions" of the "enclosures" to describe Cox in particular.  JA10321; JA10421. McLane is plainly inapplicable in this argument.

McLane is a patent for a portable grill where the lower part of the grill, often called a firebox, is completely portable and removable from its supporting structure. See Fig. 3 (JA10435):



The cooking units of McLane lack any "fixed portion," much less any covers at all.  Cox, on the other hand, is the very definition of "fixed portions." Cox is a grill that weighs "over 700 pounds" JA10425 (Col 5, Line 56) and includes 5 different doors, with 5 different cooking compartments with one general fuel source. Figs. 1-3 (JA10425; JA5864-65) are shown below with door identifiers in red circles and arrows pointing out cooking areas:



33



FIG. 2

From the technical complexity of Cox by itself, one can easily see why the USPTO agreed with A&J that Cox and McLane were simply not combinable. JA10347. But, and importantly, Cox includes enclosures that are not accessible <u>at all</u>, but still include "exhausts." See Fig 3 above, bypass volume 96.

Notwithstanding the clear (and prevailing) first argument before the USPTO, A&J's alternative argument was directed to the fact that there is no motivation arising in Cox to necessarily put an exhaust on an openable "cover" in McLane (assuming McLane had covers) because Cox includes multiple exhausts on many different portions of the grill, some of which are completely inaccessible. Those

34

portions of the grill that are "fixed," such as area 96, are enclosures that have an exhaust (56) thereto but no cover whatsoever to access the enclosure. JA10421. A&J was therefore stating that even if the grills are combinable, one of skill in the art would not necessarily place an exhaust in the cover over the cooking grill when Cox itself has contrary teachings of exhaust placement.

Moreover, a reasonable competitor would recognize that the USPTO did not consider appeal brief statements about the McLane reference to limit the scope of the claimed invention. Rather, the USPTO recognized that the remarks explaining the unworkability of the proposed modification of McLane "clearly establish that such modification would render McLane's invention unsatisfactory for its intended purpose." JA10347 (Reasons for Allowance).

When the appeal brief is considered in the context of the prosecution history as a whole, no reasonable competitor would conclude that remarks directed to the unsuitability of combining Cox and McLane constituted "clear and unmistakable surrender" of claim scope. Hypothetical arguments of this sort, unrelated to the Applicant's own invention, do not constitute a surrender of claim coverage, they are not the "clear and unmistakable surrender of subject matter" required by *Deering Precision* and its progeny.

Accordingly, this Court should find that the Commission erred in narrowly construing "openable [] cover" to only include the moving portion of a grill cover.

### D.    This Court should Remand This Case for the ITC to Determine Whether the Non-Infringing Grills Actually Infringe the '712 Patent Under a Proper Claim Construction

As a result of its erroneous construction of the term "openable [] cover," the Commission and the ALJ both found that summary determination was warranted to find non-infringement of seven accused products: (1) Char-Broil Oklahoma Joe Combination Charcoal/Gas Longhorn Grill, Model Number 12210767; (2) Char-Broil Oklahoma Joe Combination Charcoal/Gas Longhorn Grill, Model Number 14201767; (3) Char-Broil charcoal/Gas Combo 1010 Deluxe, Model No. 463724514; (4) Outdoor Leisure Products Smoke Hollow Model Numbers PS9500, 8000, 8500, 3500, 3300, and 6500; and (5) Chang Red Stone Model 1046761. JA3928; JA3934-938.

This Court should reverse the erroneous claim construction that unduly limits the structure of the openable cover, and remand this case to the ITC for further fact finding about whether these grills infringe the claims of the '712 patent.

## II.    The Commission Erred by Construing "Openable [] Cover Means" (Claim 10) to Exclude Grills that have Exhausts on the Stationary Part of a Two-Part Grill Cover

The ITC erred by narrowly construing the term "openable [] cover means" in claim 10 to exclude grills that have exhausts on the stationary portion of a two-part grill cover.   Claim 10 requires that a grill have an "openable first cover means for selectively covering the first grill" that "includes at least one exhaust means" and an "openable second cover means for selectively covering the grill" that "includes at least one exhaust means."   JA378.   In a previous order on review of summary determination motions, the Commission found that Claim 10 was a means-plus-function claim, and that the claimed function is "selectively covering the [] grill." JA3915; JA3936.   The Commission remanded the issue to the ALJ to determine whether the ALJ's finding of prosecution history estoppel as to claims 1 and 17 also applied to claim 10.   JA3928.   The ALJ found that the purported disclaimer as to claims 1 and 17 also applied to claim 10. JA5622.   Thus, the ALJ found that the corresponding structure is "a cover or a lid that excludes any portion of the grill enclosure that is not openable (i.e., fixed).   JA5621.   This narrow construction led to findings of non-infringement as to the same grills held as not infringing claims 1 and 17.   A&J petitioned the Commission for review of these findings, but the Commission declined to review them. JA6269-276.   Thus, the ALJ's Final Initial

Determination as to this issue reflects the final determination of the Commission. *See* JA6271-272.

The ALJ's narrow construction of structures corresponding to "openable [] cover means" is erroneous because, firstly, in terms of the September 4, 2012 appeal brief that the ALJ relied on in finding a disclaimer of structures, the ALJ conflated the argument made as to the patentability of claim 1 with the separate argument for the patentability of claim 10.  Secondly, the ALJ ignored the law that shows there is a heightened standard to find argument-based prosecution history estoppel in the context of means-plus-function patent claims.   And thirdly, the ALJ incorrectly failed to consider a second structure that "selectively covers the grill means"—the firebox shown in the specification—that demonstrates a two-part grill covers can constitute structure for an "openable [] cover means."  This Court should reverse the ITC's incorrect limitation of structures corresponding to "openable [] cover means" and remand this to the ITC for further factual findings of whether the currently held non-infringing products do infringe claim 10 as properly construed.

### A.     The Separate Argument for the Patentability of Claim 1 in the Appeal Brief Cannot Be Used to Find an Estoppel of Claim 10

The ALJ and Commission erred in finding that prosecution history estoppel applies to Claim 10 from arguments in the appeal brief relating to the patentability of Claim 1.  As a matter of law, the separate arguments made for Claim 1 and Claim

10 were treated separately by the USPTO as required under federal regulations governing appeal briefs and policies reflected in the Manual of Patent Examining Procedure (MPEP). The USPTO is presumed by law to have followed its own regulations and there is no evidence in the record whatsoever that it failed to follow these regulations and policies. Thus, the statement found by the ALJ to give rise to prosecution history estoppel for claim 1 cannot apply to claim 10 as a matter of law because it was argued separately.

1.    **The ITC Erroneously Found that Prosecution History Estoppel from Arguments Regarding Claim 1 Also Applied to Claim 10**

When the ALJ analyzed whether there was a disclaimer of claim 10, he relied on language from A&J's Appeal Brief regarding Claim 1 (which was numbered as then-pending claim 22 at the time the brief was filed), JA10321. That argument was not included in the section of the appeal brief separately arguing the patentability of Claim 10 (then-pending Claim 32). The ALJ clearly quoted and emphasized in bold font and underlined that portion of A&J's appeal brief relating to claim 1: "**Assuming, for the sake of argument, that this combination is even possible (which it is not), at best it would result in a barbecue grill with chimneys connected to exit ports on the fixed portions of the oven/smoker enclosure which are not openable (i.e., not covers).**" JA5622 (quoting A&J's Appeal Brief to the USPTO JA10321) (emphasis added by ALJ). The ALJ explained that this quoted

and emphasized language "amounts to a clear and unambiguous disclaimer of claim scope" and that the "Commission thus correctly found that the prosecution history shows that the patentee did not regard the fixed portions of grill enclosures as 'openable.'" JA5624. The ALJ then stated that the quoted language "applies to all the 'openable [] cover' limitations of claims 1, 10, and 17," (emphasis added) and that "A&J's appeal brief applied the same arguments to overcome the rejection of each of the independent claims (including the means-plus-function claim) based on the combination of McLane and Cox." JA5624. The application of the argument directed to claim 1 to claim 10 is incorrect as a matter of law.

The ALJ's reading of A&J's appeal brief was legally erroneous because it ignored the structure and headings of the appeal brief, and is neither how the USPTO nor a member of the public would interpret the arguments. Such interpretation conflating the arguments of the patentability of separate claims is contrary to USPTO regulations and practice.

### 2. Federal Regulations Dictate the Structure of Appeal Briefs and How the USPTO Analyzes Arguments in the Briefs

Federal rules govern the requirements for the structure of appeal briefs at the USPTO; 37 C.F.R. § 41.37 (2013) dictates how appellants can structure their arguments. Under that rule, "[e]ach ground of rejection contested by appellant must be argued under a separate heading, and each heading shall reasonably identify the ground of rejection being contested (e.g., by claim number, statutory basis, and

applied reference, if any)." *Id*. at § 41.37(c)(iv) (emphasis added).  Further, the rule

states that "[f]or each ground of rejection applying to two or more claims, the claims

may be argued separately (claims are considered by appellant as separately

patentable), as a group (all claims subject to the ground of rejection stand or fall

together), or as a subgroup (a subset of the claims subject to the ground of rejection

stand or fall together)."  *Id*.  It also requires that "[u]nder each heading identifying

the ground of rejection being contested, any claim(s) argued separately or as a

subgroup shall be argued under a separate subheading that identifies the claim(s) by

number."  *Id*.  The MPEP further explains "[u]nder each heading identifying the

ground of rejection being contested, any claim(s) argued separately or as a subgroup

shall be placed under a separate subheading that identifies the claim(s) by number."

MPEP § 1205.02.  The MPEP also provides a relevant example:

> Another example is where claims 1 to 3 stand rejected under pre-AIA
> 35 U.S.C. 102(b) as being anticipated by U.S. Patent No. Z and
> appellant wishes to argue separately the patentability of each claim, a
> possible heading as required by this subsection could be "Rejection
> under 35 U.S.C. 102 (b) over U.S. Patent No. Z," and the required
> subheadings would be "Claim 1," "Claim 2" and "Claim 3." Under each
> subheading the appellant would present the argument for patentability
> of that claim.

This specific format is required so that the appellant can purposely preserve

arguments for appeal and have specific arguments addressed by the Board, which

could otherwise "roll up" all arguments into a single sample claim. See 37 C.F.R.

§ 41.37(c)(i)(iv).  Further, this Court has explained that failure of a patent appellant

to separately argue claims constitutes a waiver of any argument that the Board must consider the patentability of any grouped claim separately. *See In re McDaniel*, 293 F.3d 1379, 1384 (Fed. Cir. 2002) (analyzing predecessor rule); MPEP § 1205.2 (citing *In re McDaniel* in the context of the current rule governing appeal briefs). A patent appellant is expressly provided a way to argue the patentability of claims separately and avoid the potential downfalls from a single sample claim being selected by the Board, and A&J expressly followed those rules with its appeal brief.

### 3.    In the USPTO Appeal Brief, A&J Unambiguously Elected to Argue the Patentability of Claim 1 and Claim 10 Separately

In its appeal brief, A&J argued the patentability of Claim 10 (then numbered as claim 32) separately from claim 1 (then number 22) and made its intent to do so clear. In the section of the brief entitled "Summary of Claimed Subject Matter," A&J described claims 22 and 32 in separate paragraphs, and described them as "independent claim 22" and "independent claim 32." JA10309-310. A&J included a separate subheading for claim 22: "i**. Separate Argument for the Patentability of Independent Claim 22.**" JA10316 (emphasis added). It was this portion of the brief that contained the language describing "fixed portions" that the Commission has held gave rise to prosecution history estoppel for Claims 1 and 17. *See* JA10321; JA3924-925.

In contrast to that section of the brief, A&J used a distinct and different heading for the means-plus-function claim 32: "**ii. Separate Argument for the**

**Patentability of Independent Claim 32."**   JA10323-324 (emphasis added). That

portion of the brief contains no language discussing the "fixed portions" limitation

that the ITC relied to limit claim 10.  Thus, A&J complied with USPTO regulations

and the MPEP and made it clear that the arguments for the patentability of claims 1

and 10 were to be considered separately and independently.   See 37 C.F.R.

§ 41.37(c)(iv); MPEP § 1205.02; *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004)

(concluding that the appellant sufficiently argued two sets of claims separately);

*In re Van Geuns*, 988 F.2d 1181, 1186 (Fed. Cir. 1993) ("Of course, if a party

chooses not to argue the claims separately, they would stand or fall together.").

Furthermore, the USPTO would not have allowed A&J to merely state that it

directed separate arguments to the patentability of claim 32 (Claim 10) as a patent

appellant is not allowed to simply incorporate earlier arguments by reference.  *See*

*In re Watts*, 354 F.3d at 1369.  The arguments made for the patentability of claim 32

are reproduced here:

> "ii Separate Argument for the Patentability of Independent Claim 32
> …
> Appellant respectfully submits that the combination of McLane and
> Cox fails to render obvious the features of claim 32 for <u>similar</u> reasons
> to those discussed above with reference to claim 22. <u>Specifically</u>, the
> cited references fail to render obvious the features of claim 32 at least
> because the combination of the compact portable barbecue grill having
> shallow, upwardly open housings described in McLane with the
> oven/smoker enclosures and chimneys described in Cox would render
> McLane unsatisfactory for its intended purpose with regard to claim 32
> and even if the references could be combined as suggested the
> combination of McLane and Cox fails to teach or suggest wherein the

first cover means includes at least one exhaust and wherein the second cover means includes at least one exhaust means as recited in claim 32, in light of Oliver which teaches away from combining the features of claim 32. For at least the reasons presented herein it would not have been obvious to combine the teachings of McLane with those of Cox and the combination of McLane and Cox further does not teach or suggest of the features of claim 32."

JA10323-324 (underline emphasis added).

Note that the argument begins with the statement that claim 32 is patentable for "similar reasons" to those of claim 22, <u>not</u> the "same reasons." A&J was not permitted to simply incorporate arguments by reference when separately arguing claim sets. *See, e.g.* Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions, 77 Fed. Reg. 48612-01 (Aug. 14, 2012) ("The prohibition against incorporation by reference minimizes the chance that an argument would be overlooked and eliminates abuses that arise from incorporation and combination.") If the USPTO thought A&J was improperly stating it was making separate arguments for claims yet simply incorporating arguments by reference, it would have rejected A&J's brief. It did not.

To make it clear that the appellant is not simply incorporating the earlier argument of claim 1, the substantive arguments for patentability of claim 10 then begin in the next sentence starting with the word "Specifically." The words "fixed portion" do not appear in this section of the appeal brief at all. Nor is there a statement that the exhaust must be in the moving portion of the openable cover

44

means. The arguments all focus on the failure of the combination of Cox and McLane, <u>in light of the teachings of Oliver</u>, to suggest the presence of exhaust means in the cover.

Oliver includes an express teaching to not include exhausts in the cover. Cox teaches exhausts that are below the cooking surface and enclosures of the grill that are not openable at all. The USPTO agreed with this specific argument in the Notice of Allowance. JA10347.

The reason A&J had a separate argument for the patentability of claim 10 is straightforward: it is a means-plus-function claim and has a different scope than claims 1 and 17. The arguments that are applicable to the elements of claims 1 and 17 are not necessarily applicable to claim 10 and the potential range of equivalent structures. It is clear that A&J intended to and did separately argue the patentability of Claims 1 and 10 in the appeal brief. The USPTO would not have lumped the arguments of the claims together for consideration as the ALJ and Commission did here.

### 4. As a Matter of Law, the USPTO Considered the Arguments Supporting Patentability of Claims 1 and 10 Separately

The law presumes that the USPTO complies with its own rules, which is a presumption overcome only upon presentation of contrary evidence. *Rite–Hite Corp. v. Kelley Co., Inc.*, 819 F.2d 1120, 1123 (Fed. Cir. 1987) ("Kelley has provided neither evidence nor inference to overcome the presumption that the

USPTO complied with its own rules.").  Further, although the MPEP does not have the force and effect of law, it is entitled to judicial notice as the agency's official interpretation of statutes or regulations, provided that it is not in conflict with the statutes or regulations. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 n.10 (Fed. Cir. 1995).  Here, there is no conflict between the MPEP and the language of 37 C.F.R. § 41.37(c)(iv).

Indeed, pursuant to the Patent Act, "[t]he Applicant has the right to have <u>each</u> of the grounds of rejection relied on by the Examiner reviewed independently by the Board."  *In re McDaniel*, 293 F.3d 1379, 1384 (Fed. Cir. 2002) (citing 35 U.S.C. § 6(b) (providing that "[t]he Board of Patent Appeals and Interferences <u>shall</u> ... review adverse <u>decisions of examiners</u> upon applications for patents") (emphasis added by Federal Circuit).  Thus, the federal regulation governing appeals and the MPEP language clarifying that headings may indicate separate patentability arguments for different claims have the force of law, and the USPTO is presumed to have complied with the law.  The federal rule governing appeal briefs and the MPEP required that the USPTO consider A&J's specific headings and arguments of the appeal brief for Claim 1 (then pending as claim 22) and Claim 10 (then pending as claim 32) separately.  *See In re McDaniel*, 293 at 1384; MPEP § 1205.2.  There is no evidence in the record that shows the USPTO failed to comply with its own regulations.

Thus, the statement by the ITC that "A&J's appeal brief applied the same arguments to overcome the rejection of each of the independent claims (including the means-plus-function claim) based on the combination of McLane and Cox," is simply incorrect. JA5624.  It was legal error to conflate arguments in the appeal brief made for claim 1 to support an erroneous finding of estoppel as to claim 10.  JA5624-625 (concluding that "based on the plain language of the claims and the '712 applicant's disclaimer, the "openable []cover" limitations of claims 1, <u>10</u>, and 17 of the '712 patent cannot be read to re-capture fixed portions of a grill.") (emphasis added).

Furthermore, in view of the correct legal standard for review of an appeal brief, a competitor could not reasonably read A&J's appeal brief arguments regarding Claim 1 as creating an estoppel of claim 10.  *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324–25 (Fed. Cir. 2002); *Cybor Corp. v. FAS Techs.*, Inc., 138 F.3d 1448, 1457 (Fed. Cir. 1998) (*en banc*) (abrogated on different grounds, *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1338 (Fed. Cir. 2015)).

The Court should find that the ITC erred as a matter of law in applying prosecution history estoppel to Claim 10 based on language in the appeal brief separately discussing independent Claim 1.

**B.    The Construction of "Openable [] Cover Means" should be construed to include both the non-moving and moving portions of two-part covers**

The ITC found that the term "openable [] cover means" of Claim 10 "does not include fixed portions of a grill enclosure," and the "recited exhausts must be located in the 'openable' portion of the grill." JA5623.  This construction is solely based upon a statement that was expressly made with respect to Claim 1 and therefore cannot, as a matter of law, be applied to Claim 10.

The ITC construed the "openable [] cover means" of Claim 10 in the same manner as the openable cover in claims 1 and 17.  JA5623.  This construction is based upon: (1) a narrowing amendment made to the claims on August 25, 2011, and (2) argument-based estoppel from a single sentence in the appeal brief of the application. *Id*. This construction is improper. Firstly, the prosecution history of the '712 patent does not contain an explicit disclaimer of structures that are equivalent to the "openable cover means."   Secondly, precedent involving prosecution disclaimer in means-plus-function claims shows that there is a heightened standard requiring an explicit surrender of structures.  Thirdly, the language in the appeal brief fails to meet the high legal standard necessary to surrender the stationary part of two-part grill covers.

### 1.     The August 25, 2011 Amendment is Not Narrowing

The ALJ held that the amendment that added the elements of the exhaust to the openable cover was "narrowing." JA5623.  As is described *supra* as to claims 1 and 17, the ITC gives no theory on why the claim scope was changed.

In the August 25, 2011 amendment to claim 10, the Patentee never made any statements concerning how the earlier terms "opening" is different from "exhaust" and why the earlier claim language of the "opening" being on the cover was changing the scope of the claims. JA 10202-204.  There simply is no language, argument, or other facts from the 2011 amendment that constitutes an explicit disclaimer.  Nowhere in that amendment do the terms "fixed portion" appear.  And to the extent that there is potentially any ambiguity, there cannot be an estoppel.  *Omega Eng'g, Inc.*, 334 F.3d at 1324.  Therefore, the 2011 Amendment cannot be the impetus to add the element of "fixed portions" of the grill to the construction of Claim 10.

### 2.     There Must be an Explicit Disclaimer of Equivalent Structures to the Openable Cover Means in the Prosecution History

The ITC correctly noted that "[p]rosecution history disclaimer applies to means-plus-function limitations in the same manner that it applies to other claim limitations," citing Regents of the *Univ. of Minn. v.  AGA Medical Corp.*, 717 F.3d 929, 942 (Fed. Cir. 2013).  JA5622.  However, this Court has repeatedly emphasized

that limitations to structural equivalents from arguments in the prosecution history must be <u>explicit</u>, clear, and unmistakable.

The ITC cites *Alpex Computer Corporation* as supporting the proposition that argument-based estoppel can limit the range of equivalents under 112(f), JA5622, but does not note that *Alpex* itself and cases following it show that an "explicit" disclaimer must occur in the prosecution history for an estoppel of equivalent structures to be found. In other words, there must be a literally described disclaimer of equivalent structures. *See Alpex Computer Corp.*, 102 F.3d at 1217 ("Alpex <u>described</u> the means-plus function limitation under § 112, ¶6, <u>as not covering</u> a shift register-based video display system.") (emphasis added); *see also J&M Corp. v. Harley Davidson, Inc.,* 269 F.3d 1360, 1365 (Fed. Cir. 2001) ("single clamp structure of the accused devices cannot be an equivalent of the dual clamp embodiment [because] J&M <u>explicitly</u> sought coverage of a single clamp embodiment of its invention.") (emphasis added); *Signtech Usa Ltd. v. Vutek Inc.*, 174 F.3d 1352, 1356 (Fed. Cir. 1999) ("the magistrate's limitations on claim scope, with reference to the preferred embodiment and the <u>explicit </u>disavowal of prior art structure, correctly construed the invention.") (emphasis added).

This high threshold to find an estoppel of a means-plus-function equivalent structure exists because the ability to draft patent claims in this manner is a statutory right given patentees. It is a bedrock principle of federal law that a waiver of a

statutory right must be explicit, clear, and unmistakable. This concept has been confirmed by federal courts in a variety of legal contexts. For example, the Supreme Court explained "[w]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is explicitly stated." *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 709-10 (1983) (emphases added). *See also Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.* 179 F.3d 1279, 1292 (11th Cir. 1999) (explaining that, under the Foreign Sovereign Immunities Act, an express waiver under section must give a "clear, complete, unambiguous, and unmistakable" manifestation of the sovereign's intent to waive its immunity). Thus, to find an estoppel with respect to equivalent structures of the openable cover means of Claim, A&J must have explicitly waived its statutory right to structural equivalents.

The ITC ignores this different and higher standard for estoppel with respect to means-plus-function claim language and does explain how the 2011 amendment is explicit in limiting the structural equivalents of the openable cover means of Claim 10. The estoppel here is based on a single sentence of appeal brief argument that makes no reference to structural equivalency at all.

### 3.    The Argument in the Appeal Brief is Completely Irrelevant to Structural Equivalency, and Is Too Ambiguous to Create an Estoppel

The ALJ found that the construction of "openable cover means" does not include "fixed portions" of the grill.  As noted above, these terms only are used with respect to the motivation of combining the references of Cox and McLane.  Nowhere in the specification or prosecution history is there guidance on what structure of the Patentee's claimed grill constitutes "fixed portions."

Any ambiguity in determining whether an estoppel applies from a statement inures to the benefit of the Patentee and cannot support the finding of an estoppel. *See Omega Eng'g, Inc.*, 334 F.3d at 1324; *Northern Telecom Ltd. v. Samsung Electronics Company*, 215 F.3d 1281, 1293–95 (Fed. Cir. 2000) (Inventors statements that are amenable to multiple reasonable interpretations were "far too slender a reed to support the judicial narrowing of a clear claim term."); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1347 (Fed. Cir. 2001) (refusing to limit the ordinary meaning of the claim because the alleged disclaimer in the file wrapper was at best "inconclusive").  What the "fixed portions" of Cox and McLane are is plainly subject to different interpretations.

The ITC did not state what specific "structures" a "fixed portion" does or does not encompass, and the sole argument advanced to show prosecution history estoppel of claim 10 is that cited for finding an estoppel to claim 1.  The ITC has not

shown that there is an explicit, clear, and unmistakable disclaimer of any equivalent structures of the openable cover means of Claim 10.

### C.    The ITC Erred in Failing to Consider the Structure of the Firebox in the '712 Specification as an "Openable Cover Means"

The ITC erred in finding that A&J's arguments regarding the inclusion of the second cover means of the firebox 324 shown in the '712 patent was not timely raised or salient. JA5625. The ITC further found that the arguments are immaterial to the construction of Claim 10 as there is nothing that "links" the structure of the firebox 324 to the "openable cover means." JA5626.  Yet, the evidence shows that one of skill in the art would know that the firebox cover in the '712 patent is a structure that could be used as the openable cover means.  Further, the record shows that A&J's arguments regarding the firebox were timely, and that the firebox is material to determining structure corresponding to claim 10.

### 1.    Two Structures are Shown in the '712 Patent that are "Selectively Covering the Grill"

All structures in a specification must be reviewed in correspondence to a means-plus-function element, and not just that in the preferred embodiment. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002) (emphasis added).  *See also Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("Identification of corresponding structure may embrace more than the preferred embodiment. A means-plus-function

claim encompasses all structure in the specification corresponding to that element and equivalent structures."). This includes "any alternative structures identified, even when the most frequently described structure and embodiment are different." *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1329 (Fed. Cir. 2004)).

Each of the openable cover means of the first and second means for cooking food in Claim 10 has two structures that are shown in the '712 specification that selectively cover the grill: covers 111, 211, 311, 121, 221, 321, and the half cylinder lid of the fourth cooking mode unit 324. JA373-76. In the description of Fig. 3 in the '712 patent, the specification further describes "a fourth cooking mode unit 324. This unit 324 may operate separately to prepare food in another cooking mode or may operate in conjunction with the second cooking unit 320," col. 3, 42-45. JA377. Fig. 3 shows an exemplary embodiment of fourth cooking mode unit 324 with a cylindrical smoker box structure in which the upper semi-cylinder forms the cover of fourth cooking mode unit 324, and a door is provided to permit access to the cooking area:



FIG. 3

The Fourth cooking mode unit 324 is explicitly claimed in Claims 3 and 12. JA378.

Accordingly, the structure in the '712 specification corresponding to "openable [] cover means" and the claimed function of covering a grill at the user's selection must include at least the two types of cover structures disclosed. "Openable cover means" constitutes the entirety of the structure enclosing the cooking area above the surface of the cooking grill including not only one-piece covers like the half cylinder lids, but also two-piece covers in which a portion of the structure enclosing the cooking space remains in place while an access door is opened to permit access to the cooking area.

## 2. The Argument on the Inclusion of the Firebox Lid Was Timely

The ITC found that A&J's argument regarding the firebox lid was untimely. JA5625. What the ITC opinion omits is that the respondents at the ITC argued all the way through the Final Hearing that claim 10 was not in means-plus-function format (*See* Respondents' Prehearing Brief) JA4090, and the ALJ's initial holding that Claim 10 is not in means-plus function format, JA1850-860, was overturned by the Commission. JA3926. The structural equivalents to Claim 10 were never fully at issue or briefed until the Commission order, which occurred right before the beginning of the Final Hearing.

Evidence was then specifically adduced at the hearing that shows the fourth cooking mode unit 324 (firebox) includes a structure that can constitute an openable

cover means.   The evidence shows that, when originally instructed by A&J to manufacture the Duo grill, Fudeer sales manager Wei Yang Xin thought A&J meant to include a charcoal firebox on the cart with an existing model of an A&J gas grill: "We still cannot understand what's your meaning of the new 'Duo'…We think that there is gas grill (Gas Wrangler on the left side) with side fire box (Charcoal Wrangler on the right)."   A10789-790.   Xin further acknowledged during cross-examination that "a side firebox," such as unit 324, "is a type of charcoal grill." JA8812-814.   His testimony shows that one of skill in the art would know that "charcoal grill" unit 324 discloses a lid structure that covers a grill, and that such structure is within the range of equivalents under § 112(f).   See also JA8307 Testimony of Michael Thuma (noting that "covers" in Claim 10, "regardless of whether they're one piece, two piece, are all included underneath the means plus function claim.").

Even Char-Broil's own expert uses the terms "lid" and "openable cover" interchangeably. See JA8975:5-7 July 18, 2014 Transcript, ("Q: Is there a distinction in your mind between lid and openable cover? A: No.")  Moreover, a similar two-piece "firebox lid" is shown and described in the Product Guide for defendant Char-Broil's Oklahoma Joe's Model 12201767 grill:



(JA12868-869; July 17, 2014 transcript at JA8782-784). One of skill in the art recognizes the top structure of a firebox as a "lid" or "cover" even though only part of the lid opens and moves and would recognize that side firebox 324 in the '712 patent is a disclosure of one embodiment of a "means for selectively covering the grill."

### 3.    The Firebox Lid is Relevant to Claim 10 to Interpret the Terms "Fixed Portions"

The ITC states that "the disclosure of fourth cooking mode unit 324 is immaterial to the construction of the "openable [] cover means" attached to the first and second means for cooking food in Claim 10[]." JA5625. It argues that the firebox lid structure is not "linked" to the "openable cover means" in the specification or prosecution history, and therefore cannot be considered as an equivalent structure. JA5625-626.

However, the structure of the firebox lid is one structure of "openable [] cover means," as indicated in the patent specification and as found by one of skill in the

art. See JA8307-308. Testimony of Michael Thuma. Patent specifications do not need <u>word-for-word</u> support of the structures to be included in the claims, structural equivalents are interpreted in view of what one of skill in the art would glean from the specification. *See Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).

Furthermore, it is indisputable that the firebox lid is a structure that, at the least, *can* be the openable cover means. No one has claimed this is impossible or even difficult to do. In view of this reality, the ITC's construction of Claim 10 becomes problematic: What structure of the firebox lid is the "fixed portion"? The half-cylindrical door of the side firebox moves but the rest of the lid does not. This is shown in the exemplary figure of the two-piece "firebox lid" for Char-Broil's Oklahoma Joe's Model 12201767 grill. JA12868.

The construction of Claim 10 to include the terms "fixed portion" would still need to read on the half-cylinder lid structure, which indisputably could be the openable cover means. A claim construction that proposes to add limitations that gives ambiguity to a claim is not proper. *See Funai Elec. Co. Ltd. v. Daiwoo Electronics Corp.*, 616 F.3d 1357, 1366 (2010). Therefore, the inclusion of the terms "fixed portions" in Claim 10 is improper as it adds ambiguity and clarifies nothing.

### III. The Factual Determination of Non-Infringement for the Char-Broil 463724512 Grill Was Not Supported By Substantial Evidence

The ALJ initially found that one of the accused grills, the Char-Broil 463724512, did not infringe the '712 patent because it "does not have an exhaust on its openable cover." JA5638. A majority of the Commission affirmed that finding on modified grounds. JA31. The majority explained:

> The undisputed evidence shows that the gas grill of the Char-Broil 463724512 grill has an opening that is surrounded on the top and sides by the openable cover and the bottom by the grill body. See supra at 31-32. Such an opening is not sufficient to satisfy the "includes" limitation because the undisputed evidence shows that the bottom edge of the opening is part of the fixed portion of the grill. *Id*. A contrary finding would be inconsistent with the Commission's constructions of "openable [] cover" and "openable [] cover means" to exclude any fixed portion of the grill.

However, a dissenting Commissioner determined that the evidence shows that the Char-Broil 463724512 grill cover does, in fact, include an exhaust that "moves" with the cover of the grill. JA34 n.12. A&J agrees with the dissent and submits that it was factual error for the majority of the Commission to find that the grill does not infringe any claim of the '712 patent.

The evidence shows the full Commission's finding of non-infringement for this particular grill was erroneous as the grill includes an exhaust—even under the ITC's existing construction of "openable [] cover." This Court should reverse the

Commission here and hold that the Char-Broil grill infringes claims 1, 10, and 17 of the '712 patent.

## A.    The Dissenting Commissioner is Correct

Commissioner Schmidtlein disagreed with the determination that the Char-Broil 463724512 "has not been shown to infringe claims 1, 2, and 4-8 of the '712 patent." JA34 n.12.  She found that the grill includes an exhaust. *Id*. She explained that "the word 'exhaust' in claims 1 and 17 has been construed to require "a passage in the cover" through which smoke, waste gases, and/or cooking vapors pass out of the cooking unit." *Id*. She further noted that the Commission "has previously determined in this investigation that an exhaust located wholly within the fixed part of the grill was not "on" the cover and therefore did not infringe. *Id*. (citing JA3935; JA3937).  Consistent with those prior determinations, she found that "the Char-Broil 463724512 gas grill's openable cover "includes" an exhaust.  JA34 n.12.

Commissioner Schmidtlein explained that "A&J's expert, Mr. Thuma, testified that the Char-Broil 463 7245 12 grill has a large channel exhaust 'on' the cover of the gas unit." JA34 n.12 (citing A9687 (Thuma Witness Statement at Q43).  She noted that "Mr. Thuma further testified that the gas grill cover surrounds the exhaust passage on three sides such that the exhaust passage/structure extends a height measured at 1 3/8 units into the cover." JA34 n.12 (citing Tr. (Thuma) at JA8347: 15 -16; JA8358 :3-8).  She also noted that when

the cover of the gas grill is opened, the exhaust structure changes position and moves along with the cover. JA34 n.12 (citing Tr. (Thuma) at JA8359: 1-5; JA8370:22-371:1-3). Further, her own examination of the example of the grill introduced into evidence confirms the exhaust structure is "on" and "in" the openable cover. JA34 n.12.

Thus, the dissent explains why the record evidence does not support the majority of the Commission's determination that the Char-Broil grill does not infringe the '712 patent. A&J agrees with the arguments of Commissioner Schmidtlein in this regard.

## B.    The Evidence Supports a Finding of Infringement Under Any Construction of "Openable Cover" or "Openable [] Cover Means"

In addition to the evidence cited in Commissioner Schmidtlein's dissent, A&J introduced additional evidence at the hearing that supports that the cover of the Char-Broil 463724512 grill includes an exhaust.

Char-Broil's Vice-President and Chief Engineer, Alex Gafford, testified extensively regarding combustion exhaust testing, stating that certification testing requires sampling "where most of the exhaust gas is exiting the grill," JA8794:14-24, that the samples taken for this 4512 grill are taken at the gap; JA8795: 4-7; and the sample probe is placed at the transition from inside to outside the lid; JA8797:

10-20.  Mr. Gafford's testimony confirms that gap/space in the 4512 grill is where most of the exhaust gas is exiting the grill; it is an exhaust.

A&J's expert Thuma identified that exhaust as a channel exhaust.  JA8340. Thuma noted that when the cover opens, the hole moves with the cover; JA8359:1-5, and noted that when the cover is opened, the exhaust has the same dimensions, and the location of the exhaust moves as the cover moves, JA8370:22-8371:13.  If the shape of the hole changes during that transition, it is still an exhaust, just as the shape of holes in the butterfly exhausts of the charcoal cover can be changed through the user's manipulation and remain an exhaust. JA8371:14-8372:18.

Moreover, the undisputed evidence shows that this exhaust opening is purposefully machined and designed into the gas grill cover.  Mr. Gafford testified that cover design includes a "fold" or protrusion about 3/8" above the exhaust to function as a "rain lip" to keep rainwater from dripping into the interior. JA8797:21-798:4.  He testified that the 4512 design includes different covers for the gas grill unit and the charcoal grill unit. JA8798:5-15.  He also admitted that in Char-Broil's redesign of this grill, both the gas unit and the charcoal unit have identical covers. JA8798:16-799:5.

Clearly, there is "substantial evidence" that the Char-broil 463724512 grill cover "includes an exhaust" as covered by the '712 patent claims. "Substantial

evidence must be sufficient 'to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusions sought to be drawn from it is one of fact for the jury.'" *Norgen Inc. v. International Trade Comm'n*, 699 F.3d 1317, 1321 (Fed. Cir. 2012) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). Here, there is sufficient evidence that the grill cover does include an exhaust and this Court should reverse the ITC's finding hold that that the Char-broil grill infringes claims 1, 10 and 17 of the '712 patent.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

This Court should vacate and/or reverse the ITC's erroneous claim construction of "openable [] cover" (Claims 1 and 17) and "openable [] cover means" (Claim 10) and remand this case for further finding of infringement by grills that are currently held as non-infringing. The Court should also vacate, reverse and/or remand the ITC's erroneous opinion that the Char-Broil 463724512 grill, based on the record, did not infringe the asserted claims of the '712 patent.

Dated: January 7, 2016                    Respectfully submitted,

                                         /s/ Lance D. Reich
                                         Lance D. Reich
                                         HAN SANTOS REICH PLLC
                                         Attorney for Appellants

# ADDENDUM

**ADDENDUM**
**TABLE OF CONTENTS**

Description                                                                                    Page

Commission Opinion,                                                                          A65
Issued February 20, 2015 **(Public)**

U.S. Patent No. 8,381,712 (Issue Date:  February 26, 2013)                  A370

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

| In the Matter of | |
| --- | --- |
| CERTAIN MULTIPLE MODE OUTDOOR GRILLS AND PARTS THEREOF | Investigation No. 337-TA-895 |

COMMISSION OPINION

This investigation was instituted on September 26, 2013, based on a complaint filed on behalf of A&J Manufacturing, LLC of St. Simons, Georgia and A&J Manufacturing, Inc. of Green Cove Springs, Florida (collectively "A&J" or "Complainants"). 78 *Fed. Reg.* 59373 (Sept. 26, 2013). The complaint, as amended, alleged violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the sale for importation, importation, or sale within the United States after importation of certain multiple mode outdoor grills and parts thereof by reason of infringement of claims 1-20 of U.S. Patent No. 8,381,712 ("the '712 patent"), the claim of U.S. Patent No. D660,646, and the claim of U.S. Patent No. D662,773. Only the allegations pertaining to the '712 patent remain in the investigation. On July 31, 2014, the Commission determined not to review an initial determination granting a motion for partial termination of the investigation based on withdrawal of allegations in the complaint concerning the two asserted design patents. *See* Order No. 50 (Jul. 14, 2014).

The investigation is now before the Commission for a final disposition on the issues under review, remedy, the public interest, and bonding. The Commission has determined to affirm, with modified reasoning, the administrative law judge's ("ALJ") final initial determination ("ID") finding that there is a violation of section 337 of the Tariff Act of 1930, as

1

A65

amended (19 U.S.C. § 1337), in the unlawful importation, sale for importation, and sale after

importation by respondents The Brinkmann Corporation ("Brinkmann") of Dallas, Texas;

Outdoor Leisure Products, Inc. ("OLP") of Neosho, Missouri; Dongguan Kingsun Enterprises

Co., Ltd. ("Kingsun") of Dongguan City, China; Academy, Ltd. ("Academy") of Katy, Texas;

and Ningbo Huige Outdoor Products Co., Ltd. ("Huige") of Zhejiang Province, China, of certain

multiple mode outdoor grills and parts thereof by reason of infringement of one or more claims

of the '712 patent.  The Commission also found respondent Keesung Manufacturing Co., Ltd.

("Keesung") of Guangzhou, China in default pursuant to section 337(g)(1) and 19 C.F.R. §

210.16 for failing to respond to the Notice of Investigation and the complaint.  The Commission

has further determined to affirm, with modified reasoning, the ID's finding that respondents

Char-Broil, LLC ("Char-Broil") of Columbus, Georgia; and Zhejiang Fudeer Electric Appliance

Co., Ltd. ("Fudeer") of Zhejiang Province, China have not violated section 337 in connection

with the '712 patent.  The Commission adopts the final ID to the extent it does not conflict with

this opinion.

     Having found a violation of section 337 in this investigation, the Commission has

determined that the appropriate form of relief is:  (1) a limited exclusion order ("LEO")

prohibiting the unlicensed entry of covered multiple mode outdoor grills and parts thereof

manufactured by, for, or on behalf of Brinkmann, OLP, Kingsun, Academy, Huige, and

Keesung, or any of their affiliated companies, parents, subsidiaries, or other related business

entities, or their successors or assigns; and (2) cease and desist orders ("CDO") prohibiting

Brinkmann, OLP, and Academy from conducting any of the following activities in the United

States: importing, selling, marketing, advertising, distributing, transferring (except for

exportation), and soliciting U.S. agents or distributors for multiple mode outdoor grills and parts

2

A66

PUBLIC VERSION

thereof that infringe one or more claims of the '712 patent. The orders include the following exemptions: (1) conduct licensed or authorized by the owner of the '712 patent; (2) conduct related to covered products imported by or for the United States; and (3) the importation, distribution, and sale of parts for use in the maintenance, service, or repair of covered products purchased prior to the date the orders become final within the meaning of 19 U.S.C. § 1337(j).

The Commission has further determined that the public interest factors enumerated in section 337(d), (f), and (g) (19 U.S.C. §§ 1337(d), (f), and (g)) do not preclude issuance of the orders. During the period of Presidential review (19 U.S.C. § 1337(j)), the Commission has determined to set a bond in the amount of 100 percent of the entered value for all covered products manufactured by, for, or on behalf of defaulted respondent Keesung, and to set a bond in the amount of zero percent of the entered value for all covered products manufactured by, for, or on behalf of Brinkmann, OLP, Kingsun, Academy, and Huige.

I.    **BACKGROUND**

A.    **Procedural History**

The Commission instituted this investigation on September 26, 2013, based on a complaint filed on behalf of A&J. 78 *Fed. Reg.* 59373 (Sept. 26, 2013). The complaint, as amended, alleged violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the sale for importation, importation, or sale within the United States after importation of certain multiple mode outdoor grills and parts thereof by reason of infringement of claims 1-20 of the '712 patent, the claim of U.S. Patent No. D660,646, and the claim of U.S. Patent No. D662,773.[1] The Commission's notice of investigation, as amended, named numerous respondents, including Brinkmann, OLP, Kingsun, Academy, Huige, Char-Broil, and Fudeer

---

[1] *See supra* at 1.

3

(collectively "the Remaining Respondents"). The Office of Unfair Import Investigations was also a party to this investigation.

Numerous respondents named in the notice of investigation were terminated from the investigation based on:

- Substitution of respondent Char-Broil for respondent W.C. Bradley Co.;

- Name change of respondent Kamado Joe Company to Premier Specialty Brands, LLC;

- Withdrawal of allegations in the complaint directed to Kmart Corporation; Sears Brands Management Corporation; Sears Holdings Corporation; and Sears, Roebuck & Company;

- Consent orders and/or settlement agreements: HEB Grocery Company, LP d/b/a H-E-B; Guangdong Canbo Electrical Co., Ltd.; Ningbo Spring Communication Technologies Co. Ltd.; Premier Specialty Brands, LLC; Wuxi Joyray International Corporation; GHP Group, Incorporated ("GHP"); Tractor Supply Co. ("TSC"), Chant Kitchen Equipment (HK) Ltd. ("Chant"); and Rankam Metal Products Manufactory Limited, USA ("Rankam"); and

- A finding that Keesung was in default.

*See* ID at 2-3, 5-6.

On March 5, 2014, respondents Char-Broil, Fudeer, OLP, Kingsun, TSC, and Chant filed a motion for summary determination of non-infringement of the asserted claims of the '712 patent. On March 24, 2014, A&J opposed the motion, and the Commission Investigative Attorney ("IA") filed a response in partial support of the motion. On April 17, 2014, the ALJ granted the motion in part. Order No. 33. The ALJ construed the term "openable [] cover" to mean "a cover that excludes any portion of the grill enclosure that is not openable (*i.e.* fixed)." *Id.* at 4. The ALJ found that the applicant had disclaimed any construction of the term "openable [] cover" that included non-openable/fixed portions of the grill as a result of the claim amendments made on August 25, 2011. *Id.* at 7-8. The ALJ also found that the applicant's

4

argument in his appeal brief to the PTO's Board of Patent Appeal and Interferences ("BPAI")

clearly and unmistakably showed that the applicant did not regard the fixed portion of the grill

enclosure as "openable." *Id.* at 6.

In Order No. 33, the ALJ ruled on eight different products/product lines:

(i)     Char-Broil Oklahoma Joe Combination Charcoal/Gas
        Longhorn Grill, Model Number 12210767 ("the Char-
        Broil 12210767 grill");
(ii)    Char-Broil Oklahoma Joe Combination Charcoal/Gas
        Longhorn Grill, Model Number 14201767 ("the Char-
        Broil 14201767 grill");
(iii)   Char-Broil Model 463724512 Charcoal/Gas Grill
        Combination ("the Char-Broil 463724512 grill");
(iv)    Char-Broil Charcoal/Gas Combo 1010 Deluxe, Model
        No. 463724514 ("the Char-Broil 463724514 grill");
(v)     Rankam Model No. GR2034205-SC (Ver 2);
(vi)    Rankam Model No. GR2071001-MM (Ver 2);
(vii)   Outdoor Leisure Products Smoke Hollow Model
        Numbers PS9500, 8000, 8500, 3500, 3300, and 6500
        ("the OLP/Kingsun Redesigned Grills"); and
(viii)  Chant Red Stone Model 1046761.

*Id.* at 8.  The ALJ found that seven of the products did not meet the "openable [] cover"

limitations of the asserted independent claims and therefore did not infringe.  The ALJ also

found that a question of fact existed with respect to the Char-Broil 463724512 grill.

Accordingly, the ALJ denied the motion for summary determination with respect to that grill, but

granted it as to the other grills.

On June 24, 2014, the Commission affirmed-in-part and vacated-in-part Order No. 33.

The Commission adopted the ALJ's construction of the term "openable [] cover," which the

Commission summarized as follows:

> The ALJ determined that the plain language of the disputed claim
> term "openable [ ] cover" requires that the cover be openable, and
> that in view of the prosecution history of the '712 patent, the
> "openable [ ] cover" limitations cannot be met by grills having
> exhausts ***on fixed portions of the grill***.

5

A69

Comm'n SD Op. at 6 (Jun. 27, 2014) (emphasis added). The Commission also determined that

the term "openable [] cover means" in claim 10 is a means-plus-function limitation and vacated

the ALJ's grant of summary determination as to that claim because the ALJ had not construed

"openable [] cover means" as a means-plus function limitation. *Id.* at 13. The Commission

found that the claimed function was "selectively covering the [] grill," and instructed the ALJ to

identify structure in the specification that performed the claimed function. *Id.* at 14-15.

    The Commission also found that A&J acknowledged that Rankam Model No.

GR2034205-SC (Ver 2), Rankam Model No. GR2071001-MM (Ver 2), and Chant Red Stone

Model No. 1046761 do not infringe the asserted claims of the '712 patent. *Id.* at 16. The

Commission determined that the other four products/product lines at issue did not infringe claims

1 and 17 of the '712 patent. Specifically, the Commission found that:

- The Char-Broil 12201767 grill does not infringe because it does not have exhausts on the "openable [] covers," *id.* at 22;

- The Char-Broil 14201767 grill does not infringe because "the first and second openable grill covers do not include any exhausts. Instead, a single smokestack is located on a fixed portion of the grill to provide ventilation for one of the cooking units and lateral vents are located on the fixed portion of the grill to provide ventilation for the second cooking unit," *id.*;

- The Char-Broil 463724514 grill does not infringe because "the first and second openable grill covers do not include any exhausts. Instead, the grills include vents located on the fireboxes, which are fixed portions of the grill," *id.* at 23; and

- Each of the OLP/Kingsun Redesigned Grills does not infringe because each grill "does not include an exhaust or smokestack on the openable covers of at least one of the cooking units," *id.* at 24.

    An evidentiary hearing was held in this investigation from July 15-18, 2014.

Respondents Brinkmann, OLP, Kingsun, Char-Broil, Fudeer, Academy, and Huige appeared at

the hearing.

6

PUBLIC VERSION

On September 26, 2014, the ALJ issued his final ID, finding a violation of section 337 as to Brinkmann, OLP, Kingsun, Academy, and Huige based upon his determinations: (i) that certain, but not all, accused products infringe at least one claim of the '712 patent; (ii) that the domestic industry requirement has been satisfied with respect to the '712 patent; and (iii) that the asserted claims of the '712 patent have not been shown by clear and convincing evidence to be invalid.

The ID also found that the following products do not infringe any asserted claim of the '712 patent: (i) Char-Broil/Fudeer Model Nos. 463724512, 12201767, 463724514, and 14201767 (collectively, "the Char-Broil/Fudeer Grills"); (ii) the OLP/Kingsun Redesigned Grills; and (iii) GHP's Dyna-Glo Model Nos. DGJ810CSB-D and DGB730SNB-D (collectively, "the GHP Grills"). ID at 57, 59, 62. Thus, the ID found no violation as to Respondents Char-Broil, Fudeer, and GHP.[2] *See id.* at 1, 103. On October 9, 2014, the ALJ issued his recommended determination ("RD") on remedy and bonding.

On October 14, 2014, complainant A&J filed a petition for review of (1) the ID's interpretation of the scope of claim 10 of the '712 patent; (2) the ID's finding that the accused Char-Broil/Fudeer Grills and the OLP/Kingsun Redesigned Grills do not satisfy the "openable []  cover means" limitations of claim 10 of the '712 patent; and (3) the ID's finding that the Char-Broil 463724512 grill and GHP's DGB730SNB-D grill do not satisfy the claim limitation that the first cover "includes at least one exhaust" in claims 1, 10, and 17 of the '712 patent. On the same day, respondents Brinkmann, OLP, and Academy together sought review of the following

---

[2] GHP was terminated from this investigation on August 25, 2014 based on a settlement agreement, license, and consent order. *See* Notice of the Commission's Determination Not to Review an Initial Determination Terminating GHP Group, Inc. Based on a Settlement Agreement, Patent License Agreement and Issuance of a Consent Orders; Issuance of a Consent Order (Aug. 25, 2014).

PUBLIC VERSION

determinations: (1) that the asserted claims have not been shown by clear and convincing evidence to be invalid as obvious over U.S. Patent No. 5,632,265 ("Koziol") in view of U.S. Patent No. 4,773,319 ("Holland '319) and U.S. Patent No. 6,606,986 ("Holland '986"); and (2) that the asserted claims have not been shown by clear and convincing evidence to be invalid as obvious over U.S. Patent No. 6,189,528 ("Oliver"), either alone or in view of Holland '319. Respondent OLP separately challenged the ID's construction of the claim term "exhaust," and its finding that certain OLP products infringe claims 1-16 of the '712 patent. Respondents Academy and Huige petitioned for review of the ALJ's determination (Order No. 47) to exclude evidence and testimony concerning their redesigns, and the ALJ's refusal to make a determination as to whether those redesigns infringe the '712 patent. A&J, the Remaining Respondents, and the IA each filed a response to the petitions on October 22, 2014.

No party sought review of the following determinations of the ID: (1) that the Commission has subject matter, personal, and in rem jurisdiction in this investigation; (2) that certain accused products have been or have not been imported or sold for importation into the United States; (3) that Brinkmann's 3820 grill does not infringe any asserted claim of the '712 patent; (4) that Brinkmann's 3821 grill infringes claims 1, 2, 4, 6-10, 13, and 15-20 of the '712 patent; (5) that Brinkmann's 3800 and 3802 grills infringe claims 1, 4, 6-10, 13, and 15-20 of the '712 patent; (6) that Academy's DLX2012, DLX2013, and CG3023 grills infringe claims 1-13, 15, and 16 of the '712 patent; (7) that the Huige Sear & Smoke Triad grill infringes claims 1-13, 15, and 16 of the '712 patent; (8) that GHP's DGJ810CSB-D grill does not infringe claims 1, 4, and 6-8 of the '712 patent; and (9) that the domestic industry requirement has been satisfied with respect to the '712 patent.

8

A72

On December 2, 2014, the Commission determined to review the final ID in part and requested additional briefing from the parties on certain issues. Specifically, the Commission determined to review: (1) the ID's construction of the "exhaust" and "exhaust means" limitations in claims 10 and 16 of the '712 patent, and related findings regarding infringement of those claims; (2) the ID's findings regarding infringement of claims 1, 4, and 6-8 of the '712 patent by the GHP Grills; (3) the ID's findings regarding infringement of claims 1, 2, 4-8, 10, 11, and 13-15 of the '712 patent by the Char-Broil 463724512 grill; and (4) the ID's finding that the '712 patent was not shown to be invalid. 79 *Fed. Reg.* 72700-02 (Dec. 8, 2014). The Commission also solicited briefing from the parties and from the public on the issues of remedy, bonding, and the public interest. On December 12, 2014, the parties filed written submissions on the issues under review, and on remedy, bonding, and the public interest. On December 19, 2014, the parties filed reply submissions.

## B.     U.S. Patent No. 8,381,712

The '712 patent relates to a "simultaneous multiple cooking mode barbecue grill" having a first cooking mode unit and a second cooking mode unit that can be "operated simultaneously to prepare food using multiple cooking modes." JX-1 (the '712 patent) at Abstract. Claims 1-20 are asserted. The asserted independent claims each relate to cooking units having "openable [] cover[s]" that "includes at least one exhaust." *Id.* at 4:54, 6:60. The asserted independent claims and dependent claim 16 recite:

> **Claim 1.** A barbecue grill having multiple cooking units, comprising:
>
> a support structure configured to support a plurality of cooking units;
>
> a first cooking unit configured to cook food using gas cooking fuel, the first cooking unit attached to the support structure and including at least one first grill, the first cooking unit further including an openable first cover attached to the first cooking unit that selectively covers the first grill, wherein the first cover **includes at least one exhaust**; and

9

a second cooking unit configured to cook food using solid cooking fuel, the second cooking unit attached to the support structure and including at least one second grill, the second cooking unit further including an openable second cover attached to the second cooking unit that selectively covers the second grill, wherein the second cover **includes at least one exhaust,**

wherein the first cooking unit and the second cooking unit are simultaneously operable to cook food and the first grill and second grill are selectively and independently coverable.

**Claim 10.** A barbecue grill having multiple means for cooking, comprising:

a first means for cooking food using gas cooking fuel, the first means for cooking including at least one first grill and an openable first cover means for selectively covering the first grill, wherein the first cover means is attached to the first means for cooking and **includes at least one exhaust;**

a second means for cooking food using solid cooking fuel, the second means for cooking including at least one second grill and an openable second cover means for selectively covering the second grill, wherein the second cover means is attached to the second means for cooking and **includes at least one exhaust means;** and

a structure means for supporting the first means for cooking and the second means for cooking;

wherein the first means for cooking and the second means for cooking are simultaneously operable to cook food and the first grill and second grill are selectively and independently coverable.

**Claim 16.** The barbecue grill of claim 10, wherein the configuration of the at least one **exhaust means** of the first cover means includes a configuration of at least two **exhaust means.**

**Claim 17.** A barbecue grill having multiple cooking units, comprising:

a support structure configured to support a plurality of cooking units;

a first cooking unit supported by the support structure, the first cooking unit having a substantially cylindrical shape, the first cooking unit configured to cook food using gas cooking fuel, the first cooking unit including at least one first grill and an openable first cover attached to the first cooking unit that selectively covers the first grill, wherein the first cover **includes at least one exhaust;** and

a second cooking unit supported by the support structure, the second cooking unit having a substantially cylindrical shape, the second cooking unit configured to cook food using solid cooking fuel, the second cooking unit including at least one second grill and an openable second cover attached to the second cooking unit

10

A74

that selectively covers the second grill, wherein the second cover **includes at least one exhaust,**

wherein the first cooking unit and the second cooking unit are simultaneously operable to cook food and the first grill and second grill are selectively and independently coverable.

*Id.* at 4:54-5:8, 5:40-59, 6:22-47 (emphasis added).

### 1.    Relevant Prosecution History

The applicant's originally filed claims sought broad coverage. *See* JX-7 at 10-14. The applicant amended the claims to distinguish the claimed invention from the prior art cited by the U.S. Patent and Trademark Office ("PTO") examiner on August 25, 2011, to add the following narrowing limitations:

(i) that the recited cover be "openable"; and

(ii) that the cover include "at least one exhaust."

*Id.* at 259-63. To rebut the examiner's prior art rejections, the applicant argued that the claim language added to independent claims 22, 32, and 40 (issued as claims 1, 10, and 17, respectively) regarding the exhausts included on the first and second covers formed the basis of patentability for these claims. *Id.* at 269-75. In particular, the applicant distinguished the prior art U.S. Patent No. 4,665,891 ("Nemec") and U.S. Patent No. 6,209,533 ("Ganard") references by stating:

> [N]either Nemec nor Ganard teaches or suggests that the configuration of one smoke stacks [sic] on the cover of one cooking unit would be based on the type of fuel used in that cooking unit, and that the configuration of another smoke stack on the cover of another cooking unit would be based on the type of fuel used in that other cooking unit. Thus, applicant submits that Nemec and Ganard fail to teach or suggest . . . "an openable first cover. . . includ[ing] at least one exhaust" . . . and "an openable second cover attached to the second cooking unit. . . includ[ing] at least one exhaust."

11

A75

*Id.* at 270-71. However, even the narrowed claims were finally rejected over U.S. Patent No. 4,878,477 ("McLane") in view of U.S. Patent No. 4,700,618 ("Cox"). *Id.* at 295. The examiner found that McLane disclosed all of the claimed limitations except for the "openable [] cover" limitations and the "[] cover includes at least one exhaust" limitations of claim 22. *Id.* at 295. The examiner, however, found that Cox taught these limitations of claim 22, and stated that placing the exhausts "on the first or second cover" was a mere rearrangement of parts that would not affect the functioning of the units. *Id.* at 295-99. The examiner also rejected the narrowed claims under 35 U.S.C. § 112, first paragraph, for lack of written description, and objected to the drawings as not showing every feature of the claimed invention, in part because the exhausts and the cover were not shown. *Id.* at 293-94. The examiner made similar rejections with respect to claims 32 and 40. *Id.* at 296-99.

In response to the § 112 rejection and the objection to the drawings, the applicant amended the drawings and added language to the specification defining each of the lids **111**, **121**, **211**, **221**, **311**, and **321** in FIGS. 1-3 as an "openable [] cover" and each of the smokestacks **112**, **122**, **212**, **222**, **312**, and **322** in FIGS. 1-3 as an "exhaust." *See id.* at 342-43. The applicant made no amendment relating to the fourth cooking mode unit **324** depicted in Figure 3.

The applicant later argued in his appeal brief to the BPAI that claim 22 (issued as claim 1) was not rendered obvious over McLane in view of Cox because (1) "[i]t would not have been obvious to modify the teachings of McLane in view of the teachings of Cox because doing so would render McLane unsatisfactory for its intended purpose"; and (2) "[e]ven if McLane and Cox could be combined as suggested, the combination still does not teach or suggest 'wherein the first cover includes at least one exhaust,' and 'wherein the second cover includes at least one exhaust,' as recited in claim 22 in light of the prior art of record which teaches away from

12

combining the features of claim 22." *Id.* at 383, 387. With respect to his second argument, the

applicant stated:

> The Office suggests that combining the barbecue grill of McLane
> with the oven/smoker enclosures and chimneys described in Cox
> would render obvious "wherein the first cover includes at least one
> exhaust" and "wherein the second cover includes at least one
> exhaust," as recited claim 22. Office Action, pp. 7-8. Assuming,
> for the sake of argument, that this combination is even possible
> (which it is not), **at best it would result in a barbecue grill with
> chimneys connected to exit ports on the fixed portions of the
> oven/smoker enclosures which are not openable (i.e., not
> covers).** Thus, even if the references could be combined in the
> manner suggested in the Office Action, the combination still fails
> to teach "wherein the first cover includes at least one exhaust," and
> "wherein the second cover includes at least one exhaust," as
> recited in claim 22. In its rejection of claim 22, the Office
> acknowledges the fact that Cox does not disclose these features of
> claim 22.

*Id.* at 387 (emphasis added). As part of its second argument, the applicant also argued that the

prior art of record, specifically Oliver, taught away from including exhausts on the openable

covers. *Id.* at 388.

In a separate section of the appeal brief, the applicant argued for the patentability of claim

32 (issued as claim 10), stating:

> Appellant respectfully submits that the combination of McLane
> and Cox fails to render obvious the features of claim 32 **for
> similar reasons to those discussed above with reference to
> claim 22.** Specifically, the cited references fail to render obvious
> the features of claim 32 at least because (1) the combination of the
> compact, portable barbecue grill having shallow, upwardly-open
> housings described in McLane with the oven/smoker enclosures
> and chimneys described in Cox would render McLane
> unsatisfactory for its intended purpose with regard to claim 32, and
> **(2) even if the references could be combined as suggested the
> combination of McLane and Cox fails to teach or suggest
> "wherein the first cover means...includes at least one exhaust"
> and "wherein the second cover means...includes at least one
> exhaust means," as recited in claim 32, in light of Oliver which
> teaches away from combining the features of claim 32.**

13

A77

> For at least the reasons presented herein, it would not have been
> obvious to combine the teachings of McLane with those of Cox,
> and the combination of McLane and Cox further does not teach or
> suggest all of the features of claim 32. Appellant respectfully
> requests that the Board reverse the rejection of claim 32.

*Id.* at 389-90 (emphasis added). Thereafter, the pending claims were allowed. In the Notice of

Allowance, the examiner stated the reasons for allowance:

> As regards the invention recited in independent claims 22, 32, and
> 40, the combination recited in the claim is novel and unobvious. Of
> particular interest is appellant's argument regarding the
> modification of McLane. Specifically, the arguments clearly
> establish that such modification would render McLane's invention
> unsatisfactory for its intended purpose. Appellant's arguments are
> further convincing regarding the teaching away by McLane which
> teaches away from the claimed invention and modifying references
> in providing independent covers for the grills that are required to
> be upwardly open and disposable. Yet another prior art reference
> Oliver (6,189,528 – cited on the PTO-892 form mailed 3/31/08)
> discloses a grill with dual chambers and independent covers, and
> even mentions that either gas or solid fuel may be utilized.
> Nevertheless, Oliver fails to disclose or make obvious multiple
> distinct fuels at one time among other limitations required by the
> claims. The prior art of record does not anticipate, nor make
> obvious, the claimed invention, alone or in combination therewith.

*Id.* at 413.

### C.    Products at Issue

The accused products allegedly include multiple mode outdoor grills having at least two

cooking units that are simultaneously operable to cook food using gas and solid fuels. The

accused products, except for the GHP Grills, are listed in the final ID at pages 47-48.

14

A78

## II.   ISSUES UNDER REVIEW

### A.   The ID's construction of "exhaust" and "exhaust means" in claims 10 and 16, and related findings on infringement of claims 10-16

#### 1.   Claim Construction

Claim 10 recites "the first cover means . . . includes at least one **exhaust**" [hereinafter, "the first cover means clause"], JX-1 at 5:46-47 (emphasis added), and "the second cover means . . . includes at least one **exhaust means**" [hereinafter, "the second cover means clause"], *id.* at 5:53 (emphasis added).  Claim 16 recites that "the configuration of the at least one **exhaust means** of the first cover means includes a configuration of at least two **exhaust means**." *Id.* at 6:22-24 (emphasis added).

The ID determined that the "exhaust" and "exhaust means" limitations in claims 10 and 16 should be afforded the same meaning as the "exhaust" limitations in claims 1 and 17.  ID at 32-33.  The ID rejected A&J's request to construe the "exhaust means" limitation of claim 10 as a means-plus-function limitation because it found that A&J failed to raise this argument in its pre-hearing brief and A&J failed to articulate any construction of "exhaust means" that was different from its proposed construction for the "exhaust" limitation.  *Id.* at 32-33, n. 13. Accordingly, the ID construed all of the "exhaust" and "exhaust means" limitations in the asserted claims to mean "a passage in the cover through which smoke, waste gases and/or cooking vapors pass out of the cooking unit." *Id.* at 37.

The Commission determined to review the ID's construction of the "exhaust" and "exhaust means" limitations in claims 10 and 16 of the '712 patent, and related findings regarding infringement of those claims.  Complainant A&J argued in its pre-hearing brief that "[b]ecause Claim 10 and its dependent claims are unquestionably written in means-plus-function

15

format, they must be construed as provided in 35 U.S.C. § 112(f)." ComplPRHB[3] at 55.

Moreover, at the evidentiary hearing, A&J argued that "exhaust means" is a means-plus-function

limitation, despite A&J now, before the Commission, abandoning its argument that "exhaust

means" should be interpreted under § 112, ¶ 6.[4]  Tr. at 363:15-18; ComplSub at 1-5.  However,

A&J failed to articulate any construction of "exhaust means" that is different than its proposed

construction for the term "exhaust."  ComplPRHB at 48-49; *see* ID at 32-33 n.13 (citing

ComplPHB[5] at 14-15, 17); Tr. at 29:1-6; ComplSub at 5.

At the outset, we recognize that all parties now argue, before the Commission, that the

"exhaust" and "exhaust means" limitations in claim 10 should be construed in the same manner

as the "exhaust" limitations in claims 1 and 17.  ComplSub[6] at 4; ComplRSub[7] at 1-2; RespSub[8]

at 10; *see* ID at 33.  Even though the parties do not contest the ID's construction of the "exhaust

means" limitation in claims 10 and 16 to be identical to the "exhaust" limitations in claims 1 and

17, this does not relieve the Commission of its responsibility to interpret the claims as a matter of

---

[3] Complainants A&J Manufacturing, LLC and A&J Manufacturing, Inc.'s Prehearing Statement & Brief (Jun. 20, 2014).

[4] Paragraph 6 of 35 U.S.C. § 112 was replaced with newly designated § 112(f) when § 4(c)(6) of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, took effect on September 16, 2012.  Because the patent application that led to the '712 patent was filed before the effective date of the AIA, we apply the pre-AIA version of that section.

[5] Complainants A&J Manufacturing, LLC and A&J Manufacturing, Inc's Posthearing Brief (Jul. 31, 2014).

[6] Complainants' Briefing on Commission Review of Final Initial Determination (Dec. 12, 2014).

[7] Complainants' Reply to Respondents' and Staff's Briefing on Commission Review of Final Initial Determination (Dec. 19, 2014).

[8] Respondents' Written Submission in Response to Commission's Determination to Review-In-Part Final Initial Determination Finding a Violation of Section 337 (Dec. 12, 2014).

law.  *See Rodime PLC v. Seagate Tech., Inc*., 174 F.3d 1294, 1302 (Fed. Cir. 1999) (stating that

even though the appellant appeared to have conceded that the "positioning means" element

invoked § 112, ¶ 6 and devoted its argument on appeal to the function and corresponding

structure implicated by that limitation, that concession "does not relieve this court of its

responsibility to interpret the claims as a matter of law").  To interpret the claims, the

Commission must decide the subsidiary question of whether the claim term "exhaust means"

invokes § 112, ¶ 6.  *See id.*; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1098 (Fed. Cir.

2014) ("Determining whether certain claim language invokes § 112, ¶ 6 'is an exercise in claim

construction and is therefore a question of law.'")).

    Having considered all of the parties' submissions and the record evidence, the

Commission has determined that § 112, ¶ 6 applies to the "exhaust" and "exhaust means"

limitations in claims 10 and 16 because the intrinsic evidence shows that the patentee clearly

intended for them to be construed as means-plus-function limitations.  We address first the

"exhaust means" limitations in claims 10 and 16, before addressing the "exhaust" limitation in

claim 10.

### a.      "exhaust means" in claims 10 and 16

    The use of the word "means" results in a presumption that a claim term is a means-plus-

function limitation.  *See Robert Bosch, LLC*, 769 F.3d at 1097.  The presumption may be

rebutted if the claim itself recites sufficient structure for performing the claimed function.  *See*

*Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996).  "The question is whether the

claim language names particular structures or, instead, refers only to a general category of

whatever may perform specified functions."  *Robert Bosch, LLC*, 769 F.3d at 1099 (citing

*Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1536 (Fed. Cir. 1991)).  When a term only

17

indicates what the recited means *"does,* not what it *is* structurally," the claim is properly

construed under § 112, ¶ 6. *Laitram Corp.*, 939 F.2d at 1536. For example, in *Biomedino, LLC*

*v. Waters Techs. Corp.,* 490 F.3d 946 (Fed. Cir. 2007), the Court held that the term "control" in

the phrase "control means for automatically operating said valving" failed to convey sufficient

structure to rebut the presumption that means-plus-function claiming applied because "'control'

is simply an adjective describing 'means': it is not a structure or material capable of performing

the identified function." *Id.* at 949-50.

    In determining whether § 112, ¶ 6 applies and whether the presumption has been

rebutted, we rely primarily on the claim language itself, but also rely on other intrinsic evidence,

such as the prosecution history. *See Rodime PLC*, 174 F.3d at 1302 (citing *York Prods., Inc. v.*

*Central Tractor,* 99 F.3d 1568, 1574 (Fed. Cir. 1996)); *Cole*, 102 F.3d at 531 ("We decide on an

element-by-element basis, based upon the patent and its prosecution history, whether § 112, ¶ 6

applies."); *Kreepy Krauly U.S.A., Inc. v. Sta–Rite Indus., Inc.*, 1998 WL 196750, at *3 (Fed. Cir.

1998) (unpublished opinion) (concluding that "[n]othing in [the claim at issue] or the prosecution

history suggests that the claim language at issue was intended to be construed in means-plus-

function form"); *Greenberg v. Ethicon Endo–Surgery, Inc.*, 91 F.3d 1580, 1584 (Fed. Cir. 1996)

(considering prosecution history to determine whether means-plus-function applies).

    Looking first at the claim language itself, we find that the term "exhaust means" fails to

convey sufficient structure to rebut the presumption that means-plus-function claiming applies

because "exhaust" is simply an adjective describing "means"—it is not a structure or material

capable of performing the claimed function. *See infra* at section II.A.1.c. A&J argues in its

submission that, in every instance of the term "means for" in claim 10, there is explicit

description of the function which the means perform. ComplSub at 3. By contrast, the "means

18

for" signal is not used with the "exhaust" and "exhaust means" limitations, nor does the claim language include *further* description of a function performed. *See id.* at 4. Therefore, A&J appears to argue, and we agree, that the term "exhaust" indicates what the claim element *does*, not what it *is* structurally. *See Laitram Corp.*, 939 F.2d at 1536.

The Commission's construction of the term "exhaust" in claims 1 and 17 does not in and of itself rebut the presumption that "exhaust means" in claims 10 and 16 invokes § 112, ¶ 6. As the Federal Circuit held in *Laitram Corp.*, a patentee cannot escape the express mandate of § 112, ¶ 6 by the presence of other claims specifically claiming the disclosed structure which underlies the means clause or an equivalent of that structure. 939 F.2d at 1538. To find otherwise would improperly conflate construction of a means-plus-function limitation under § 112, ¶ 6 with the ordinary rules of construction applicable to other limitations. The distinction is important because only means-plus-function limitations will be narrowly construed under § 112, ¶ 6 as limited to the "structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6; *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999) (stating that in comparison to claims that do not contain means-plus-function limitations, claims subject to § 112, ¶ 6 are generally viewed to be more narrow in scope). A claim's remaining limitations will be subject to ordinary rules of construction and the broader application of the doctrine of equivalents. *See General Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1360 (Fed. Cir. 1999). Here, the patentee drafted one set of claims using the word "exhaust" as a noun to denote structure, as in claims 1 and 17, and another set of claims using the words "exhaust means" where "exhaust" is used as an adjective, as in claims 10 and 16. *See* Tr. (Thuma) at 342:17-343:2 (testifying that the word "exhaust" can be used as an adjective modifying a noun or as a noun implying some sort of structure). Accordingly, the Commission's

19

construction of "exhaust" in claims 1 and 17 does not imply that the presumption that the "exhaust means" limitations in claims 10 and 16 invoke § 112, ¶ 6 has been rebutted.

Any doubt as to the proper construction of "exhaust means" in claims 10 and 16 is resolved by the prosecution history, which makes clear that the patentee deliberately chose to draft the "exhaust means" as a mean-plus-function limitation, and the examiner understood it as such. Specifically, in its August 25, 2011 amendment, the patentee requested that the examiner "interpret claims 32-37 [issued as claims 10-15] in accordance with 35 U.S.C. § 112, ¶ 6," and the examiner consistently did so. *See* JX-7 at 266-67, 299-301. The patentee argued that the specification provided examples of structure corresponding to each of the recited means in claims 10 and 16. *Id.* at 267. In particular, the patentee identified two smokestacks on the first cooking mode unit **110** in Fig. 1 and two smokestacks on the first cooking mode unit **210** in Fig. 2 as examples of structure corresponding to the recited "at least one exhaust means" of the first cover. *Id.* In addition, the patentee identified a smokestack on the second cooking mode unit **120** in Fig. 1 and a smokestack on the second cooking mode unit **220** in Fig. 2 as examples of structure corresponding to the recited "at least one exhaust means" of the second cover. *Id.*

In the face of this explicit direction provided by the intrinsic evidence, the only arguments offered to support the contention that the presumption has been rebutted rely essentially on expert testimony. In some circumstances, expert testimony may be probative of whether a claim term itself corresponds to sufficiently definite structure. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 498 F. App'x 986, 990 (Fed. Cir. 2013) reh'g en banc granted, opinion reinstated by *Lighting Ballast Control LLC v. Philips Electronics N. Am. Corp.*, 744 F.3d 1272 (Fed. Cir. 2014) (en banc). Here, the IA refers to Dr. Stevick's testimony that "a person of ordinary skill in the art would find that the term "exhaust means" recites

20

PUBLIC VERSION

sufficiently definite structure – an exhaust – such that the term should not be construed as a

means-plus-function limitation." IASub[9] at 2 (quoting RX-190C at Q42). We find Dr. Stevick's

testimony conclusory, unhelpful, and directly in conflict with the intrinsic evidence. *See Robert*

*Bosch, LLC*, 769 F.3d at 1101 (finding expert's statements regarding the structural meanings of

claim terms as both conclusory and unhelpful); *Lighting World, Inc. v. Birchwood Lighting, Inc.*,

382 F.3d 1354, 1358 (Fed. Cir. 2004) (explaining that even when expert evidence has been

offered with respect to the issue of claim construction, a court must determine whether that

evidence comports with the intrinsic evidence in the case). We, thus, give no weight to Dr.

Stevick's testimony in light of the explicit prosecution history. *See Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) ("[E]ven if the judge permissibly

decided to hear all the possible evidence before construing the claim, the expert testimony, which

was inconsistent with the specification and file history, should have been accorded no weight.").

Moreover, there is no evidence that "exhaust" was used synonymously with a defined

class of structures at the time the application was filed, unlike the testimony considered in

*Rembrandt Data Techs., LP v. AOL*, 641 F.3d 1331 (Fed. Cir. 2001). In *Rembrandt*, the Court

held that the terms "fractional rate encoding means" and "trellis encoding means" were not

governed by § 112, ¶ 6 because expert testimony confirmed that they were commonly used in

publications to identify defined algorithms known in the art. *Id.* at 1340-41. Here, the parties'

primary dispute with respect to the "exhaust" limitations was "what structure, if any, the term

requires." ID at 33. Before the ALJ and the Commission, the parties argued extensively as to

the type of structures covered by the claimed "exhaust," but did not agree on a specific defined

---

[9] Brief of the Office of Unfair Import Investigations on the Issues Under Review and on
Remedy, the Public Interest, and Bonding (Dec. 12, 2014).

group. For example, one expert testified that a person of ordinary skill in the art would interpret "exhaust" to include "channels, ducts, vents, pipes, louvers, dampers, or smokestacks, or any other structure that defines an opening or passage to allow smoke, vapor and/or gas to escape the cooking unit." *Id.* at 34 (citing CX-891C at Q19). However, "merely listing examples of possible structures is insufficient to avoid invocation of § 112, ¶ 6." *Robert Bosch, LLC*, 769 F.3d at 1101. "Indeed, means-plus-function language that defines a category in functional terms will typically cover examples of structures that fall within it . . .[t]his is not a basis for distinguishing structural language from § 112, ¶ 6 language." *Id.*

To summarize, the Commission finds that § 112, ¶ 6 presumptively applies to the "exhaust means" limitations in claims 10 and 16 because those limitations employ traditional "means" language and the prosecution history explicitly discloses that the patentee and the examiner understood "exhaust means" to be construed under § 112, ¶ 6. The record evidence does not overcome the presumption that "exhaust means" is a means-plus-function limitation since the claim language does not link the means with any further function or structure, other than "exhaust." Accordingly, the Commission finds that the "exhaust means" limitations in claims 10 and 16 are governed by § 112, ¶ 6.[10]

---

[10] Commissioner Schmidtlein agrees with the determination that 35 U.S.C. § 112, ¶ 6 governs the construction of the claim limitation "exhaust means" in claims 10 and 16. She reaches this determination based on the prosecution history. She does not, however, join the Commission to the extent that it determines that § 112, ¶ 6 governs on the basis of the claim language by itself.

The use of the word "means" in a claim triggers a rebuttable presumption that § 112, ¶ 6 applies. *TecSec, Inv. v. Int'l Bus. Mach., Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013). The Federal Circuit has instructed that the intrinsic evidence of the patent should be considered before making a determination as to whether § 112, ¶ 6 applies. *See Inventio AG v. Thyssenkrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011). In this case, as noted in the Commission's opinion, the patentee unmistakably stated in the prosecution history that "exhaust means" in claims 10 and 16 should be governed by § 112, ¶ 6. Therefore, in Commissioner Schmidtlein's view, given that the prosecution history is unequivocal on this

### b.    "exhaust" in claim 10

The Commission finds that it is also appropriate to interpret the "exhaust" limitation in

claim 10 under § 112, ¶ 6 because the claim language indicates that the patentee inadvertently

omitted the word "means" after the word "exhaust" in the first cover means clause.  Any doubt

about the claim's drafting error and the patentee's intent is resolved by the prosecution history.

---

point, the prosecution history dictates that "exhaust means" should be treated as a means-plus-function limitation.  *See Springs Window Fashions LP v. Novo Indus., LP,* 323 F.3d 989, 995 (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.").

The Commission explains that the word "exhaust" in the limitation "exhaust means" in claims 10 and 16 is an adjective and in such a context fails to convey sufficient structure to one of ordinary skill in the art.  The Commission further explains that the word "exhaust" in claims 1 and 17 denotes structure on the basis that it is used there as a noun.  Commissioner Schmidtlein does not agree that simply adding "means" to the word "exhaust" changes whether sufficient structure is conveyed to one of ordinary skill in the art.  On the contrary, determining whether the limitation "exhaust means" conveys sufficient structure turns on the question of whether the word "exhaust" by itself conveys sufficient structure.  *See, e.g., TecSec, Inv.,* 731 F.3d at 1347 (holding that the limitation "system memory means" does not invoke § 112, ¶ 6 because the words "system memory" by themselves convey sufficient structure).  In this case, the word "exhaust" has already been construed by the Commission in claims 1 and 17.  *See Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same·claim or in other claims of the same patent.").  When the Commission construed the word "exhaust" in claims 1 and 17, the Commission did not apply § 112, ¶ 6.  In not applying § 112, ¶ 6, the Commission effectively found that the word "exhaust" conveys sufficient structure.  *See Lighting World, Inc.,* 382 F.3d at 1358 (explaining that the presumption that § 112, ¶ 6 does not apply when the word "means" is not used can be overcome by showing that "the claim term fails to recite sufficiently definite structure").  There is nothing on the face of claims 10 and 16 to suggest that the word "exhaust" in the limitation "exhaust means" should be construed differently than the word "exhaust" in claims 1 and 17.  It is only when the prosecution history is consulted that the patentee's intention becomes clear.  In fact, in this case, the patentee's intention is undeniably clear.  The analysis may be different in a case where the prosecution history is muddled or not so clear.

Accordingly, in finding that the presumption has not been overcome, Commissioner Schmidtlein relies on the prosecution history for construing "exhaust means" in claims 10 and 16 and not the claim language standing alone.  *See TecSec, Inv.,* 731 F.3d at 1345-46 (explaining that the patentee's statements in the prosecution history were sufficient to overcome construction suggested by the claim language).

23

A court can correct a patent if "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification *and* (2) the prosecution history does not suggest a different interpretation of the claims." *Group One Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005) (quoting *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)). The error in claim 10 is apparent on the face of the patent because claim 16, which depends from claim 10, recites "**exhaust means** of the first cover means." JX-1 at 6:22-24 (emphasis added). Without this antecedent reference to the "exhaust [means]" of the first cover means of claim 10, claim 16 would be found invalid for indefiniteness. *See Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005) (stating that absent evidence of culpability or intent to deceive, a patent claim should not be invalidated based on an obvious clerical error). Here, even A&J concedes that "means" was inadvertently omitted during prosecution. ComplSub at 2-3.

Indeed, the prosecution history supports our finding that the patentee inadvertently struck out the word "means" from the first cover means clause in claim 10. *Id.* Specifically, in response to the May 25, 2011 office action, the patentee on August 25, 2011 amended claim 32 (issued as claim 10) to recite "the first cover means . . . includes at least one **exhaust means**" and "the second cover means . . . includes at least one **exhaust means**." JX-7 at 260-61 (emphasis added). In the same amendment, the patentee added new claim 44 (issued as claim 16), which depends from claim 32, to recite that the "**exhaust means** of the first cover means includes a configuration of at least two **exhaust means**." *Id.* at 263 (emphasis added). Subsequently, the patentee on January 31, 2012 mistakenly struck out the word "means" from the first cover means clause but not from the second cover means clause, as shown below.

24

A88

> 32. (Currently amended) A barbecue grill having multiple means for cooking, comprising:
>
> a first means for cooking food using gas cooking fuel, the first means for cooking including at least one first grill and an openable first cover means for selectively covering the first grill, wherein the first cover means is attached to the first means for cooking and includes at least one exhaust means ~~having a configuration based on the type of fuel used in the first cooking means~~;
>
> a second means for cooking food using solid cooking fuel, the second means for cooking including at least one second grill and an openable second cover means for selectively covering
>
> the second grill, wherein the second cover means is attached to the second means for cooking and includes at least one exhaust means ~~having a configuration based on the type of fuel used in the first cooking means~~; and
>
> a structure means for supporting the first means for cooking and the second means for cooking;
>
> wherein the first means for cooking and the second means for cooking are simultaneously operable to cook food and the first grill and second grill are selectively and independently coverable.

*Id.* at 345-46. The patentee did not amend claim 44 (issued as claim 16). *Id.* at 348. In view of the intrinsic evidence, we reject the Remaining Respondents' argument that the "exhaust means" in claim 16 should be interpreted as referring to the "exhaust" of the first cover means in claim 10. RespSub at 10-11.

The prosecution history does not suggest a different interpretation of the "exhaust" limitation in claim 10. Just as the Supreme Court found in *Essex*, the Commission finds that the omission of the word "means" from the first instance of "exhaust" in claim 10 was inadvertent and unnoticed. *See I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 441-42 (1926) (affirming the district court's interpretation of the words "upper edge" to mean "[rear] upper edge" because the omission of the word "rear" was inadvertent and unnoticed in view of the intrinsic evidence). The patentee called no attention to the omission and did not differentiate "exhaust" and "exhaust means" in claim 10 in an effort to avoid prior art. *See id.* As noted above, complainant A&J agrees that the omission is a drafting error. The Commission thus finds

25

that "exhaust" should be construed as the same as "exhaust means" and have the same effect as if "means" had been included. *See id.*

Furthermore, if by the omission of the word "means," claim 10 should otherwise be regarded as having the same scope as the plain and ordinary meaning of "exhaust" in claims 1 and 17, thereby making the scope of claim 10 broader than what the patentee intended and what the examiner understood, such a construction would conflict with the patentee's express intent to limit "exhaust [means]" of the first cover means to the corresponding structures disclosed in the '712 patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) (stating that "the prosecution history can inform the meaning of claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be").

c.     **Construction of the "exhaust means" and "exhaust" limitations in claims 10 and 16 under 35 U.S.C. § 112, ¶ 6**

Because we have concluded that both the "exhaust means" and "exhaust" limitations in claims 10 and 16 invoke § 112, ¶ 6, we now must construe those limitations by identifying the claimed function and the corresponding structure described in the specification that performs the function. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006). The IA and the Remaining Respondents assert that the function is "carrying smoke outside of the [first/second] means for cooking." RespSub at 12; IASub at 3. A&J asserts that the function should be "to permit smoke, waste gases and/or cooking vapors to pass out of each respective means for cooking food." ComplSub at 6. As stated above, the ID construed "exhaust" in claims 1 and 17 to mean "a passage in the cover through which smoke, waste gases, and/or cooking vapors pass out of the cooking unit." ID at 37. The Commission adopts A&J's proposed function for "exhaust means" – "to permit smoke, waste and/or cooking vapors to pass

26

PUBLIC VERSION

out of each respective means for cooking food," which is consistent with the ID's construction of "exhaust" in claims 1 and 17 and the expert testimony regarding a person skilled in the art's understanding of the function of "exhaust" in the context of the patent claims and specification. *See id.* at 34-37.

All parties agree that the corresponding structure described in the specification that performs the function "to permit smoke, waste gases and/or cooking vapors to pass out of each respective means for cooking food" is met by the smokestacks shown in Figs. 1-3 of the '712 patent. Namely, elements **112** (Fig. 1), **212** (Fig. 2), and **312** (Fig. 3) are the structures corresponding to the "exhaust [means]" included with the first cover means in claims 10 and 16, and elements **122** (Fig. 1), **222** (Fig. 2), and **322** (Fig. 3) are the structures corresponding to the "exhaust means" included with the second cover means in claim 10. JX-1 at 2:32-34, 2:36-38, 3:4-7, 3:36-39; JX-7 at 267; RespSub at 12; IASub at 3-4; ComplSub at 6. As noted above, the patentee identified these structures as corresponding to the exhaust means in the prosecution history. JX-7 at 267.

### 2.  Infringement

"Literal infringement of a § 112, ¶ 6 limitation requires that the relevant structure in the accused product perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). Such a limitation "is literally met by structure, materials, or acts in the accused device that perform the claimed function in substantially the same way to achieve substantially the same result." *Id.* at 1268.

As discussed above, complainant A&J argued before the ALJ that "exhaust means" should be construed under § 112, ¶ 6. *Supra* at 15-16. When claims 10 and 16 are properly

27

construed, the Commission finds that the record evidence shows that Brinkmann's 3821 grill and

the Academy/Huige grills satisfy the "exhaust" and "exhaust means" limitations in claims 10 and

16, and that Brinkmann's 3800 & 3802 grills, the OLP/Kingsun Redesigned Grills, the

OLP/Kingsun Original Grills, and the Char-Broil/Fudeer grills do not satisfy the "exhaust" and

"exhaust means" limitations in claims 10 and 16.

A&J argues that if the "exhaust" and "exhaust means" limitations in claims 10 and 16 are

construed as means-plus-function limitations, record evidence supports a finding that the accused

grills include structures identical or equivalent to the smokestacks disclosed in the '712 patent.

*See* ComplSub at 7-11. A&J's expert, Mr. Thuma, acknowledged that "[c]laim 10 is a means-

plus-function claim" and stated that he understood that claim 10 "is interpreted to cover

structures shown in the patent that perform the functions stated." CX-890C at Q34. However,

the evidence of infringement that A&J cites is little more than its expert's conclusory testimony

that "[a]ll of these means-plus-function limitations are met by elements" of the accused products.

*Id.* at Q34 (Brinkmann 3800), Q74 (OLP/Kingsun Original Grills), Q45 (Char-Broil 463724512

grill).

Based on the record evidence, the Commission finds that Brinkmann's 3800 and 3802

grills,[11] the OLP/Kingsun Original Grills, and the Char-Broil 463724512 grill do not satisfy the

"exhaust" and "exhaust means" limitations in claims 10-16 because A&J has put forth no

evidence showing that the alleged exhaust means in these accused grills are identical to or

structurally equivalent to the smokestacks described in the '712 patent. Specifically, A&J cites

to no evidence of record as to whether the lateral vents in Brinkmann's 3800 & 3802 grills and

---

[11] The parties have stipulated that Brinkmann's 3802 grill is representative of
Brinkmann's 3800 grill. ID at 51 (citing CX-223).

the OLP/Kingsun Original Grills are identical to or structural equivalents of the smokestacks

disclosed in the '712 patent. Nor does A&J cite to any evidence of record as to whether the

channel opening and butterfly vents in the Char-Broil 463724512 grill are identical to or

structural equivalents of the smokestacks disclosed in the '712 patent. Indeed, A&J's theory of

infringement of claims 10-16 is solely based on the plain and ordinary meaning of "exhaust,"

even though 112, ¶ 6 limits means-plus-function limitations to the structures set forth in the

patent specification and equivalents thereof. *See* ID at 32-33 n.13; *Applied Med. Res. Corp.*, 448

F.3d at 1332. By failing to present evidence of infringement of claims 10-16 based on a proper

construction of "exhaust means" under § 112, ¶ 6, A&J has failed to meet its burden of proof of

infringement with respect to these accused grills.

     The parties appear to agree that construing the "exhaust" and "exhaust means" limitations

in claims 10 and 16 under § 112, ¶ 6 does not change the ID's finding of infringement as to

Brinkmann's 3821 grill and the Academy/Huige grills because both their gas grill covers and

their charcoal grill covers include smokestacks, and all other limitations of these claims are met.

*See* ComplSub at 7-8 (citing CDX-47 at 11; CX-19 at 34; CX-890C at 13; RX-208 at 2), 9-10

(citing RX-369, RX-370, RX-371, CX-110); IASub at 4-5. The Commission's construction of

claims 10 and 16 also does not change the ID's finding of non-infringement as to the

OLP/Kingsun Redesigned Grills and the Char-Broil 12201767, 463724514, and 14201767 grills

because those grills were found to have exhausts on the fixed portions of the grills. *See* ID at 56-

57, 59. Further, the Commission's construction of claims 10 and 16 does not change the ID's

finding of non-infringement as to the Char-Broil 463724512 grill because that grill was found to

have a gap located between the cover and the fixed portion of the gas grill, as discussed below,

and A&J submitted no evidence that this gap is identical to or the structural equivalent of the smokestacks disclosed in the '712 patent. *Id.* at 56.

A&J argues that Brinkmann's 3820 grill should be found to infringe because it also employs smokestacks on both covers. ComplSub at 7-8. However, the ID found no violation as to this grill because A&J offered no evidence that it was imported, sold, or offered for sale at any time during the term of the '712 patent. ID at 54; IARSub at 3 n.1. As A&J fails to identify any evidence of importation or sale of these products, the Commission affirms the ID's finding.

In view of the above, the Commission affirms the ID's finding that Brinkmann's 3820 grill does not infringe claims 10-16. The Commission affirms, with modified reasoning, the ID's finding that the Char-Broil/Fudeer grills and the OLP/Kingsun Redesigned Grills do not infringe any claims of the '712 patent. The Commission also affirms, with modified reasoning, the ID's finding that Brinkmann's 3821 grill infringes claims 10, 11, 13, 15, and 16, and that the Academy/Huige grills infringe claims 10-13, 15, and 16 of the '712 patent. In addition, the Commission reverses the ID's finding that Brinkmann's 3800 and 3802 grills infringe claims 10, 13, 15, and 16, and the ID's finding that the OLP/Kingsun Original Grills infringe claims 10-16 of the '712 patent.

### B.     The ID's finding regarding infringement by the Char-Broil 463724512 grill

All of the asserted claims of the '712 patent require that a "first cover" or "first cover means" "includes at least one exhaust" or "exhaust means." The ALJ's summary determination ("SD") construed the term "includes" to require that the "at least one exhaust" be located "on" the openable cover. *See* Order No. 33 at 9 (finding that the Char-Broil 12201767 grill does not infringe the asserted claims because it "provides exhausts on the fixed portions of the grill as opposed to the openable covers"). The SD also found that the patentee's narrowing amendments made during prosecution estopped A&J from asserting infringement under the doctrine of

30

equivalents. *Id.* The Commission subsequently adopted the SD's construction of "includes." *See, e.g.,* Comm'n SD Op. at 22 ("[T]he Oklahoma Joe Longhorn Model 12201767 grill does not have exhausts on the 'openable [] covers.'"), 24 ("Each of the redesigned OLP grills do not include an exhaust or smokestack on the openable covers of at least one of the cooking units.").

The ALJ, applying the Commission's construction of "includes," analyzed all of the record evidence and weighed the credibility of the witnesses at the evidentiary hearing before determining that the evidence shows that the Char-Broil 463724512 grill does not infringe because it "does not have an exhaust on its openable cover," as the asserted claims require. ID at 56 (citing RX-2178C (Stevick RWS) at 105-107; RX-606C.0005). Specifically, the ID found Dr. Stevick's testimony that "a person of ordinary skill in the art would understand the gap or space to be located adjacent to and below . . . the openable cover and not *on* the openable cover" more credible than the testimony of A&J's expert, Mr. Thuma. *See id.* (citing CX-890C (Thuma WS) at Q41-45); RX-2178C (Stevick RWS) at Q105. The ID also found that Mr. Thuma's testimony confirmed the conclusion that the alleged exhaust is below the openable cover, and not on the openable cover. ID at 56 (citing Tr. (Thuma) at 341). On review, the Commission finds no error, much less clear error, with these findings.

Indeed, the undisputed record evidence with respect to the Char-Broil 463724512 grill is as follows:

- The alleged exhaust on the gas grill cover is the "space there <u>between</u> the openable lid and the grill body." Tr. (Thuma) at 341:3-8 (emphasis added); *see also* Tr. (Stevick) at 991:23-24 ("an opening that's between the body and the lid"); RX-2178C at Q105 (testifying that "a person of ordinary skill in the art would understand the gap or space to be located adjacent to and below . . . the openable cover and not *on* the openable cover"); ID at 56, 62; Tr. (Gafford) at 797:1-5 (testifying that the space is the "gap between the firebox and the lid"); RX-587C.0019 (Gafford) (same).

31

- A fold is machined into the gas grill cover to help keep rain from dripping down inside the firebox. Tr. (Gafford) at 797:21-798:4; *see also* Tr. (Thuma) at 361:13-15 ("a rain edge to keep rain out from . . . going inside the actual grill itself").

- The bottom edge of the space is "the top of the body of the grill" and "the top edge of the body of the grill remains stationary" and "doesn't move." Tr. (Thuma) at 348:2-6, 358:9-18, 359:1-2, 13-14; *see also* Tr. (Stevick) at 992:4-9 ("The bottom edge of this opening is part of the enclosure or the body."); Tr. (Gafford) at 797:6-9 (testifying that "the firebox is all the part that doesn't move" and "[t]he lid is the part that moves").

The photograph below shows the back side of the gas grill of the Char-Broil 463724512 grill to which this testimony refers.



(RX-606C.0005)

Based on the undisputed record evidence, we affirm the ID's finding that the space between the lid and the grill body of the Char-Broil 463724512 grill does not satisfy the "openable [] cover... includes at least one exhaust" limitations. *See* RX-0606C; RX-2178C (Stevick RWS) at Q97-107; Tr. (Thuma) at 341:3-8; RX-0411.0023.

In response to the Commission's question, Respondents contend that it would be procedurally improper and prejudicial for the Commission to adopt as part of the construction of "includes" the concept that an exhaust may be "on" but not "wholly within" the cover because that question was never raised before the ALJ and no party introduced evidence on this issue. RespSub at 17. As stated in the Commission's notice, the "Commission is not changing its

32

interpretation of the claim term 'includes,' which requires that an 'exhaust' be located *on* the 'openable [] cover.'" 79 *Fed. Reg.* 72701 (Dec. 8, 2014). The Commission agrees that any alteration of its construction of "includes" (whether in claim construction or in application of the claim term) to include any fixed portion of the grill would run contrary to the law of the case and the totality of the record evidence that was before the ALJ.

We also agree with the Remaining Respondents that a construction of "includes" that allows any fixed portion of the grill to be a part of the "exhaust" or "exhaust means" conflicts with the Commission's constructions of "openable [] cover" and "openable [] cover means." The Commission construed "openable [] cover" in claims 1 and 17 to mean "a cover that *excludes any portion* of the grill that is not openable (*i.e.*, fixed)" after finding that the patentee during prosecution disclaimed from the scope of "openable [] cover" any fixed portion of the grill. Comm'n SD Op. at 11-12 (emphasis added). The Commission adopted the ID's construction of "openable [] cover means" to exclude any portion of the grill enclosure that is not openable (*i.e.*, fixed). ID at 38. The undisputed evidence shows that the gas grill of the Char-Broil 463724512 grill has an opening that is surrounded on the top and sides by the openable cover and the bottom by the grill body. *See supra* at 31-32. Such an opening is not sufficient to satisfy the "includes" limitation because the undisputed evidence shows that the bottom edge of the opening is part of the fixed portion of the grill. *Id.* A contrary finding would be inconsistent with the Commission's constructions of "openable [] cover" and "openable [] cover means" to exclude any fixed portion of the grill.

In view of the above, the Commission has determined to affirm, with modified reasoning, the ID's finding that the Char-Broil 463724512 grill does not infringe any claims of the '712

33

patent because it does not satisfy the "includes at least one exhaust" and the "includes at least one exhaust means" limitations.[12]

### C.    The ID's findings regarding infringement of claims 1, 4, and 6-8 by the GHP Grills

The ID found that the GHP Grills should not be subject to an exclusion order in light of the settlement and license agreement between A&J and GHP.[13]  ID at 62.  Nevertheless, the ID

---

[12] Commissioner Schmidtlein disagrees with the determination that the Char-Broil 463724512 grill has not been shown to infringe claims 1, 2, and 4-8 of the '712 patent.

The sole issue presented on infringement for the Char-Broil 463724512 grill is whether the grill satisfies the "includes at least one exhaust" limitation for the claimed "first cover."  The word "exhaust" in claims 1 and 17 has been construed to require "a passage *in* the cover" through which smoke, waste gases, and/or cooking vapors pass out of the cooking unit.  *See* ID at 37; 79 *Fed. Reg.* 72700-02 (Dec. 8, 2014); 19 C.F.R. § 210.42(h)(2).  Additionally, the Commission has previously determined in this investigation that an exhaust located *wholly within the fixed part* of the grill was not "on" the cover and therefore did not infringe.  *See* Comm'n SD Op. at 22, 24.  Consistent with these prior determinations, she finds that the Char-Broil 463724512 gas grill's openable cover "includes" an exhaust.

A&J's expert, Mr. Thuma, testified that the Char-Broil 463724512 grill has a large channel exhaust "on" the cover of the gas unit.  *See* CX-0890C (Thuma WS) at Q43.  Mr. Thuma further testified that the gas grill cover surrounds the exhaust passage on three sides such that the exhaust passage/structure extends a height measured at 1 3/8 units into the cover.  *See* Tr. (Thuma) at 347:15-16; 358:3-8.  Finally, Mr. Thuma's testimony, which appears to be uncontested, shows that when the cover of the gas grill is opened, the exhaust structure changes position and moves along with the cover.  *See* Tr. (Thuma) at 359:1-5; 370:22-371:13.  To Commissioner Schmidtlein, this is persuasive evidence that the openable cover "includes" an exhaust and that the exhaust is "on" as well as "in" the openable cover and not on any part of the fixed portion of the grill.

Finally, Commissioner Schmidtlein's own examination of the example of the grill introduced into evidence confirms that the exhaust structure is "on" and "in" the openable cover.  *See Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1369 (Fed. Cir. 2004) (explaining that in "many patent cases expert testimony [on infringement] will not be necessary because the technology will be easily understandable without the need for expert explanatory testimony").  Indeed, in RX-606C and RPX-0023 (the physical example of the Char-Broil 463724512 grill introduced into evidence) the exhaust structure is clearly observable as "on" or "in" the openable cover of the grill.

Accordingly, in Commissioner Schmidtlein's view, the record evidence does not support the ID's determination that the Char-Broil 463724512 grill does not infringe the '712 patent.  The expert testimony in conjunction with her observations as a fact-finder lead her to conclude that A&J satisfied its burden in showing that the Char-Broil 463724512 gas grill's openable cover "includes" an exhaust.  She would therefore find that the grill infringes claims 1, 2, and 4-8 of the '712 patent.

34

A98

determined that both grills "do not infringe any asserted claim because they lack the claimed 'exhaust' or 'exhaust means' on their openable covers, as the claims require." *Id.* In making this finding, the ID cited only record evidence showing that a channel opening in the DGB730SNB-D grill is below the openable cover, and not on the openable cover. *Id.* (citing RX-411.0023).

As noted above, GHP was terminated from this investigation on August 25, 2014, based on a settlement agreement, license, and consent order. *Supra* at 7, n.2. The patent license agreement grants GHP "a non-exclusive, non-transferable license, during the term of this Agreement, to make, have made by others, use, sell, distribute, offer to sell, import and have imported by others Licensed Products," up to an annual maximum number of units each calendar year. Joint Motion to Terminate Investigation as to GHP Group, Inc. Based on Settlement Agreement and Consent Order and Motion to Stay Investigation as to GHP, Ex. H at 1. The license agreement includes the GHP Grills as Licensed Products. Accordingly, GHP is authorized "to make, have made by others, use, sell, distribute, offer to sell, import and have imported by others" the DGB730SNB-D and DGJ810CSB-D grills under the terms of the patent license.

A&J argues that respondent Keesung, the manufacturer of the DGB730SNB-D grill, was not a party to its agreement with GHP and, therefore, it has no assurance that Keesung cannot or will not begin selling the DGB730SNB-D grill for importation through another importer or distributor that is not authorized under the GHP license agreement. ComplRSub at 21. Keesung has been found in default pursuant to section 337(g)(1) and 19 C.F.R. § 210.16. Order No. 16 (Dec. 20, 2013). Under Rule 210.16(c), the "facts alleged in the complaint will be presumed to be true with respect to the defaulting respondent." 19 C.F.R. § 210.16(c). The complaint alleges

---

[13] The DGB730SNB-D grill is manufactured by defaulted respondent Keesung. The DGJ810CSB-D grill is manufactured by respondent Kingsun.

that "the units of the Dyna-Glo DGB730SNB-D manufactured by Keesung in China and sold for

importation into the United States, imported into the United States and/or sold after importation

in the United States, infringe claims 1, 4, 6, 7, 8, 9, 10, 13, 15, and 16 of the '712 patent."

Amended Complaint at 41. Accordingly, the Commission presumes the facts alleged in the

complaint, as amended, to be true and vacates the ID's finding that the DGB730SNB-D grill

does not infringe the asserted claims of the '712 patent. 19 U.S.C. § 1337(g)(1).

The Commission has also determined to reverse the ID's finding that the DGJ810CSB-D

grill does not infringe the asserted claims of the'712 patent. The ID cited only record evidence

showing that a channel opening in the DGB730SNB-D grill is below the openable cover, and not

on the openable cover, as the basis for finding non-infringement with respect to the

DGJ810CSB-D grill. ID at 62 (citing RX-411.0023). However, the record evidence shows that

the exhausts on the DGJ810CSB-D grill are located on the openable cover. *See* CPX-5 at 11,

CDX-48, CX-890C at Q65-68, RX-412, RX-414. A&J's expert, Mr. Thuma, testified that the

DGJ810CSB-D grill meets each and every limitation of claim 1. CX-890C at Q65-68. A&J also

presented undisputed evidence that the DGJ810CSB-D grill satisfies the limitations in dependent

claims 4 and 6-8. *See* CDX-48. Accordingly, the Commission finds that the DGJ810CSB-D

grill infringes claims 1, 4, and 6-8 of the'712 patent; however, GHP is permitted "to make, have

made by others, use, sell, distribute, offer to sell, import and have imported by others" this

product pursuant to the terms of its license agreement.

36

A100

**D.    The ID's finding that the '712 patent was not shown to be invalid**

    **1.    Obviousness over Koziol in view of Holland '319 and/or Holland '986**

Respondents contend that the asserted claims of the '712 patent are invalid as obvious under 35 U.S.C. § 103 over Koziol (RX-48) in view of Holland '319 (RX-28) and/or Holland '986 (RX-72).

The ID noted that Koziol was not before the examiner during prosecution of the '712 patent, but he found Koziol to be cumulative of Oliver, a reference that was considered by the examiner. ID at 71 (citing Tr. (Stevick) at 908). The ID also found that Koziol "discloses an assembly for mounting multiple barbeque grills on a common post or support," *id.* at 69 (citing RX-48 at Abstract), but that Koziol does not teach the following:

> (1) The details of grilling devices, such as grills having openable covers, either attached to the grill body or not; RX-190C (Stevick WS) at Q196 ("Koziol does not specifically teach that the covers or lids are openable.");
>
> (2) The use of an exhaust in a grill, much less placement of an exhaust in an openable cover versus exhaust below the cooking area of the grill; RX-190C at Q181, 198;
>
> (3) The placement or use of a cooking grate, or cooking grill; RX-190C at Q194;
>
> (4) Any disclosure of cooking simultaneously with two different fuels; the Koziol patent is directed to a mounting assembly, and Koziol does not disclose a device for simultaneous multi-mode cooking; CX-900C (Thuma RWS) at Q60-64.

*Id.* at 70-71. The ID further found that Respondents did not show that a person skilled in the art would have necessarily modified Koziol into the multimode grill disclosed in the '712 patent. *Id.* at 71. The ID rejected the Respondents' obviousness argument to combine the smokestacks disclosed in either of the Holland references with the cooking apparatus taught by Koziol because the Respondents applied their proposed construction of "exhaust" instead of the ID's construction of the term. *Id.* at 72.

The Commission has determined to affirm, with modified reasoning, the ID's finding that the asserted claims of the '712 patent have not been proven invalid as obvious over Koziol in view of the Holland references. The Commission finds that Koziol, even when combined with the teachings of the Holland references, fails to teach a first cooking unit [or means for cooking food] and a second cooking unit [or means for cooking food] that are simultaneously operable to cook food using gas and solid cooking fuels respectively, and openable covers [or openable cover means] including at least one exhaust [or exhaust means].

The asserted claims of the '712 patent require two cooking units [or means for cooking food] attached to a common support structure, one unit that uses gas cooking fuel and another unit that uses a solid cooking fuel. The ID did not explicitly find whether Koziol discloses this cooking combination. *See id.* at 69-72. A&J's expert, Mr. Thuma, testified that one could assume the combination if one had the benefit of *hindsight*. CX-900C (Thuma) at Q65. Based on the record evidence, the Commission finds that a person of ordinary skill in the art would understand that Koziol discloses a gas cooking unit and a charcoal cooking unit attached to a common support structure. FIG. 6 of Koziol discloses a gas barbecue grill unit **20** and an auxiliary gas burner unit **85**, both attached to support member **12**. RX-48 at 4:17-34. The gas grill **20** could be considered the "first cooking unit." The "second cooking unit" is the charcoal unit **81** attached to the support member **20**, as shown in FIG. 5 of Koziol. *Id.* at 4:10-13. Although the gas grill **20** is not shown on the same support structure as the charcoal grill **81**, Koziol teaches that:

> While preferred embodiments have been described above, it should
> be readily apparent to those skilled in the art that a number of
> modifications and changes may be made without departing from
> the spirit and scope of the invention. For example, . . .while a gas
> grill unit has been utilized in conjunction with an auxiliary unit, it
> is apparent that a charcoal grill unit such as indicated at **81**, could

38

> likewise be employed. Barbeque grill units which utilize both gas
> and charcoal are also becoming popular. These also can be readily
> accommodated because of the gas supply lines **64** and **65**.

*Id.* at 5:27-40. In view of all that Koziol teaches, we find that a person skilled in the art would understand to combine the charcoal unit **81** with the gas grill **20** on the common support member **12**. *See* RPet. at 32-33 (citing RX-190C at Q200).

Even though Koziol discloses this cooking combination, the ID identified four limitations of the asserted claims that are absent in Koziol: (i) "openable [] cover" and "openable [] cover means"; (ii) "exhaust" and "exhaust means"; (iii) cooking simultaneously with two different fuels; and (iv) cooking grate or grill. *See* ID at 70-71. As explained below, the Commission affirms, with modified reasoning, the ID's findings regarding the first three limitations (i)-(iii), but vacates the ID's finding regarding the last limitation, (iv), *i.e.*, Koziol does not teach the "placement or use of a cooking grate, or cooking grill". *Id.* at 71.

The Remaining Respondents concede that the cooking units **20/21**, and **81** do not explicitly disclose a cover that is openable and attached to a cooking unit. RPet[14] at 31, 32. However, the Remaining Respondents argue that "[o]ne of ordinary skill would have understood that handles on the fronts of the covers in Figs. 3-6 and 11 [highlighted in yellow in the original exhibits and reproduced below] indicate that the covers are hinged on the back side and rotate open in the standard manner as depicted in burner unit **85** on the right side in Fig. 6, where 'a cover is also provided at **93** which is hinged by the hinges **94**.'" *Id.* at 21 (citing RX-190C (Stevick WS, Q196) (quoting RX-48 at 4:36-37)) (emphasis added).

---

[14] Petition for Review of ALJ's Final Initial Determination on Violation of Section 337 by Respondents the Brinkmann Corporation, Outdoor Leisure Products, Inc., and Academy, Ltd. (d/b/a Academy Sports + Outdoors) (Oct. 14, 2014)

A103

PUBLIC VERSION



RX-190C at Q196 (FIGS. 3, 6, & 11 of Koziol - RX-0048.0002, 0048.0003, & 0048.0005; RDX-0005.0003)

The Remaining Respondents also claim that Mr. Thuma not only admitted that he had seen grills similar to those disclosed in Koziol that operate in this manner, but more importantly, he testified that he could not identify any grill similar to Koziol that did not operate in this manner. *Id.* (citing Tr. (Thuma) 481:15-482:1). Finally, they argue that Koziol discloses at least as much as the '712 patent with regard to "openable [] cover." *Id.*

The Commission finds that the Remaining Respondents have not proven by clear and convincing evidence that Koziol discloses "openable [] cover" or "openable [] cover means." We find no support for Dr. Stevick's assumption that the parts of the units highlighted in yellow above are handles or have anything to do with covers. Contrary to the Remaining Respondents' contention that Koziol discloses as much as the '712 patent, the '712 patent explicitly identifies elements **111**, **121**, **211**, **221**, **311**, and **321** in FIGS. 1-3 as "openable cover[s]." Although FIG.

40

6 of Koziol does show an openable cover (element **93**), there is no indication that this cover is incorporated in any of the other units. And, even if the other units did have a cover, there is no indication that the cover would have been attached to a common support structure, as required by the claims. Tr. (Thuma) at 478:2-480:19 (testifying that Koziol says nothing about handles on grill covers and if the Koziol grill has a handle in the front, it might also have a handle in the rear of the unit such that two handles could be used to lift off the cover entirely).

In addition, the Remaining Respondents have not shown by clear and convincing evidence that Koziol discloses simultaneous operation of two cooking grills using different fuels. As the ID found, Koziol discloses an assembly for mounting multiple barbeque grills on a common support structure, but Koziol is silent as to simultaneous multimode cooking, and does not describe the use of grills or any details of the cooking units to be mounted on the support structure. ID at 70. The Remaining Respondents provide no evidence that Koziol teaches this limitation, other than arguing that "[t]here is nothing in Koziol that would prevent the grills shown and described from operating simultaneously, and as a matter of common sense there would be no reason to combine two cooking units on a single support structure unless they were independently and simultaneously operable." RPet at 24. The Remaining Respondents cite to several statements by A&J's expert, but none of Mr. Thuma's cited statements support the Remaining Respondents' argument. *Id.* at 24-25.

After analyzing Koziol, the ID acknowledged Respondents' argument that the Holland references disclose one or two smokestack(s) on the openable cover of a grill, but rejected their argument based on the combination of Koziol and either Holland '319 and/or Holland '986 because "the claim term 'exhaust' does not require a smoke stack or chimney-type exhaust." ID at 72. The Commission finds this legal reasoning erroneous because there is no dispute that a

41

smokestack meets the ID's construction of "exhaust" and the Commission's construction of "exhaust means."

Nevertheless, the Commission finds that the Remaining Respondents have not presented clear and convincing evidence that one of ordinary skill the art would have modified Koziol's cooking apparatus to include the smokestacks disclosed in the Holland references on its covers. Mr. Thuma admitted that Koziol necessarily includes some manner of exhausting gases. RPet at 26 (citing Tr. at 488:1-11). However, the manner of exhausting gases that is disclosed in Koziol is not on the grills themselves but, instead, "cut outs" **30, 31, 33,** and **35** in the support structure (as shown in FIG. 1) "provide combustion air and clearance for the gas feed lines and the usual burner venturi tubes." RX-48 at 3:48-54, 3:3-8. The Remaining Respondents concede that Koziol is silent as to any type of "exhaust" or "exhaust means" on the grills themselves (either on the alleged covers or fixed grill body). RespSub at 24 (citing RX-48.0007 at 3:52-56). We agree with A&J that Koziol does not teach exhausts or "exhaust means" and nothing in Koziol provides any teaching, suggestion, or motivation to add exhausts or "exhaust means" on the covers rather than below the surface of the cooking grill, or elsewhere in the grill body. ComplSub at 27-28.

The evidence that the Remaining Respondents rely on in support of their argument to modify Koziol incorrectly assumes that Koziol's cooking units have openable covers and that all that is at issue is simply a matter of adding smokestacks to those covers. For example, the Remaining Respondents argue that it would have been obvious to modify the openable covers of Koziol to add one or more smokestacks, as disclosed by Holland '319, because A&J's expert conceded that the smokestacks in Holland '319 perform the same function as the smokestacks in the '712 patent, and that the motivation for including the smokestacks in the '712 patent would

42

have been the same motivation for including smokestacks in Holland '319. RPet at 26-27 (citing Tr. (Thuma) at 419:10-23). As another example, the Remaining Respondents contend that it is undisputed that where the entire upper half of the grill is an openable cover, "the logical and common location for exhausts is in the cover" so that the exhaust is above the cooking surface. *Id.* at 27 (citing RX-48 at Q198); *see also* Tr. at 936:24-937:8; RX-591 at Q45-53.

Even if adding smokestacks to Koziol is "the predictable use of prior art elements according to their established functions," the Remaining Respondents present no evidence that the smokestacks would have been added on the covers instead of any fixed portion of the grills. *Id.* (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007)). They concede that the redesigned Rankam grill, for example, shows a method for exhausting a grill by including vents in the body of a grill and below the cooking surface. RespRSub[15] at 24. The Commission has found that other accused grills, such as the Char-Broil 12201767 grill and the OLP/Kingsun Redesigned Grills, include smokestacks on the fixed portion of the grills. Comm'n SD Op. at 21-22, 24-25.

In view of the above, the Commission affirms, with modified reasoning, the ID's finding that the independent claims of the '712 patent have not been proven invalid as obvious over Koziol in view of the Holland references. Additionally, the Commission adopts the ID's finding that evidence of secondary considerations of non-obviousness weigh against a finding of obviousness. *See* ID at 78-82.

---

[15] Respondents' Reply to Complainants' and Staff's Briefing on Commission's Determination to Review-In-Part Final Initial Determination Finding a Violation of Section 337 (Dec. 19, 2014).

43

## 2.     Obviousness over Oliver alone or in view of Holland '319

Respondents contend that the asserted claims are invalid as obvious over Oliver (RX-64) alone, or in view of Holland '319.

The ID noted that Oliver was before the PTO and considered by the examiner. *Id.* at 73. The ID found that the only suggestion in Oliver of simultaneous cooking with both gas and solid fuel is in the configuration of FIG. 20.  However, he found that that configuration does not show two cooking units because the removal of body ends **16** allows for access for the propane burner **94** and makes the body of cooking unit **104** an open trough without any separation into a first cooking unit and a second cooking unit capable of independent operation, which the '712 patent requires. *Id.* at 76-77.  The ID also found that Oliver does not specify using four body ends in the double width cooker configuration as required to form two separate cooking units. *Id.* at 75. The ID further found that a person of skill in the art would not confuse a griddle as shown in FIG. 20 with a grill and, thus, Oliver does not teach cooking on a grill over gas. *Id.* at 77 (citing CX-900C at Q41).  As with Koziol, the ID rejected the Respondents' obviousness argument to combine the smokestacks disclosed in Holland '319 with the cooking apparatus taught by Oliver because the Respondents applied their proposed construction of "exhaust" instead of the ID's construction of the term. *Id.* at 77-78.

The Commission has determined to affirm, with modified reasoning, that the Remaining Respondents failed to prove by clear and convincing evidence that the asserted claims of the '712 patent are invalid as obvious over Oliver in view of Holland '319 because the prior art combination fails to teach or suggest a gas cooking unit including a grill, and openable covers [or openable cover means] including at least one exhaust [or exhaust means].

44

First, we find the ID erred in interpreting the independent claims of the '712 patent to require that the first and second cooking units be "capable of independent operation." *Id.* at 77. Independent claims 1, 10 and 17 require that the two cooking units are "simultaneously operable," but do not require that they are independently operable. Indeed, only dependent claims 4 and 13 require independent operation of the cooking units.

Second, we agree with the Remaining Respondents that the specification and prosecution history of the '712 patent does not support the ID's conclusion that FIG. 20 of Oliver lacks two separate cooking units. RPet at 36-37. The specification describes the embodiment shown in FIG. 20 as a "double width cooker" "in which two cooking systems are configured to operate together." RX-64 at 2:49-52, 6:17-18. With respect to the prosecution history, the examiner, in the first office action, described Oliver as disclosing "a simultaneous multiple cooking mode barbecue grill (see fig. 20), comprising a first cooking mode unit configured to prepare food in a first cooking mode (the grill on the left uses propane tank 96); a second cooking mode unit configured to prepare food in a second cooking mode (col. 2, ln. 51-55; the grill on the right uses charcoal) . . . ." JX-7 at 50. Subsequently, in the Notice of Allowance, the examiner stated that Oliver "discloses a grill with ***dual chambers*** and independent covers, and even mentions that either gas or solid fuel may be utilized." *Id.* at 413 (emphasis added). Indeed, the patentee characterized FIGS. 19 and 20 of Oliver as "***dual unit*** embodiment," and described FIG. 20 as having two units. *Id.* at 70 (emphasis added).

The Commission finds that the ID incorrectly adopted A&J's argument that the configuration in FIG. 20 does not show two cooking units because there is a trough at the bottom. ID at 77. While it is true that the specification describes that the body ends on the gas cooking unit side of the double width cooker (FIG. 20) may be omitted, there is no evidence that

45

the same is true of the body ends on the charcoal cooking unit side. We agree with the ID's finding that "[i]n every case in which Oliver describes a configuration that can use gas fuel to cook, the body ends **16** are omitted." ID at 76 (citing Fig 15, RX-64 at 5:62-64). On the flip side, in every case in which Oliver describes a configuration that uses charcoal to cook, the body ends **16** are included. *See, e.g.*, RX-64 at 3:12-13 ("A body end **16** at each end of reflector **12** closes the ends of the body portion of the cooker."). The same is true for the double width cookers described in Oliver. *See id.* at 6:28-33 ("Cooker **102** may be assembled **with body ends 16** for use with one or two grates **48** to support fuel such as charcoal or wood. Cooker **104** may be assembled . . . **without body ends 16** to provide propane heat for cooking.") (emphasis added). One of ordinary skill in the art would recognize that the body ends are necessary to confine the charcoal inside the grill to prevent the "start [of] grass fires" and for "draft control," which were two of Oliver's central concerns. RPet at 37 (citing RX-64 at 1:23 and 1:36; Tr. (Stevick) at 876:23-877:21 and 882:3-889:3). Because Oliver discloses the use of body ends **16** in every embodiment that includes a cooker using charcoal, the charcoal cooking unit that is combined with the gas cooking unit in FIG. 20 would also include body ends, thereby separating itself from the gas cooking unit in FIG. 20. *See id.* at 36-37 (citing Tr. (Stevick) at 876:23-889:3). Accordingly, the Commission finds that the charcoal cooking unit and the gas cooking unit shown in FIG. 20 each constitute a "cooking unit" within the meaning of the '712 patent. *Id.* at 38 (citing Tr. at 876:18-877:21).

Third, the ID's conclusion that Oliver lacks disclosure of dual-mode cooking simultaneously with gas and charcoal contradicts the teachings of Oliver. The examiner who issued the first office action found that Oliver disclosed a barbeque grill that included a gas cooking unit and a charcoal cooking unit that "operated simultaneously to prepare food using

46

multiple cooking modes." JX-7 at 50 (citing RX-64 at 6:25-26). Subsequently, a different examiner allowed the claims in part because "Oliver fails to disclose or make obvious *multiple distinct fuels at one time* among other limitations required by the claims." *Id.* at 413 (emphasis added). We agree with the first examiner's interpretation of Oliver and believe that the subsequent examiner incorrectly interpreted Oliver. In the summary of the invention, Oliver describes that the disclosed system "includes a number of different cooking modes" and "[s]ome of these modes may be carried out simultaneously." RX-64 at 1:46-50. Oliver teaches that FIG. 20 shows dual gas and charcoal capability, and that they can be operated simultaneously. *Id.* at 2:52-55 (FIG. 20 shows that "a container of fuel is positioned along one end thereof for cooking on a griddle on one side of the cooking system, and a charcoal grill is used on the other side."); 6:25-26 ("In this embodiment [of FIG. 20], one can griddle and grill simultaneously."). Accordingly, the Commission finds that Oliver discloses dual-mode cooking simultaneously with gas and charcoal.

Nevertheless, the Commission finds that the asserted claims are not obvious over Oliver in view of Holland '319 because the asserted claims require that the gas cooking unit includes a grill, but Fig. 20 shows a griddle on a gas cooking unit. We agree with the ID's finding that "Oliver does not teach cooking on a grill over gas." ID at 77 (citing CX-900C at Q41). The record evidence shows that Oliver teaches away from using a grill with gas. CX-900C at Q41. Specifically, A&J's expert, Mr. Thuma, testified that "Oliver's teachings about holding in radiant heat would discourage the skilled artisan from trying to use the Oliver gas burner with a grill, because the body ends 16 must be omitted." *Id.* at Q39.

After analyzing Oliver, the ID acknowledged Respondents' argument that Holland '319 discloses smokestacks on the openable cover of a grill, but rejected Respondents' argument

47

based on the combination of Oliver and Holland '319 because "the claim term 'exhaust' does not require a smoke stack or chimney-type exhaust." ID at 77-78. The Commission finds that the ID's rationale for rejecting Respondents' obviousness argument is incorrect, although we ultimately agree that the Remaining Respondents have failed to present clear and convincing evidence that one of ordinary skill the art would have modified Oliver's cooking apparatus to include the smokestacks disclosed in Holland '319.

There is no dispute that a smokestack meets the ID's construction of "exhaust" and the Commission's construction of "exhaust means." However, we agree with A&J that a person of ordinary skill in the art would not be motivated to place smokestacks as taught by Holland '319 on the covers (or lid reflectors) disclosed in Oliver because that would defeat one of the objectives of Oliver, a cooking system that can be broken down, stored flat, and easily transported, and would conflict with Oliver's purposes of reflecting and holding in radiant heat. AJResp[16] at 19-20. Oliver describes a "portable grill easily carried as components, which may be stacked as generally flat parts, to be carried in a compact container, and may be easily assembled without tools and used in various modes." RX-64 at Abstract. Oliver criticized that the prior art systems' open lid designs "lose heat, [and] do not reflect heat to food being cooked." *Id.* at 1:27-28. Oliver describes that the function of its lid reflectors are to "reduce the loss of heat" within the cookers. *Id.* at 6:61-63. Therefore, the Commission finds that Oliver explicitly teaches away from including exhausts on its lid reflectors. We note that the patentee made these same arguments in its appeal brief before the BPAI. *See* JX-7 at 388.

---

[16] Complainants' Combined Response in Opposition to Respondents' Petitions for Review of Final Initial Determination of Non-Infringement of U.S. Patent No. 8,381,712 (Oct. 22, 2014).

48

Finally, the Remaining Respondents have not shown by clear and convincing evidence that Oliver alone satisfies the "exhaust" or "exhaust means" limitations in the asserted claims. Oliver discloses that prior art systems are inefficient by design because of "[i]nadequate draft control" and "[n]o combustion air control," RX-64 at 1:21-26, and that the purpose of the invention is to improve "draft control," making it possible to start a "charcoal fire, even in rain, by positioning body and lid ends to control draft," *id.* at 1:53-55. Oliver teaches that "lid ends **18** may be slid along rods **28** and **30** to vary the distance from lid **14** to vary flow of draft air for the fire." *Id.* at 4:67-5:2. Additionally, Claim 18 of Oliver recites "wherein at least one of the lid ends may be spaced apart from the lid reflector to provide combustion air for the cooker." *Id.* at 10:35-37. Therefore, Oliver teaches that the purpose of the opening created by the space between the lid end and the lid reflector is for "vary[ing] flow of draft air for the fire," *id.* at 4:67-5:2, and "to provide combustion air for the cooker," *id.* at 10:35-37. *See also id.* at 6:41-43 ("controlling draft with lid ends **19**"). However, Oliver is silent as to whether smoke, waste gases and/or cooking vapors pass out of the opening between the lid and the lid reflector, and the Remaining Respondents have not presented clear and convincing evidence that it does so. Therefore, the Commission finds that the opening created by the space between the lid end and the lid reflector does not satisfy the ID's construction of "exhaust," *i.e.*, "a passage in the cover through which smoke, waste gases and/or cooking vapors pass out of the cooking unit." Nor does the Commission find that the opening created by the space between the lid and the lid reflector satisfies the Commission's construction of "exhaust means" because it has not been shown that the opening performs the function "to permit smoke, waste gases and/or cooking vapors to pass out of each respective means for cooking food" and there is no evidence showing that such an opening is a structural equivalent of the smokestacks disclosed in the '712 patent.

49

Moreover, Oliver teaches that the opening between the lid end and the lid reflector can be created in single cooker **10** (FIGS. 1-3 & 10) (*id.* at 4:67-5:2) and the double width cooker shown in FIG. 21 (*id.* at 6:41-43), but Oliver is silent as to whether the opening can be created in the double width cooker **104** of FIG. 20.  The opening may not be possible in cooker **104** if one of the cooking units uses a propane tank because the brackets **76** that hold the propane tank **96** would prevent the lid end from sliding along rods **128** and **130**.  *See id.* at 6:30-39.  For this reason, the Commission finds that an opening between the lid end and the lid reflector cannot be created in a double width cooker that uses propane fuel for cooking.

A&J argues that Oliver's disclosure of sliding a lid along rods to create an opening does not teach an "exhaust" because the opening is not a permanent feature of a cover.  *See* AJ Resp at 17-18.  We reject this argument because the asserted claims do not require any sort of permanency with respect to the "exhaust" or "exhaust means" limitations.

In view of the above, the Commission has determined to affirm, with modified reasoning, the ID's finding that the independent claims of the '712 patent have not been proven invalid as obvious over Oliver in view of Holland '319.  Additionally, the Commission adopts the ID's finding that evidence of secondary considerations of non-obviousness weigh against a finding of obviousness.  ID at 78-82.

### 3.    Dependent claims

The Commission has determined to affirm, with modified reasoning, the ID's finding that the dependent claims of the '712 patent have not been proven invalid for the reasons discussed above with respect to the independent claims.

50

### E.    Remedy, Public Interest, and Bonding

#### 1.    Remedy

The Commission is authorized to issue a limited exclusion order ("LEO") excluding the articles of the person(s) found in violation. 19 U.S.C. §1337 (d)(1), (g)(1). If certain criteria are met, the Commission may issue a general exclusion order ("GEO") excluding all infringing goods regardless of the source. 19 U.S.C. §1337 (d)(2), (g)(2). The Commission may also issue a cease and desist order ("CDO") directed to any entity violating section 337, ordering it to cease and desist from engaging in the unfair methods or acts involved. 19 U.S.C. §1337 (f)(1), (g)(1). In general, the Commission issues CDOs to persons or business entities that have a "commercially significant" domestic inventory of subject articles that have already been imported, in order to prevent continued unfair acts with respect to violating articles. *See, e.g., Certain Integrated Repeaters*, Inv. No. 337-TA-435, Comm'n Op. at 27 (Aug. 2002).

#### a.    General Exclusion Order

A&J argues that a GEO is necessary to prevent circumvention of a LEO and to address the widespread pattern of violation of section 337 in this investigation. According to A&J, a GEO is necessary to prevent circumvention of a LEO because (1) the demand for multiple mode grills in the U.S. market is established and growing as shown by A&J's and Respondents' sales volumes and profitability; (2) multiple mode grills are sold through well-established marketing and distribution networks, which include brick-and-mortar retail establishments and the online market; and (3) there are a large number of non-respondent Chinese manufacturers that produce multiple mode grills and there is no significant barrier to the expansion of their foreign production. ComplRmdySub[17] at 5-9. A&J asserts that there is a widespread pattern of violation

---

[17] Complainants' Submission on Remedy, Public Interest, and Bonding (Dec. 12, 2014).

51

as demonstrated by the significant volume of imports of Respondents' accused grills, and the substantial number of entities worldwide that either manufacture or are capable of manufacturing infringing grills for importation into the United States. *Id.* at 10. Finally, A&J asserts that a GEO is appropriate because it is difficult to identify the source of infringing products when grills are not typically branded with the manufacturer's name. *Id.* at 11-12.

The ALJ declined to recommend a GEO because (1) A&J failed to name the importer Blue Rhino during the course of the investigation; (2) none of the Respondents are likely to circumvent an LEO; and (3) the Commission has already determined that certain design-around products do not infringe. RD at 3-4. A&J argues that the fact that it did not name Blue Rhino, a newly discovered importer of infringing grills, is not a sufficient basis for denying the issuance of a GEO. ComplRmdySub at 12 n. 1 (citing *e.g.*, *Certain Ground Fault Circuit Interrupters & Prods. Containing Same* ("*Certain GFCI*"), Inv. No. 337-TA-739, Comm'n Op. at 87-92 (June 8, 2012) (rejecting argument that a complainant must name all known respondents and refusing to carve a non-named party from the GEO)). A&J also argues that there is no evidence that creating a non-infringing redesigned grill would be easy or that new entrants would even want to introduce redesigns that have not been commercially tested. *Id.* at 13-14.

The Remaining Respondents argue that there is no widespread violation because A&J presented no evidence that any of the non-respondent manufacturers identified during the hearing had actually imported a multiple mode grill. RespRmdySub[18] at 3-4. The Remaining Respondents also argue that it is not difficult to identify the source of the infringing products as shown by the ease with which A&J's economic expert, Dr. Button, was able to identify manufacturers of potentially infringing grills. *Id.* at 4. The Remaining Respondents further

---

[18] Respondents' Written Submission on the Issues of Remedy, the Public Interest, and Bonding (Dec. 12, 2014).

argue that a GEO is unnecessary given the time needed by new entrants to bring multiple mode grills to market and the barriers to entry to such market. *Id.* at 5.

The IA believes that A&J has neither shown a likelihood of circumvention, nor a widespread pattern of violation and difficulty in ascertaining the source of infringing goods. IASub at 16-18. To the contrary, the IA argues that the evidence shows that circumvention is unlikely. *Id.* at 18 (citing Tr. at 507:9-508:1).

The Commission has "broad discretion in selecting the form, scope and extent of the remedy." *Viscofan, S.A. v. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986). The Commission may issue a GEO under section 337(d)(2) only when at least one of two conditions are met:

> (A) a general exclusion from entry of articles is *necessary to prevent circumvention* of an exclusion order limited to products of named persons; or
>
> (B) there is *a pattern of violation* of this section *and* it is *difficult to identify the source of infringing products*.

19 U.S.C. § 1337(d)(2) (emphasis added).

The record evidence cited by A&J does not support a conclusion that a GEO is necessary to prevent circumvention of a LEO or to address a pattern of violation and that it is difficult to identify the source of infringing products. A&J's evidence consists of unsupported attorney arguments and speculative assumptions that potential non-respondent manufacturers and importers may circumvent an LEO. ComplRmdySub at 13-14. A&J concedes that there is no evidence that any of the Respondents found in violation of section 337 are likely to circumvent a LEO. *See id.* at 5; IASub at 16-17 (citing Tr. at 507:9-508:1). By contrast, in *Certain GFCI*, the Commission found that two of the respondents in the investigation may have been attempting to circumvent the LEO issued in an earlier investigation, and evidence further showed that some

53

respondents and other potential manufacturers have a propensity and ability to change names and corporate forms. *Certain GFCI*, Comm'n Op. at 88-89. More recently, the Commission issued a GEO under sections 337(d)(2)(A) and (B) because the evidence showed that the defaulting respondents have, or are capable of, changing names, facilities, or corporate structure to avoid detection. *Certain Cases for Portable Electronic Devices*, Inv. Nos. 337-TA-861/867, Comm'n Op. at 9-10 (June 20, 2014). In that same investigation, the Commission also found that evidence of pervasive internet auctions selling counterfeit products covered by the asserted patent demonstrated that the respondents can easily circumvent a LEO. *Id.* at 9.

Moreover, the Commission has already determined that certain design-around multiple mode grills, as well as some of the accused products, do not infringe the '712 patent. We agree with the IA that "it is more likely that manufacturers would design around the asserted patent, instead of circumventing any remedial order." IASub at 17. We find unpersuasive A&J's unsupported assertion that reliance on the redesigns requires new market entrants to risk rejection by the marketplace. ComplRRmdySub[19] at 2. Accordingly, the Commission finds that the factual requirements for the issuance of a GEO under section 337(d)(2)(A) or (B) have not been met. 19 U.S.C. § 1337(d)(2).

### b.    Limited Exclusion Orders

The Commission finds that a limited exclusion order preventing entry of the infringing products of Brinkmann, OLP, Kingsun, Academy, and Huige is appropriate. RD at 7. In addition, as requested by A&J, the LEO should also be issued against the accused products of defaulted party Keesung. Specifically, as to Keesung, A&J requests that any LEO issued by the Commission should include this defaulted respondent, but reflect the fact that the DGB730SNB-

---

[19] Complainants' Reply Submission on Remedy, Public Interest, and Bonding (Dec. 19, 2014).

D grill may be sold to GHP under license. ComplSub. at 21. The IA believes that no remedy should issue in this investigation as to Keesung because A&J's allegations as to Keesung appear limited to the GHP DGB730SNB-D grill, and that grill was the subject of a settlement agreement between A&J and GHP. IARSub at 9. A&J argues that Keesung was not a party to its agreement with GHP and, therefore, it has no assurance that Keesung cannot or will not begin selling the DGB730SNB-D grill for importation through another importer or distributor. ComplRSub. at 21. Here, Keesung was found in default under section 337(g)(1), which states that the Commission "shall, upon request, issue an exclusion from entry" directed to a respondent found in default. 19 U.S.C. § 1337(g)(1); Order No. 16 (Dec. 20, 2013). The Commission has determined to grant A&J's request and the LEO will include Keesung (except as authorized by the patent license agreement between GHP and A&J or other such license).

The Remaining Respondents request that any remedial order be narrowly tailored to identify the model numbers of the grills that are found not to infringe any claims of the '712 patent, to include a certification provision, and to include an exception for continued sales of service and repair parts for grills that were sold before issuance of the order. RespRmdySub at 8-12. We address each of these requests below.

The Remaining Respondents request that any remedial order identify with specificity what grills are not infringing. The Commission has previously stated that because A&J admits that three redesigned products do not infringe, those redesigned products will be exempted from any remedy that might issue in this investigation. Comm'n SD Op. at 16. Those three redesigned products are (1) Rankam Model No. GR2034205-SC (Ver 2); (2) Rankam Model No. GR2071001-MM (Ver 2); and (3) Chant Red Stone Model 1046761. *Id.* The remedial orders issued in this investigation also exempt all other products that have been found not to infringe,

55

*i.e.*, the OLP/Kingsun Redesigned Grills and the Char-Broil/Fudeer grills, and identify the pages in the Commission's Opinions that discuss these non-infringing products. *See Certain Electronic Digital Media Devices and Components Thereof*, Inv. No. 337-TA-796, Comm'n Op. at 107 (Aug. 9, 2013).

The Remaining Respondents also request that any remedy "cover only those grills found to infringe." RespRmdySub at 12. To the extent they are suggesting that our orders should explicitly identify the specific models of grills found to infringe, we reject this suggestion.

The RD adopted Respondents' request that any LEO include a provision that would allow them to certify that the products being imported are not excluded from entry under the LEO. RD at 6. A&J argues that a certification provision is unnecessary because the asserted claims are neither product-by-process claims nor claims that cover products requiring complicated and costly reverse engineering procedures to determine infringement. ComplRRmdySub at 2-3 (citing *Certain Ink Jet Print Cartridges and Components Thereof*, Inv. No. 337-TA-446, USITC Pub. 3549, Comm'n Op. at 10-11 (Oct. 2002)). However, it has been Commission practice for the past several years to include certification provisions in all exclusion orders to aid Customs and Border Protection ("CBP") in enforcing the Commission's remedial orders. IARSub at 12; *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, Comm'n Op., 2012 WL 3715788 at *13 (June 5, 2012). Therefore, the LEO includes a certification provision.

The RD rejected the Respondents' request that any LEO should exempt from its scope all activities related to, and component parts utilized in, the servicing or repair of previously sold accused products and any merchandise delivered pursuant to preexisting contracts because Respondents did not show how and to what extent their customers or others would be harmed

56

absent this exemption. RD at 6. The IA and A&J agree with the RD's recommendation. *See* ComplRmdySub at 15-16; IASub at 18-19; IARSub at 12. The Remaining Respondents contend that consumers who legally purchased accused grills should be permitted to continue to purchase parts to maintain those grills in a safe and working manner. RespRmdySub at 11. They also contend that some of the grills were imported and sold before the '712 patent issued in 2013. *Id.* Additionally, they argue that A&J did not present any evidence establishing which parts are unique to the accused grills and which are standard parts also used in non-accused single-mode grills. *Id.* The Remaining Respondents assert that it would be unfair to exclude parts that are also used to repair non-accused single-mode grills. *Id.* at 11-12. Moreover, even if alternative products are available, the Remaining Respondents submit that the Commission has found that the public interest is served by an exemption from any exclusion order for the importation of parts and components used in the maintenance, service, repair, or replacement of accused products previously sold in the United States. *Id; Certain Liquid Crystal Display Devices & Products Containing the Same*, Inv. No. 337-TA-631, Comm'n Op. at 27 (July 14, 2009) ("the public interest weighs in favor of an exemption to allow importation of service and replacement parts"); *Certain Integrated Circuits, Chipsets, & Products Containing Same*, Inv. No. 337-TA-786, Final Initial Determination, 2012 WL 3610787 at *88 (July 12, 2012). The Commission most recently included such an exemption in the remedial orders issued in *Certain Sleep-Disordered Breathing Treatment Systems and Components Thereof*, Inv. No. 337-TA-890, Comm'n Op. at 47 (Dec. 23, 2014), which involved medical devices used to treat certain health conditions. In this investigation, Respondents cite the need for customers to be able to purchase replacement parts to keep their grills in safe operable condition. RespRmdySub at 11. Accordingly, the remedial orders here provide for an exemption for the importation of parts for

57

use in the service, repair and maintenance of accused products previously sold in the United States.

### c.    Cease and Desist Orders

The RD also recommended that CDOs issue as to Respondents Brinkmann, OLP, Academy, and Char-Broil if a violation is found as to those Respondents. RD at 10. The RD found that those Respondents maintain commercially significant inventories in the United States. *Id.* at 8.

Brinkmann and Academy do not challenge the RD's findings that they maintain commercially significant inventories of infringing grills in the United States. RD at 7-8. The record evidence supports the ID's findings. *See* CX-0171C.0029; JX-0017C at 109; CX-0163C at 29-30; *see also* CDX-42C. Thus, cease and desist orders against Brinkmann and Academy are warranted. Char-Broil has not been found in violation of section 337.

As to whether a CDO is proper against OLP, A&J asserts that as of March 27, 2014, OLP held [    ] units of an assortment of three of its original grill models in its Neosho, Missouri facility, and an additional [    ] grills at Kingsun's warehouse in China. ComplSub at 45. A&J contends that these numbers constitute commercially significant inventory. ComplRSub at 20.

The IA believes that evidence of the [    ] original grills maintained at OLP's warehouse in Neosho, Missouri supports the ID's finding that OLP maintains a commercially significant inventory of the OLP grills that have been found to infringe the '712 patent. IARSub at 8 (citing CX-889C at Q536-41, 553, 554).

The Remaining Respondents argue that A&J bears the burden of proving that a respondent has a commercially significant inventory in the United States. RespSub at 49. They contend that the RD's finding of commercially significant inventory was based on evidence of

58

CONFIDENTIAL MATERIAL REDACTED

CONFIDENTIAL MATERIAL REDACTED

over [    ] grills, not the [    ] grills that the Commission found infringing, and Dr. Button's

testimony that a commercially significant inventory would be based on a finding that both the

original and the redesigned grills infringe. *Id.* at 51.

The sole issue presented by the parties is whether the record evidence supports a finding

that the [    ] units stored in OLP's Neosho facility constitute a commercially significant

inventory. The [    ] units stored in OLP's Neosho facility consist of the 1200SH, SH5000, and

SH7000 model grills. CX-709C. A&J has shown with record evidence that, because these grills

are relatively expensive products, sale of this inventory by OLP would adversely impact A&J.

*See* CX-329C at 1 (1200SH model sold for [    ] by Orchard Supply Company LLC in 2013); 14

(SH5000 model sold for [    ] at Farm King in 2013); 15 (SH7000 model sold for [    ] at ACE

Hardware Corp. in 2013). Accordingly, the Commission finds that the [    ] units constitute a

commercially significant inventory.

As discussed above with respect to the LEO, the remedial orders exclude the distribution

and sale of parts for use in the maintenance, service, or repair of covered products previously

sold in the United States.

## 2.    Public Interest

The Commission must weigh the effect that remedial orders will have on four public

interest factors when determining whether the issuance of such orders is appropriate: (1) the

public health and welfare; (2) competitive conditions in the U.S. economy; (3) the production of

like or competitive articles in the U.S.; and (4) U.S. consumers. 19 U.S.C. §§ 1337(d), (f), (g).

The Commission considers these public interest factors in determining the appropriate remedy in

each investigation.

59

A123

CONFIDENTIAL MATERIAL REDACTED

PUBLIC VERSION

A&J argues that a remedial order would not have an adverse effect on the public interest. ComplRmdySub at 19. First, A&J contends that the public interest favors the protection of U.S. intellectual property rights. *Id.* Second, A&J asserts that competitive conditions in the U.S. economy and production of like or directly competitive articles will not be negatively impacted by a remedial order. *Id.* at 20. Third, A&J argues that multiple mode grills are not the type of products that should raise public interest concerns in a section 337 investigation. *Id.*

The IA's submissions did not discuss public interest.

The Remaining Respondents do not argue that the public interest counsels against issuing a remedy in this investigation, but, rather, they argue that any remedy should be narrowly tailored to cover only those grills found to infringe. RespRmdySub at 8-12. The request to tailor the remedial orders to cover specific models of grills has been addressed above. *Supra* at 55-56.

In view of the evidence of record here, the Commission finds that the remedial orders discussed above would not have an adverse impact on the public health and welfare, competitive conditions in the U.S. economy, the production of like or competitive articles in the United States, or U.S. consumers. Accordingly, the Commission has determined that the public interest factors enumerated in section 337(d), (f), and (g) (19 U.S.C. §§ 1337(d), (f), and (g)) do not preclude issuance of its remedial orders.

### 3.    Bonding

During the 60-day period of Presidential review, imported articles otherwise subject to remedial orders are entitled to conditional entry under bond. 19 U.S.C. § 1337(j)(3). The amount of the bond specified by the Commission must be an amount sufficient to protect the complainant from any injury. *Id.*; 19 C.F.R. § 210.50(a)(3). The Commission frequently sets the bond by attempting to eliminate the difference in sales prices between the patented domestic

60

A124

**CONFIDENTIAL MATERIAL REDACTED**

product and the infringing product or basing the bond upon a reasonable royalty rate based on the evidence of record. *Certain Microsphere Adhesives, Process For Making Same, and Products Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 24, USITC Pub. No. 2949 (Jan. 1996). Complainant bears the burden of establishing the need for a bond amount in the first place. *Certain Rubber Antidegradants, Components Thereof and Products Containing Same*, Inv. No. 337-TA-533, Comm'n Op. at 39-40 (July 21, 2006).

A&J argues that the bond rate should be set at [ ] per grill based on its lost profits. *See* RD at 12. The RD rejected A&J's lost profits calculation because its analysis did not account for non-infringing alternatives and it did not address whether A&J would have the manufacturing and marketing capability to exploit excess demand in the absence of excluded products. *Id.* Moreover, the RD noted that the Commission has previously declined to use lost profits as a basis for establishing the appropriate bond rate. *Id.* (citing *Certain Hardware Logic Emulation Systems & Components Thereof*, Inv. No. 337-TA-383, Comm'n Op. at 41 (Apr. 1, 1998)).

The RD also rejected A&J's belated argument that the bond should be set at 100% of the entered value of Respondents' products on the basis that a bond rate cannot be set based on pricing differentials or a reasonable royalty. *Id.* at 13. The RD noted that A&J failed to make this argument in its prehearing brief. Moreover, it found that an appropriate bond rate cannot be set based on a reasonable royalty because A&J withheld from respondents the terms of its licensing agreements that may bear on this issue. *Id.* As such, the RD recommended that no bond be imposed during the period of Presidential review.

All of the parties agree that price differential and royalty rates are not appropriate for determining bond in this investigation. *Id.* at 11. As to A&J's lost profits analysis, regardless of whether the Commission applies such an analysis in determining bond rates, A&J's evidence is

61

A125

**CONFIDENTIAL MATERIAL REDACTED**

flawed because it does not account for non-infringing alternatives. Moreover, the analysis does not address whether A&J would have the manufacturing and marketing capability to exploit excess demand in the absence of excluded grills. *Id.* at 12. In addition, A&J does not assert, nor does the evidence show, that a bond amount can be set based on the price differential between the imported products and A&J's domestic industry products. Further, because A&J has not disclosed the terms of its licenses for the '712 patent to respondents, there is insufficient evidence to establish an appropriate bond amount based on reasonable royalty. Therefore, the Commission has determined to set a bond in the amount of zero percent during the period of Presidential review for all covered products imported by or manufactured by, for, or on behalf of Brinkmann, OLP, Kingsun, Academy, and Huige. *See Certain Liquid Crystal Display Devices*, Inv. No. 337-TA-631, Comm'n Op. at 28 (July 10, 2009).

With respect to the defaulted respondent Keesung, the Commission has determined to impose a bond of 100 percent of the entered value of the imported infringing products. *See Certain Digital Photo Frames and Image Display Devices and Components Thereof*, Inv. No. 337-TA-807, Comm'n Op. at 12-18 (Mar. 12, 2013).

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: February 20, 2015

62

A126

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **COMMISSION OPINION** has been served by hand upon the Commission Investigative Attorney, R. Whitney Winston, Esq., and the following parties as indicated, on **February 20, 2015.**

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**On Behalf of Complainants A&J Manufacturing, LLC and**
**A&J Manufacturing, Inc.:**

V. James Adduci, II
**ADDUCI MASTRIANI & SCHAUMBERG LLP**
1133 Connecticut Avenue, NW
Washington, DC 20036

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

**On Behalf of Respondents Char-Broil, LLC, and Zhejiang**
**Fudeer Electric Appliance Co., Ltd.:**

Jeffrey M. Telep, Esq.
**KING & SPALDING LLP**
1700 Pennsylvania Ave., NW
Washington, DC 20006

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

**On Behalf of Respondent Academy Ltd. d/b/a Academy**
**Sports + Outdoors and Ningbo Huige Outdoor Products, Ltd.:**

James B. Coughlan, Esq.
**PERKINS COIE**
700 Thirteenth Street, NW, Suite 600
Washington, DC 20005

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

Certificate of Service – Page 2

**On Behalf of Respondent The Brinkmann Corporation:**

Gary A. Clark, Esq.                          ☐ Via Hand Delivery
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**  ☒ Via Express Delivery
333 South Hope Street, 43rd Floor            ☐ Via First Class Mail
Los Angeles, CA 90071                        ☐ Other:_____

**On Behalf of Respondent Outdoor Leisure Products, Inc. and
Dongguan Kingsun Enterprises Co., Ltd.:**

Michael R. Dzwonczyk, Esq.                   ☐ Via Hand Delivery
**SUGHRUE MION PLLC**                        ☒ Via Express Delivery
2100 Pennsylvania Ave., NW                   ☐ Via First Class Mail
Washington, DC 20037                         ☐ Other:_____

A128



## THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

June 06, 2013

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,381,712*
ISSUE DATE: *February 26, 2013*

By Authority of the

**Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office**

**T. LAWRENCE**
**Certifying Officer**



US008381712B1

(12) **United States Patent**

Simms, II

(10) Patent No.: **US 8,381,712 B1**

(45) Date of Patent: **Feb. 26, 2013**

(54) **SIMULTANEOUS MULTIPLE COOKING MODE BARBECUE GRILL**

(76) Inventor: **John Lee Simms, II**, Atlanta, GA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 510 days.

(21) Appl. No.: **11/193,320**

(22) Filed: **Jul. 30, 2005**

**Related U.S. Application Data**

(60) Provisional application No. 60/592,428, filed on Jul. 31, 2004, provisional application No. 60/592,429, filed on Jul. 31, 2004.

(51) Int. Cl.
*F24B 3/00* (2006.01)

(52) U.S. Cl. ............... 126/25 R; 126/36; 126/2; 126/3; 99/339

(58) Field of Classification Search ................ 126/2, 3, 126/36, 151, 25 R, 307 R, 220; 99/339, 374, 99/448, 292
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D165,998 | S | 2/1952 | Pollard | |
| 2,666,426 | A | 1/1954 | Pollard | |
| 2,687,716 | A | 8/1954 | Wong | |
| 2,817,331 | A * | 12/1957 | Kaplan et al. | 126/41 R |
| 2,902,026 | A | 9/1959 | Hathorn, Jr. | |
| 2,903,549 | A * | 9/1959 | Joseph | 99/400 |
| D196,553 | S | 10/1963 | Mayer | |
| 3,477,580 | A | 11/1969 | Willinger | |
| 3,541,947 | A * | 11/1970 | Anderson | 99/332 |
| D229,660 | S | 12/1973 | Gammon | |
| 3,802,413 | A * | 4/1974 | Pepin | 126/25 R |
| 3,868,942 | A | 3/1975 | Lewis | |
| D235,088 | S | 5/1975 | Erikson | |
| 4,090,490 | A | 5/1978 | Riley et al. | |
| 4,170,173 | A | 10/1979 | Bradford | |

| | | | | |
|---|---|---|---|---|
| D255,863 | S | 7/1980 | Futch | |
| 4,392,419 | A * | 7/1983 | Bonny | 99/339 |
| 4,665,891 | A * | 5/1987 | Nemec et al. | 126/25 R |
| 4,677,964 | A * | 7/1987 | Lohmeyer et al. | 126/41 R |
| 4,700,618 | A * | 10/1987 | Cox, Jr. | 99/339 |
| 4,773,319 | A * | 9/1988 | Holland | 99/446 |
| 4,809,671 | A * | 3/1989 | Vallejo, Jr. | 126/39 R |
| 4,878,477 | A * | 11/1989 | McLane | 126/41 R |
| 4,886,045 | A * | 12/1989 | Ducate et al. | 126/41 R |
| 4,934,333 | A * | 6/1990 | Ducate et al. | 126/24 |
| 5,070,857 | A | 12/1991 | Sarten | |
| 5,076,252 | A * | 12/1991 | Schlosser et al. | 126/25 R |
| 5,195,423 | A * | 3/1993 | Beller | 99/340 |
| 5,213,027 | A * | 5/1993 | Tsotsos et al. | 99/339 |
| 5,460,159 | A * | 10/1995 | Bussey | 126/25 R |
| 5,481,964 | A * | 1/1996 | Kitten | 99/339 |
| 5,528,984 | A * | 6/1996 | Saurwein | 99/482 |
| 5,566,606 | A * | 10/1996 | Johnston | 99/446 |
| 5,706,797 | A * | 1/1998 | Moore et al. | 126/41 R |
| 5,752,497 | A | 5/1998 | Combs et al. | |
| 5,768,977 | A * | 6/1998 | Parris et al. | 99/340 |
| 5,893,357 | A * | 4/1999 | Royer et al. | 126/9 R |
| 6,039,039 | A * | 3/2000 | Pina, Jr. | 126/25 R |
| 6,103,289 | A * | 8/2000 | Tippmann et al. | 426/510 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 11/194,120, filed Jul. 30, 2005, Simms, II.

(Continued)

*Primary Examiner* — Alfred Basichas

(74) *Attorney, Agent, or Firm* — Lee & Hayes, PLLC

(57) **ABSTRACT**

A simultaneous multiple cooking mode barbecue grill that includes a first cooking mode unit configured to prepare food in a first cooking mode, a second cooking mode unit configured to prepare food in a second cooking mode, and a supporting structure that supports the first cooking mode unit and the second cooking mode unit so that the first and second cooking mode units can be moved securely and operated simultaneously to prepare food using multiple cooking modes.

**20 Claims, 3 Drawing Sheets**



Copy provided by USPTO from the PIRS Image Database on 06/04/2013

# US 8,381,712 B1

Page 2

| U.S. PATENT DOCUMENTS | | | | |
|---|---|---|---|---|
| 6,145,431 | A | * | 11/2000 | Tippmann et al. ............... 99/330 |
| 6,189,528 | B1 | * | 2/2001 | Oliver ....................... 126/25 R |
| 6,209,533 | B1 | * | 4/2001 | Ganard ...................... 126/25 R |
| 6,257,130 | B1 | * | 7/2001 | Schlosser ...................... 99/482 |
| D447,913 | S | | 9/2001 | Cragg |
| 6,439,221 | B1 | * | 8/2002 | Ward et al. ................. 126/25 R |
| 6,508,165 | B2 | * | 1/2003 | Johnson ........................ 99/339 |
| 6,523,461 | B1 | * | 2/2003 | Johnston et al. ............... 99/340 |
| 6,557,545 | B2 | * | 5/2003 | Williams .................... 126/25 R |
| 6,564,793 | B2 | * | 5/2003 | DeClue .................... 126/25 AA |
| 6,606,986 | B2 | * | 8/2003 | Holland et al. ............. 126/25 R |
| 6,626,089 | B1 | * | 9/2003 | Hubert ......................... 99/339 |
| D483,602 | S | | 12/2003 | Murray |
| 6,681,759 | B2 | | 1/2004 | Bentulan |
| D491,410 | S | | 6/2004 | Saunders |
| 6,820,538 | B2 | * | 11/2004 | Roescher ...................... 99/340 |
| 7,159,509 | B2 | * | 1/2007 | Starkey ........................ 99/339 |
| D607,263 | S | | 1/2010 | Antwine |
| D636,217 | S | | 4/2011 | Slater et al. |
| 2002/0106428 | A1 | * | 8/2002 | Szyjkowski ................. 426/113 |
| 2003/0019492 | A1 | | 1/2003 | Williams |
| 2010/0083947 | A1 | | 4/2010 | Guillory et al. |
| 2010/0258106 | A1 | | 10/2010 | Simms, II |

OTHER PUBLICATIONS

U.S. Appl. No. 29/392,019, filed May 16, 2011, Simms, II.
U.S. Appl. No. 29/392,027, filed May 16, 2011, Simms, II.

* cited by examiner

A372



FIG. 1

Copy provided by USPTO from the PIRS Image Database on 06/04/2013

JX-0001.0004

A373



FIG. 2

Copy provided by USPTO from the PIRS Image Database on 06/04/2013



FIG. 3

Copy provided by USPTO from the PIRS Image Database on 06/04/2013

US 8,381,712 B1

**1**

# SIMULTANEOUS MULTIPLE COOKING MODE BARBECUE GRILL

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of priority to U.S. provisional patent application Ser. No. 60/592,428, entitled "Simultaneous Multiple Cooking Mode Barbecue Grill," and filed on Jul. 31, 2004, and to U.S. provisional patent application Ser. No. 60/592,429, entitled "Heating of Radiant Materials for Preparation of Barbecue," and filed on Jul. 31, 2004, both of which are incorporated by reference herein.

This application is related to U.S. nonprovisional patent application Ser. No. 11/194,120, entitled "Heating of Radiant Materials for Preparation of Barbecue," and filed concurrently with this application on Jul. 30, 2005, which is incorporated by reference herein.

## TECHNICAL FIELD

The present invention generally relates to cooking equipment, and more particularly, to a simultaneous multiple cooking mode barbecue grill.

## BACKGROUND OF INVENTION

Barbecue enthusiasts have the need to prepare barbecue using various modes (methods, manners, etc.) of cooking. For example, sometimes barbecuing with a charcoal based fuel (e.g., charcoal briquettes) is needed. Other times, barbecuing with a wood based fuel is needed (e.g., for a smoker process). Yet other times, barbecuing with a gas based fuel (e.g., propane) is needed. Furthermore, other types of fuel may be needed to satisfy the barbecuing objective.

Existing options typically consist of a barbecue grill that can only prepare barbecue in a single mode. For example, some options provide for charcoal grilling, others for wood or smoker grilling, and yet others for gas grilling. For the "multi-mode" barbecuer, these options require the use of more than one separate grill. A few options consist of a grill that can be converted between two modes, for example, charcoal and gas. However, these options are still limited in that they can only be operated in one mode at a time and typically require complicated reconfigurations to switch between cooking modes. Moreover, these existing options lack sufficient capability for controlling the various cooking modes in order to obtain performance that is even comparable to existing single mode grills.

Therefore, there is a need in the art for a barbecue grill that is capable of cooking in multiple modes simultaneously while offering the control and performance capabilities for each mode that is at least comparable to a corresponding single mode grill.

## SUMMARY OF INVENTION

The invention, in accordance with exemplary embodiments described herein, provides a simultaneous multiple cooking mode barbecue grill. In a general embodiment, the simultaneous multiple cooking mode barbecue grill can include a first cooking mode unit configured to prepare food in a first cooking mode, a second cooking mode unit configured to prepare food in a second cooking mode, and a supporting structure that supports the first cooking mode unit and the second cooking mode unit so that the first and second cooking mode units can be moved securely and operated

**2**

simultaneously to prepare food using multiple cooking modes. Exemplary embodiments of the simultaneous multiple cooking mode barbecue grill disclosed herein can provide, among other benefits, the ability to effectively and conveniently prepare barbecue by various cooking modes at the same time.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. **1** shows an exemplary multiple mode barbecue grill in accordance with exemplary embodiments of the invention.

FIG. **2** shows an alternate exemplary multiple mode barbecue grill in accordance with exemplary embodiments of the invention.

FIG. **3** shows another alternate exemplary multiple mode barbecue grill in accordance with exemplary embodiments of the invention.

## DETAILED DESCRIPTION OF EXEMPLARY EMBODIMENTS OF INVENTION

Exemplary embodiments of the invention will be described hereinafter with reference to the drawings, in which like reference numerals may represent like elements throughout the several figures. In that regard, FIG. **1** shows an exemplary multiple mode ("multi-mode") barbecue grill **100** in accordance with exemplary embodiments of the invention. The grill **100** includes a first cooking mode unit **110** and a second cooking mode unit **120**. The first cooking mode unit **110** may, for example, operate using a gas based fuel such as propane. This gas based fuel may be supplied from a fuel container **114** that is connected to the first unit **110**. The first cooking mode unit **110** may include an openable cover **111** with exhausts **112**. The second cooking mode unit **120** may, for example, operate using a charcoal based fuel such as charcoal briquettes, chunks, fragments, etc. The second cooking mode unit **120** may include an openable cover **121** with exhaust **122**. The first unit **110** and second unit **120** are typically supported by a common supporting structure (assembly, platform, base, frame, etc.) **130**.

Additional components of the grill **100**, such as the fuel container **114**, can also be supported by the supporting structure **130** so that the components of the grill **100** can be moved (positioned, placed, etc.) securely (e.g., without shifting, slippage, disturbance, etc.) and operated together simultaneously. In this regard, the first unit **110** and second unit **120** (as well as other components of the grill **100**) may be attached, connected, or otherwise secured to the supporting structure **130** by means, methods, apparatuses, etc. that may be known in the art and/or apparent to one of ordinary skill in the art based on the disclosure herein. Moreover, the multi-mode grill **100** may include additional cooking mode units in accordance with some exemplary embodiments of the invention. For example, the multi-mode grill **100** may also include a third cooking mode unit **140**, which can provide another mode for cooking with the grill **100**. For instance, the third cooking mode unit **140** may be an auxiliary or side burner unit that can provide a radiant heat cooking mode by, for example, radiating heat, flames, etc. at one or more of its surfaces (e.g., via a burner component, structure, assembly, etc.) by the burning (combustion, etc.) of a gas based fuel such as propane. In that regard, the third cooking mode unit **140** may also be connected to the fuel container **114** for a fuel supply. However, the third cooking mode unit **140** may operate using other types of fuel (energy, materials, etc.) as well.

FIG. **2** shows an alternate exemplary multiple mode barbecue grill **200** in accordance with exemplary embodiments

Copy provided by USPTO from the PIRS Image Database on 06/04/2013

JX-0001.0007

US 8,381,712 B1

3

of the invention. In that regard, the grill 200 includes some of the same (or similar) features as the grill 100 discussed above. For example, the grill 200 includes a first cooking mode unit 210 and a second cooking mode unit 220. The first cooking mode unit 210 may include an openable cover 211 with exhausts 212, and the second cooking mode unit 220 may include an openable cover 221 with exhaust 222. Furthermore, the grill 200 includes a common supporting structure (assembly, platform, base, frame, etc.) 230 that can support the cooking mode units 210, 220 as well as additional components, such as a fuel container 214, all which may be attached, connected, or otherwise secured to the structure 230 by means, methods, apparatuses, etc. that may be known in the art and/or apparent to one of ordinary skill in the art based on the disclosure herein. Moreover, the grill 200 may include additional cooking mode units such as a third cooking mode (e.g., a side burner) unit 240. Additionally, in accordance with some exemplary embodiments of the invention, the grill 200 may include a supporting surface (shelf, platform, etc.) 250 (e.g., as depicted in FIG. 2), which can be used for various purposes such as to support food, cooking utensils, etc. that may be used along with the grill 200.

FIG. 3 shows another alternate exemplary multiple mode barbecue grill 300 in accordance with exemplary embodiments of the invention. Similar to the foregoing grill 200, the grill 300 also includes some of the same (or similar) features as the grill 100, which was discussed above. For example, the grill 300 includes a first cooking mode unit 310 and a second cooking mode unit 320 supported on a common supporting structure (assembly, platform, base, frame, etc.) 330, which can also support additional components such as a fuel container 314, and these components may be attached, connected, or otherwise secured to the structure 330 by means, methods, apparatuses, etc. that may be known in the art and/or apparent to one of ordinary skill in the art based on the disclosure herein. The first cooking mode unit 310 may include an openable cover 311 with exhausts 312, and the second cooking mode unit 320 may include an openable cover 321 with exhaust 322. Furthermore, the grill 300 may include a third cooking mode (e.g., a side burner) unit 340. Additionally, in accordance with some exemplary embodiments of the invention, the grill 300 can include a fourth cooking mode unit 324. This unit 324 may operate separately to prepare food in another cooking mode or may operate in conjunction with the second cooking unit 320. For example, the second cooking unit 320 may operate in a smoker cooking mode (e.g., wood burning), wherein the fourth unit 324 may operate as a firebox (offset firebox, side firebox, smoker box, etc.) in which fuel materials can be burned or combusted to provide heat and/or smoke to the second cooking unit 320 through an interconnection of the two units 320, 324 to prepare smoked barbecue. Furthermore, the fourth cooking mode unit may operate in other cooking modes, such as a separate barbecue or smoker grill unit for example.

The exemplary multiple mode barbecue grills 100, 200, 300 described herein can be used to barbecue or otherwise prepare food (e.g., heat, cook, grill, char, smoke, etc.) by multiple (e.g., at least two) cooking modes (e.g., gas, charcoal, wood burning, electrical, etc.) simultaneously (concurrently, together, at the same time, etc.) on a single overall supporting structure (assembly, platform, base, frame, etc.) 130, 230, 330. Furthermore, each cooking mode provided by the multi-mode grills 100, 200, 300 may be fully and independently controlled (e.g., by means, methods, apparatuses, etc. that may be known in the art and/or apparent to one of ordinary skill in the art based on the disclosure herein) to obtain optimal performance for each cooking mode that is at

4

least comparable to the operation of corresponding single cooking mode grills. Moreover, operation in the various cooking modes provided by the grills 100, 200, 300 can be conducted without the need for complicated reconfigurations of the cooking units 110, 120, 140, 210, 220, 240, 310, 320, 324, 340. Thus, the multiple mode barbecue grills 100, 200, 300 offer a barbecue cook, enthusiast, etc. the ability to, among other things, effectively and conveniently prepare barbecue by various cooking modes at the same time. These and other such uses of exemplary embodiments of the invention will be apparent to one of ordinary skill in the art in light of the disclosure herein.

The exemplary multiple mode barbecue grills 100, 200, 300 described herein and/or various components thereof (e.g., the cooking units 110, 120, 140, 210, 220, 240, 310, 320, 324, 340 or supporting structure 130, 230, 330) can have various shapes, sizes, and configurations (e.g., other than those discussed above) within the scope of exemplary embodiments of the invention. Furthermore, the functions of such components are not limited to those described above with respect to the exemplary embodiments. Various combinations of number, types, configurations, etc. of cooking mode units can be included in the grills 100, 200, 300 in accordance with exemplary embodiments of the invention. Moreover, one or more of the various cooking units 110, 120, 140, 210, 220, 240, 310, 320, 324, 340 may include one or more features similar to those of a corresponding cooking unit of a single mode grill. Such features and variations of exemplary embodiments of the invention will be apparent to one of ordinary skill in the art in light of the disclosure herein.

The exemplary multiple mode barbecue grills 100, 200, 300 described herein and/or various components thereof (e.g., the cooking units 110, 120, 140, 210, 220, 240, 310, 320, 324, 340 or supporting structure 130, 230, 330) can be constructed of various materials that may be known in the art and/or apparent to one of ordinary skill in the art based on the disclosure herein, such as but not limited to metallic materials, non-metallic materials, composite materials, etc. Furthermore, the grills 100, 200, 300 and/or various components thereof can be manufactured according to various methods, processes, etc. that may be known in the art or apparent to one of ordinary skill in the art based on the disclosure herein, such as but not limited to manual manufacturing methods, automated manufacturing methods, assembly line processes, metallurgical processes, chemical processes, etc.

It should be understood that the foregoing descriptions merely relate to exemplary, illustrative embodiments of the invention. Therefore, it should also be understood that other various modifications may be made to exemplary embodiments described herein within the scope of the invention, which will be recognized by one of ordinary skill in the art in light of the disclosure herein.

What is claimed is:

1. A barbecue grill having multiple cooking units, comprising:

a support structure configured to support a plurality of cooking units;

a first cooking unit configured to cook food using gas cooking fuel, the first cooking unit attached to the support structure and including at least one first grill, the first cooking unit further including an openable first cover attached to the first cooking unit that selectively covers the first grill, wherein the first cover includes at least one exhaust; and

a second cooking unit configured to cook food using solid cooking fuel, the second cooking unit attached to the support structure and including at least one second grill,

Copy provided by USPTO from the PIRS Image Database on 06/04/2013

JX-0001.0008

US 8,381,712 B1

5

the second cooking unit further including an openable second cover attached to the second cooking unit that selectively covers the second grill, wherein the second cover includes at least one exhaust,

wherein the first cooking unit and the second cooking unit are simultaneously operable to cook food and the first grill and second grill are selectively and independently coverable.

2. The barbeque grill of claim 1, further comprising:

a side burner supported by the supporting structure and comprising a component configured to prepare food by radiating heat or emitting flames;

wherein the side burner, the first cooking unit, and the second cooking unit are simultaneously operable to cook food.

3. The barbeque grill of claim 2, further comprising:

a firebox supported by the supporting structure and configured to provide heat or smoke to the second cooking unit when a fuel material is burned or combusted in the firebox;

wherein the firebox simultaneously operable with the side burner, the first cooking unit, and the second cooking unit.

4. The barbeque grill of claim 1, wherein the first cooking unit and the second cooking unit are operable independently of each other.

5. The barbeque grill of claim 1, further comprising:

at least one substantially vertical panel positioned between the first cooking unit and the second cooking unit.

6. The barbeque grill of claim 1, wherein the support structure comprises at least two wheels.

7. The barbeque grill of claim 1, wherein the support structure is configured to hold at least one fuel container.

8. The barbeque grill of claim 1, wherein the first and second cooking units are each configured to hold food over a flame.

9. The barbecue grill of claim 1, wherein the configuration of the at least one exhaust of the first cover includes a configuration of at least two exhausts.

10. A barbecue grill having multiple means for cooking, comprising:

a first means for cooking food using gas cooking fuel, the first means for cooking including at least one first grill and an openable first cover means for selectively covering the first grill, wherein the first cover means is attached to the first means for cooking and includes at least one exhaust;

a second means for cooking food using solid cooking fuel, the second means for cooking including at least one second grill and an openable second cover means for selectively covering the second grill, wherein the second cover means is attached to the second means for cooking and includes at least one exhaust means; and

a structure means for supporting the first means for cooking and the second means for cooking;

wherein the first means for cooking and the second means for cooking are simultaneously operable to cook food and the first grill and second grill are selectively and independently coverable.

11. The barbeque grill of claim 10, further comprising:

a burner means for preparing food by radiating heat or emitting flames, the burner means supported by the structure means;

6

wherein the burner means, the first means for cooking, and the second means for cooking are simultaneously operable to cook food.

12. The barbeque grill of claim 11, further comprising:

a firebox means for providing heat or smoke to the second means for cooking, the firebox means supported by the structure means;

wherein the firebox means is simultaneously operable with the burner means, the first means for cooking, and the second means for cooking.

13. The barbeque grill of claim 10, wherein the first means for cooking and the second means for cooking are operable independently of each other.

14. The barbeque grill of claim 10, further comprising:

at least one substantially vertical panel positioned between the first means for cooking and the second means for cooking.

15. The barbeque grill of claim 10, wherein the structure means comprises a means for holding at least one fuel container.

16. The barbecue grill of claim 10, wherein the configuration of the at least one exhaust means of the first cover means includes a configuration of at least two exhaust means.

17. A barbecue grill having multiple cooking units, comprising:

a support structure configured to support a plurality of cooking units;

a first cooking unit supported by the support structure, the first cooking unit having a substantially cylindrical shape, the first cooking unit configured to cook food using gas cooking fuel, the first cooking unit including at least one first grill and an openable first cover attached to the first cooking unit that selectively covers the first grill, wherein the first cover includes at least one exhaust; and

a second cooking unit supported by the support structure, the second cooking unit having a substantially cylindrical shape, the second cooking unit configured to cook food using solid cooking fuel, the second cooking unit including at least one second grill and an openable second cover attached to the second cooking unit that selectively covers the second grill, wherein the second cover includes at least one exhaust,

wherein the first cooking unit and the second cooking unit are simultaneously operable to cook food and the first grill and second grill are selectively and independently coverable.

18. The barbeque grill of claim 17, wherein the first and second cooking units are supported by the support structure such that the substantially cylindrical shape of the first cooking unit and the substantially cylindrical shape of the second cooking unit are aligned substantially coaxially.

19. The barbeque grill of claim 18, wherein the first cover forms a portion of the substantially cylindrical shape of the first cooking unit, and wherein the second cover forms a portion of the substantially cylindrical shape of the second cooking unit.

20. The barbecue grill of claim 17, wherein the configuration of the at least one exhaust of the first cover includes a configuration of at least two exhausts.

*  *  *  *  *

Copy provided by USPTO from the PIRS Image Database on 06/04/2013

JX-0001.0009

A378

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 8, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served the Corrected Non-Confidential Brief of Appellants by the appellate CM/ECF system. I further certify that on this date the Corrected Confidential Brief of Appellants will be served by First-Class Mail, postage prepaid, or dispatched to a third party commercial carrier for delivery to the following:

> Cathy Chen, Esq.
> Wayne W. Herrington, Esq.
> INTERNATIONAL TRADE COMMISSION
> Office of the General Counsel
> 500 E Street, SW, Suite 614
> Washington, D.C. 20436
> cathy.chen@usitc.gov
> wayne.herrington@usitc.gov
>
> *Counsel for Appellee,*
> *United States International Trade Commission*

Upon acceptance by the Court of the e-filed documents, six paper copies of the Corrected Confidential Brief of Appellants will be shipped via overnight delivery to the Clerk, United States Court of Appeals for the Federal Circuit, 717 Madison Place, N.W., Washington, D.C. 20439.

> Respectfully submitted,
>
> /s/ Lance D. Reich
> Lance D. Reich
> HAN SANTOS REICH PLLC
> Attorney for Appellants

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,354 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(b)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Font.


Dated:  January 7, 2016                Respectfully submitted,

                                       /s/ Lance D. Reich
                                       Lance D. Reich
                                       HAN SANTOS REICH PLLC
                                       Attorney for Appellants